*This opinion is subject to revision before publication in the Pacific Reporter*

**2015 UT 36**

IN THE

SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

ROBERT CAMERON HOUSTON,
*Appellant.*

No. 20080625
Filed February 24, 2015

Second District, Farmington
The Honorable Glen R. Dawson
No. 0601700273

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard,
Asst. Att'y Gen., Salt Lake City, for appellee

John P. Pace, Salt Lake City, for appellant

JUSTICE NEHRING authored the opinion of the Court, in which JUSTICE PARRISH joined, CHIEF JUSTICE DURRANT joined except as to section II.F.2, and JUSTICE DURHAM joined in Part I.

ASSOCIATE CHIEF JUSTICE LEE authored a concurring opinion.

JUSTICE DURHAM authored a dissenting opinion, in which CHIEF JUSTICE DURRANT concurred in Part I.

JUSTICE NEHRING, opinion of the Court:[1]

**INTRODUCTION**

¶ 1    Robert Cameron Houston was seventeen and a half years old when he murdered R.E., a staff member of the

---

[1] Justice Nehring took part in this decision and authored this opinion prior to his retirement.

residential treatment center for youth where Mr. Houston was temporarily residing. The State charged Mr. Houston with aggravated murder, aggravated sexual assault, and rape. Mr. Houston pleaded guilty to aggravated murder, and the State agreed to drop the other charges.

¶ 2 The parties agreed to a sentencing hearing where a jury would determine whether Mr. Houston would be sentenced to life in prison without the possibility of parole or an indeterminate term of twenty years to life. Following the sentencing hearing, eleven of the twelve jurors voted to sentence Mr. Houston to life imprisonment without the possibility of parole.

¶ 3 On appeal Mr. Houston brings numerous constitutional challenges to his sentence. He also contends that his counsel rendered ineffective assistance of counsel during the sentencing proceeding in violation of the Sixth Amendment to the United States Constitution. After a careful review of the record, we conclude that Mr. Houston's sentence is constitutional, and his counsel was not ineffective. We therefore affirm the jury's sentence.

## BACKGROUND

¶ 4 Mr. Houston had a very difficult childhood, and he became an early juvenile offender and a troubled young adult.

¶ 5 Mr. Houston was born with a deformed ear, which left him almost completely deaf on one side and made it difficult for him to learn to talk. As a child, he struggled with this physical deformity and was also ridiculed by his peers for being overweight. Mr. Houston's parents fought often and eventually divorced, and his father was physically and verbally abusive. When his father left the home, Mr. Houston struggled emotionally over the separation. At age eight, Mr. Houston attempted suicide and was diagnosed with major depressive disorder. When he was twelve, he was sexually abused by his brother's friend for several months.

¶ 6 Mr. Houston committed several violent sexual offenses as a young teenager, which led to his placement in a residential treatment program for juvenile sex offenders. In 2003, at age fourteen, Mr. Houston attempted to rape his teenage stepsister at knifepoint. He was charged with aggravated sexual assault. Mr. Houston entered a guilty plea, though the record does not

specify to what charge he pleaded. In February 2004, at age fifteen, Mr. Houston attempted to rape his aunt, also at knifepoint. Mr. Houston was charged with aggravated sexual assault and pleaded guilty, although the record again does not specify to what charge Mr. Houston pleaded. As a result of these violent sexual assaults, Mr. Houston was placed with Youth Health Associates (YHA), a residential treatment facility for juvenile sex offenders located in Clearfield, Utah.

¶ 7    The State also presented evidence that two months after Mr. Houston's arrival at YHA he allegedly attempted to sexually assault a female staff member. The staff worker fought back and was able to gain control. After the incident, Mr. Houston allegedly explained to other staff workers that he wanted to hurt and sexually assault her. Mr. Houston did not have a weapon during that incident.

¶ 8    On February 15, 2006, when Mr. Houston was seventeen years old, he committed the murder that led to this appeal. At that time, Mr. Houston resided at an independent living home associated with YHA. It was snowing that night, and Mr. Houston did not want to walk the four blocks home from YHA to the independent living home. He asked R.E., a female staff worker, for a ride. Although it was against YHA's policy to give a ride in a personal vehicle to a resident, R.E. was sympathetic and did not want Mr. Houston to have to walk home in the bad weather.

¶ 9    When they arrived at the independent living home, R.E. followed Mr. Houston inside to sign the log book. As she turned to leave, Mr. Houston grabbed her from behind, covered her mouth with his hand, and held a knife to her throat. Mr. Houston then forced R.E. into his bedroom and ordered her to remove her clothing. R.E. told Mr. Houston that she was a virgin and that she did not want to have sexual intercourse. Mr. Houston responded angrily, and raped her. R.E. screamed and begged him to stop. Mr. Houston responded by pressing a knife to her throat. When R.E. continued to scream, Mr. Houston stabbed her in the side of the neck and sliced her throat. He then stabbed her repeatedly in the chest, side, and back. When R.E. continued to struggle, Mr. Houston attempted to kill her by snapping her neck. R.E. continued to scream, and Mr. Houston became scared and fled.

¶ 10  Mr. Houston climbed into R.E.'s car and sped off.  He drove into a house, which he later explained was an attempt to kill himself.  Mr. Houston was arrested and taken to the hospital. He was interviewed by Detective Mike Valencia shortly after arrival.  Mr. Houston confessed to attempting to kill R.E. and described in detail to the detective how he had tried to rip out R.E.'s trachea to stop her from screaming.  The detective noted that Mr. Houston was unemotional as he described the details of the crime.

¶ 11  Mr. Houston was charged with aggravated murder, aggravated sexual assault, and rape.  In exchange for the State's promise to drop the other charges, Mr. Houston pleaded guilty to aggravated murder.  The parties agreed that the sentencing hearing would be held before a jury.  Following a five-day hearing, eleven of the twelve jurors voted to sentence Mr. Houston to life imprisonment without the possibility of parole (LWOP).  After he was sentenced, Mr. Houston obtained new appointed counsel and subsequently filed a timely appeal to challenge his sentence.  We stayed the case in anticipation of the ruling in a United States Supreme Court case, *Miller v. Alabama*,[2] and the parties provided supplemental briefing concerning the effect of *Miller* on Mr. Houston's case.

¶ 12  We have jurisdiction under Utah Code section 78A-3-102(3)(i).

## STANDARD OF REVIEW

¶ 13  We begin our discussion of the standard of review by noting that Mr. Houston did not preserve any of the issues presented on appeal.  "As a general rule, claims not raised before the trial court may not be raised on appeal"[3] unless a plain error occurred,[4] exceptional circumstances warrant our review,[5] or the defendant's attorney rendered ineffective assistance of counsel.[6]

---

[2] 132 S. Ct. 2455 (2012).

[3] *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346.

[4] *Id.* ¶¶ 11, 13 (noting that to establish plain error, the defendant has the burden to show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable

(con't.)

¶ 14 The parties disagree about the standard of review that should apply to Mr. Houston's claims. Mr. Houston admits that none of his claims are preserved, and thus argues under both plain error and ineffective assistance of counsel doctrines. However, Mr. Houston also argues for two alternative, heightened standards of review. First, Mr. Houston contends that he was charged with a "capital" offense, and therefore this court should apply a "manifest prejudice" standard of review to each of his claims. Second, Mr. Houston argues that his sentence is unconstitutional and therefore he can challenge it on appeal as an "illegal" sentence under Utah Rule of Criminal Procedure 22(e), and is thereby excused from the obligation to preserve issues for appeal. In support of his rule 22(e) argument, Mr. Houston cites *State v. Candedo*, in which this court interpreted rule 22(e) to permit review of certain unpreserved constitutional challenges.[7]

¶ 15 The State disagrees with Mr. Houston. First, the State contends that "capital" review does not apply here because this is not a "capital" case.[8] According to the State, a "capital" case is one where the death penalty is sought or imposed; because of his status as a juvenile, Mr. Houston was not, and could not have been, sentenced to death, and as such, "capital" appellate review is not available. Second, the State argues that even if this court can reach Mr. Houston's unpreserved claims under rule 22(e), *State v. Candedo* was wrongly decided and should be overruled. In support of its effort to undo *Candedo*, the State argues that the opinion lacks sufficient analysis and citation to authority, creates an unjustifiable disparity between this court's treatment of unpreserved constitutional challenges to convictions and

---

likelihood of a more favorable outcome" (alteration in original) (internal quotation marks omitted)).

[5] *Id.* ¶ 11.

[6] *State v. Low*, 2008 UT 58, ¶ 19, 192 P.3d 867.

[7] 2010 UT 32, ¶ 13, 232 P.3d 1008 ("[I]f an offender's sentence is unconstitutional, the sentence is not authorized by the 'judgment of conviction,' and is therefore illegal.").

[8] The State also argues that, in any event, the "manifest and prejudicial error standard is equivalent to plain error review."

unpreserved constitutional challenges to sentences, and is inconsistent with the rule announced in *State v. Yazzie*.[9]

¶ 16   As we describe in greater detail below, we hold that each of Mr. Houston's constitutional challenges falls within the narrow scope of rule 22(e)'s exception to the preservation of claims. We therefore decline the State's request to overrule our precedent in *State v. Candedo*. Under rule 22(e), we treat Mr. Houston's claims as if they had been preserved, reviewing conclusions of law for correctness and granting no deference to the district court.[10] Because rule 22(e) provides a higher standard than "manifest prejudice" review, we decline to address Mr. Houston's alternative argument.

¶ 17   A claim of ineffective assistance of counsel is also an exception to our preservation doctrine.[11]   For "ineffective assistance of counsel claims, we review a lower court's purely factual findings for clear error, but [we] review the application of the law to the facts for correctness."[12]

## ANALYSIS

### I. MR. HOUSTON PROPERLY BROUGHT FACIAL CONSTITUTIONAL CHALLENGES TO HIS SENTENCE UNDER UTAH RULE OF CRIMINAL PROCEDURE 22(e)

¶ 18   Utah Rule of Criminal Procedure 22(e) provides that "[t]he court may correct an illegal sentence, or a sentence imposed in an illegal manner, at any time."   We hold that the rule encompasses facial constitutional challenges to the sentence that do not implicate a fact-intensive analysis. We also conclude that each of Mr. Houston's constitutional challenges to his sentence meets these criteria, and therefore his claims are properly brought under rule 22(e).

¶ 19   Under our traditional preservation doctrine, "generally an appellant must properly preserve an issue in the district court

---

[9] 2009 UT 14, ¶ 13, 203 P.3d 984.

[10] *See State v. Prion*, 2012 UT 15, ¶ 13, 274 P.3d 919.

[11] *Low*, 2008 UT 58, ¶ 19.

[12] *Archuleta v. Galetka*, 2011 UT 73, ¶ 25, 267 P.3d 232 (alteration in original) (internal quotation marks omitted).

before it will be reviewed on appeal."[13] The issue must have been "presented to the district court in such a way that the court has an opportunity to rule on [it]."[14] These preservation rules exist both to serve judicial economy and to prevent a defendant from failing to object to an issue in the hopes of reversal of a conviction on appeal.[15] However, "[o]ur preservation requirement is self-imposed and . . . . [c]onsequently, we exercise wide discretion when deciding whether to entertain or reject matters that are first raised on appeal."[16] We have therefore recognized limited exceptions to the rule, including when the issue arises under exceptional circumstances or where a plain error has occurred.[17]

¶ 20 Rule 22(e) operates as another limited exception to the preservation doctrine.[18] In *State v. Candedo*, we explained that the rule "allows an appellate court to vacate [an] illegal sentence" even if the legality of the sentence was never raised in the proceedings below.[19] We stated that our preservation rules do not apply in the context of a rule 22(e) challenge "because an illegal sentence is void and, like issues of jurisdiction [may be raised] at any time."[20]

---

[13] *O'Dea v. Olea*, 2009 UT 46, ¶ 15, 217 P.3d 704; *accord Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828.

[14] *Patterson*, 2011 UT 68, ¶ 12 (alteration in original) (internal quotation marks omitted).

[15] *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346; *see also State v. Prion*, 2012 UT 15, ¶ 19, 274 P.3d 919.

[16] *Patterson*, 2011 UT 68, ¶ 13.

[17] *Holgate*, 2000 UT 74, ¶¶ 11–13.

[18] *Prion*, 2012 UT 15, ¶ 20; *State v. Brooks*, 908 P.2d 856, 860 (Utah 1995) ("[R]ule 22(e) permits the court of appeals to consider the legality of a sentence even if the issue is raised for the first time on appeal.").

[19] 2010 UT 32, ¶ 9, 232 P.3d 1008 (internal quotation marks omitted).

[20] *Id.* (alteration in original) (internal quotation marks omitted).

¶ 21   While it is clear that the preservation rule does not apply to a defendant's challenge to an illegal sentence, we have had few occasions to discuss what constitutes an "illegal sentence."   In *State v. Yazzie*, we adopted a definition of "illegal sentence" from the United States Court of Appeals for the Tenth Circuit:

> [An illegal sentence is] one which is ambiguous with respect to the time and manner in which it is to be served, is internally contradictory, omits a term required to be imposed by statute, is uncertain as to the substance of the sentence, or is a sentence which the judgment of conviction did not authorize.[21]

¶ 22 In *Candedo*, we elaborated on this definition.   We concluded that "if an offender's sentence is unconstitutional, the sentence is not authorized by the 'judgment of conviction,' and is therefore illegal."[22]   In that case, the district court placed Francisco Candedo on nine years' probation after he pleaded guilty to three felonies arising from his involvement in a fraudulent investment scheme.[23]   Rather than object to the length of his probation at sentencing, Mr. Candedo challenged on direct appeal the legality of the duration of his probation sentence under rule 22(e), arguing that his sentence violated his

---

[21] 2009 UT 14, ¶ 13, 203 P.3d 984 (alteration in original) (quoting *United States v. Dougherty*, 106 F.3d 1514, 1515 (10th Cir. 1997)).

[22] 2010 UT 32, ¶ 13.   We disagree with the State that this definition is inconsistent with *Yazzie,* or that it is otherwise unsupported by legal authority.   We squarely rejected these arguments in *Candedo.   See id.* ¶¶ 12–14. We also note that our holding in *Candedo*—that an illegal sentence encompasses an unconstitutional sentence—is consistent with the Tenth Circuit's definition and application of this term. *See United States v. Groves*, 369 F.3d 1178, 1182 (10th Cir. 2004) ("Because the defendant reserved the right to appeal an 'illegal sentence,' and because an unconstitutional sentence is 'illegal,' we hold that the defendant is entitled to challenge his sentence . . . ."); *United States v. Lyman,* 261 F. App'x 98, 100 (10th Cir. 2008) (noting that an unconstitutional sentence is an example of an illegal sentence).

[23] 2010 UT 32, ¶ 1.

substantive due process rights under the United States Constitution.[24] The court of appeals affirmed Mr. Candedo's sentence without reaching the merits of his constitutional claim.[25] On certiorari review, we determined that the court of appeals erred when it failed to reach Mr. Candedo's constitutional challenge.[26] We concluded that "[b]ecause an illegal sentence under rule 22(e) includes constitutional violations," a defendant may raise arguments concerning the constitutionality of the sentence, even if unpreserved.[27]

¶ 23 We again considered the scope of rule 22(e) in *State v. Prion*, a case in which the defendant raised statutory and double jeopardy challenges to his sentence.[28] We recognized that the *Candedo* "formulation, if broadly construed, raises the prospect of abuse."[29] We cautioned that such abuse could arise "if rule 22(e) were construed broadly to sanction a fact-intensive challenge to the legality of a sentencing proceeding asserted long after the time for raising it in the initial trial or direct appeal."[30] In considering the scope of the rule, we also explained that our rule 22(e) derived from a former Federal Rule of Criminal Procedure that authorized a court to correct illegal sentences.[31] We recognized that federal courts traditionally limited challenges under the federal rule to attack sentences that exceeded the statutory maximum, violated double jeopardy, or were facially ambiguous or internally inconsistent.[32] Some circuits appear to have recognized a broader

---

[24] *Id.*

[25] *Id.*

[26] *Id.* ¶ 2.

[27] *Id.* ¶ 11. We nonetheless affirmed Mr. Candedo's sentence because we determined that it did not violate due process. *Id.* ¶ 25.

[28] 2012 UT 15, ¶ 10.

[29] *Id.* ¶ 20 (internal quotation marks omitted).

[30] *Id.*

[31] *Id.* ¶ 22; *see* FED. R. CRIM. P. 35(a) (1984). The federal rule was repealed in 1987. *See Prion*, 2012 UT 15, ¶ 22 n.8.

[32] *Prion*, 2012 UT 15, ¶ 22 (citing *United States v. Pavlico*, 961

(con't.)

application of the federal rule, such as when the sentence is generally "in violation of the Constitution,"[33] is based on "misinformation of a constitutional magnitude,"[34] or even when the sentence violates another federal rule.[35]

¶ 24 In *Prion*, we held that the defendant's statutory and double jeopardy challenges properly fell within the ambit of rule 22(e).[36] Such challenges attacked "facial defects" that "could

---

F.2d 440, 443 (4th Cir. 1992), and *Hill v. United States*, 368 U.S. 424, 430 (1962)); *see also State v. Higginbotham*, 917 P.2d 545, 551 (Utah 1996) (remanding to the trial court under rule 22(e) to correct a sentence enhancement made in violation of the statute).

[33] *United States v. Hovsepian*, 307 F.3d 922, 927–28 (9th Cir. 2002); *see also Hill*, 368 U.S. at 430 (finding no illegal sentence under rule 35(a) when the sentence was not "legally or constitutionally invalid in any other respect").

[34] *United States v. Plain*, 856 F.2d 913, 916 (7th Cir. 1988) (quoting *United States v. Tucker*, 404 U.S. 443, 447 (1972) (considering a rule 35 motion when a sentencing authority bases the sentencing decision on erroneous factual information)).

[35] *Cook v. United States*, 171 F.2d 567, 569 (1st Cir. 1948) (vacating a sentence that violated Federal Rule of Criminal Procedure 43 because the defendant was not present before the court when his sentence was increased).

[36] 2012 UT 15, ¶¶ 23–24. The concurrence misreads our holding in *Prion* as limiting rule 22(e) challenges to only those permitted under the antecedent federal rule. *Infra* ¶¶ 114–31. But we nowhere stated that we were adopting the federal limitation. In fact, reading *Prion* to adopt such a limitation would require us to have overruled our earlier decisions in *Candedo*, 2010 UT 32, and *State v. Telford*, 2002 UT 51, 48 P.3d 228 (per curiam). In *Candedo*, we expressly found that the defendant's substantive due process claim fell within the scope of the rule:

> We therefore hold that the court of appeals erred in failing to reach the merits of Candedo's substantive due process challenge because the definition of illegal sentence under rule 22(e) is sufficiently broad to include constitutional violations that threaten the validity of the

(con't.)

easily be corrected without the need for factual development in the original trial court."[37] We therefore reviewed the defendant's claims on the merits, ultimately concluding that his sentence violated double jeopardy.[38]

¶ 25 Mr. Houston now brings a host of constitutional claims that we have not previously addressed under rule 22(e). Today, we draw on our previous decisions to articulate the standard for a criminal defendant who brings an unpreserved claim under rule 22(e) that his or her sentence is illegal, and we reiterate the concern expressed in earlier cases that "rule 22(e) claims must be narrowly circumscribed to prevent abuse."[39]

¶ 26 We therefore hold that under rule 22(e), a defendant may bring constitutional challenges that attack the sentence itself and not the underlying conviction,[40] and which do so as a facial challenge rather than an as-applied inquiry.[41] This standard

---

> sentence. This holding allows us to reach the merits of Candedo's claim . . . .

2010 UT 32, ¶ 14. And in *Telford*, "[a]lthough we rejected Telford's separation of powers and Eighth Amendment challenges to his sentence, *we reached and considered the merits of those challenges under rule 22(e)." Id.* ¶ 11 (citing *Telford*, 2002 UT 51, ¶¶ 3–4) (emphasis added). We would not denigrate our holdings in those cases as "relatively unimportant." *Infra* ¶ 121 n.1.

[37] *Prion*, 2012 UT 15, ¶ 22.

[38] *Id.* ¶ 63.

[39] *Candedo*, 2010 UT 32, ¶ 9 (quoting *Telford,* 2002 UT 51, ¶ 5).

[40] *See Brooks*, 908 P.2d at 859 ("[A]n appellate court may not review the legality of a sentence under rule 22(e) when the substance of the appeal is . . . a challenge, not to the sentence itself, but to the underlying conviction.").

[41] The State argues that such a rule creates an unjustifiable disparity between unpreserved challenges to convictions and to sentences. To the extent that such a dichotomy exists, it is inherent in the rule itself, which allows illegal sentences to be challenged at any time. Moreover, our decision today limits that disparity by restricting constitutional challenges under the rule to only facial attacks.

comports with previous rule 22(e) decisions of this court. For example, in *State v. Telford*, we permitted the defendant to bring some unpreserved constitutional challenges to his sentence under rule 22(e) while ruling that other constitutional claims did not properly fall within the scope of rule 22(e) review.[42] We authorized the defendant's challenge to the indeterminate sentencing scheme under the separation of powers clause of the Utah Constitution.[43] We also allowed claims under the cruel and unusual punishments clauses of the Utah and United States Constitutions, but only to the extent that the defendant argued for "a per se violation."[44] In contrast, we concluded that to the extent that the defendant contested the constitutionality "*as applied to his particular case*, he impermissibly attempt[ed] to employ rule 22(e) to attack his underlying conviction."[45] Similarly, we prohibited review of claims brought under the Sixth Amendment of the United Sates Constitution and article I, section 12 of the Utah Constitution because those clauses did not relate to sentencing.[46]

¶ 27 Limiting constitutional challenges to facial attacks serves judicial economy. As we recognized in *Brooks*, "[w]hen the pertinent facts are undisputed and a purely legal question with respect to which the trial court has no discretion remains to be decided, nothing is to be gained by remanding the case to the trial court."[47] The concurrence argues that our standard creates an unworkable rule because even facial challenges can be fact-

---

[42] 2002 UT 51, ¶¶ 2–5.

[43] *Id.* ¶ 3.

[44] *Id.* ¶ 4; *see Candedo*, 2010 UT 32, ¶ 11 (recognizing that in *Telford* we reviewed separation of powers and cruel and unusual punishment challenges on their merits).

[45] *Telford*, 2002 UT 51, ¶ 7 (emphasis added).

[46] *Id.* ¶ 6. We ultimately concluded that Mr. Telford's sentence did not amount to a constitutional violation. *Id.* ¶¶ 3–4.

[47] 908 P.2d at 860; *see also Prion*, 2012 UT 15, ¶ 20 (warning against permitting rule 22(e) to "sanction a fact-intensive challenge"); *id.* ¶ 22 (explaining that facial defects can easily be corrected by an appellate court without the need to remand for factual development).

intensive.[48] But this argument also misses the mark. In this context, a fact-intensive analysis is one in which "the pertinent legal facts" are disputed or unclear. But where there is a facial constitutional attack, the court need not delve into the record or make findings of fact. Instead, the court is tasked with resolving a legal issue. But that does not mean the analysis will be easy or devoid of any reference to facts. As the opinions in the present case demonstrate, analysis of a purely legal question is often difficult and warrants rigorous debate. The rule we articulate here is not untenable just because it requires hard work by the court.

¶ 28 In the end, finality of judgment and preservation of claims are important, but so too is a criminal defendant's right to endure only those sentences that can be constitutionally imposed. Because Mr. Houston facially attacks the constitutionality of the statute that authorized his sentence, we hold that he has properly challenged it as an "illegal sentence" under Utah Rule of Criminal Procedure 22(e).[49] We next turn to the merits of Mr. Houston's claims. For analytical clarity, we separate his claims into two categories. First, we address his facial constitutional claims, and we analyze the sentence for correctness under rule 22(e)'s exception to preservation. Next, we address Mr. Houston's claims brought under the framework of ineffective assistance of counsel. We ultimately conclude that all of Mr. Houston's claims fail and therefore affirm his sentence of life without the possibility of parole.

## II. MR. HOUSTON'S SENTENCE OF LIFE WITHOUT PAROLE DOES NOT VIOLATE THE UTAH OR THE UNITED STATES CONSTITUTION

¶ 29 We begin by addressing Mr. Houston's six constitutional challenges to his sentence. Mr. Houston argues that his sentence: (A) is unconstitutional under the United States Supreme Court case *Apprendi v. New Jersey*,[50] (B) is unconstitutional because the

---

[48] *Infra* ¶¶ 128–29.

[49] In light of this limiting construction, we decline the State's request for us to overrule our holding in *Candedo*, 2010 UT 32.

[50] 530 U.S. 466 (2000).

sentencing statute does not contain a "beyond a reasonable doubt" standard of proof, (C) violates the Utah uniform operation of laws clause and the United States Equal Protection Clause, (D) violates the due process clauses of the Utah and United States Constitutions, (E) violates the unnecessary rigor clause of the Utah Constitution, and (F) violates the cruel and unusual punishments clauses of the Utah and United States Constitutions. We take up each of these issues in turn.

*A. Mr. Houston's Sentence Is not Unconstitutional Under* Apprendi v. New Jersey

¶ 30  Mr. Houston first argues that *Apprendi v. New Jersey*[51] renders the sentencing statute unconstitutional.[52]  This claim is grounded in the Fifth and Sixth Amendments to the United States Constitution.   According to Mr. Houston, his sentence is unconstitutional because *Apprendi* mandates that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."

¶ 31  In *Apprendi*, the New Jersey statutory scheme permitted a judge to impose a sentence beyond the statutory maximum if the judge determined, by a preponderance of the evidence, that the defendant committed a hate crime.[53]  The United States Supreme Court held that this sentencing scheme was unconstitutional because "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt."[54]

---

[51] *Id.*

[52] The concurrence claims that this argument is not a facial challenge.  *Infra* ¶ 128.   But Mr. Houston argues that the sentencing statute violates *Apprendi*'s constitutional protections by allowing the sentencer to impose LWOP, rather than the presumptive twenty year sentence, if the sentencer deems it appropriate.  We conclude that this is a challenge on the face of the statute and not to Mr. Houston's particular circumstances.

[53] 530 U.S. at 468–69.

[54] *Id.* at 490 (emphasis added).

¶ 32 Unlike in *Apprendi*, however, the sentencing statute under which Mr. Houston was sentenced does not require the judge to make factual findings that increase an offender's sentence. By pleading guilty to aggravated murder, Mr. Houston admitted all the facts relevant to the offense and became subject to any sentence authorized under Utah law. Under Utah's sentencing statute, a juvenile defendant guilty of aggravated murder can be sentenced to either life with the possibility of parole or LWOP.[55] There were no factual findings to be made by a jury, only a determination that LWOP would or would not be appropriate. Because the sentencing statute did not permit the jury to impose a sentence "beyond the prescribed statutory maximum," the *Apprendi* rule did not apply, and there is no violation.

*B. The Sentencing Statute Is not Constitutionally Defective*
*for Failing to Include a "Beyond a Reasonable Doubt" Standard*

¶ 33 Mr. Houston next argues that the sentencing statute is invalid and unconstitutional because it does not articulate a standard of proof for sentencing.[56] Relying on this court's decision in *State v. Wood*,[57] Mr. Houston contends that Utah's sentencing scheme requires that a jury find "beyond a reasonable doubt" that an LWOP sentence is justified and appropriate. We disagree.

¶ 34 We begin by examining the language of the sentencing statute at issue. Utah Code section 76-3-207 provides that "the jury shall . . . determine whether the penalty of life in prison without parole shall be imposed . . . . The penalty of life in prison without parole shall only be imposed if the jury determines that the sentence of life in prison without parole is appropriate."[58]

---

[55] *See* UTAH CODE § 76-3-207(5)(c) (2008). This statute was amended in 2010, but we cite to the version in effect at the time Mr. Houston was sentenced.

[56] *See id.*

[57] 648 P.2d 71 (Utah 1982).

[58] UTAH CODE § 76-3-207(5)(c) (2008).

¶ 35   In *Wood*, we interpreted an earlier version of this statute and held that, in order to impose a *death sentence* under this section, the sentencing authority must find that (1) the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt and (2) the sentence is justified and appropriate in the circumstances beyond a reasonable doubt.[59] Mr. Houston asks us to extend the *Wood* "beyond a reasonable doubt" standard to LWOP sentences.  We decline to do so.

¶ 36   We begin by noting that, unlike Mr. Houston's case, *Wood* was a death penalty case, and our holding in *Wood* was premised on the unique nature of a proceeding in which the defendant's life is at stake.  We explained:

> We reject the proposition that the death penalty may be imposed when there is substantial doubt whether it should be. . . . "Death[,] in its finality, differs from life imprisonment more than a hundred-year prison term differs from one of only a year or two.  Because of that [qualitative] difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."[60]

Throughout the *Wood* opinion, we emphasized the "irrevocable" nature of a death sentence, and the corresponding degree of conviction that a judge or jury must have to impose it.

¶ 37   In *State v. Bell*, we returned to our holding in *Wood* in the context of a different sentencing statute.[61]   In *Bell*, the defendant argued that Utah's sentencing scheme for aggravated sexual assault was unconstitutional because it did not assign a burden of proof with respect to aggravating and mitigating circumstances in determining which of the mandatory presumptions should be imposed.[62]  We held that the burden of proof rule articulated in

---

[59] 648 P.2d at 83.

[60] *Id.* at 80–81 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion)).

[61] 754 P.2d 55, 59 (Utah 1988).

[62] *Id.* at 57.

*Wood* does not apply when the jury is not considering death as a possible sentence.[63]  We explained that "the choice of death, being unique, justifies requiring the most persuasive reasons and a high degree of subjective certainty.  However, those reasons do not have great force in choosing one of three possible sentences, none of which has the finality of death."[64]

¶ 38  Because a death sentence is uniquely irrevocable and the most severe of all sentences, we have an interest in ensuring that no reasonable doubt remains before we authorize the taking of a human life.  But, as we stated in *Bell*, outside this context, there are no "clear considerations of fairness that militate in favor of a particular standard, except to the extent that one may quarrel with the wisdom of the statute—which is beyond our prerogative."[65]

¶ 39  Here, our legislature has determined that a jury may sentence a defendant to life without parole if it determines that the State has satisfied its burden to demonstrate that this is the "appropriate" sentence to impose.[66]  Mr. Houston has not demonstrated that we are constitutionally required to interfere with the legislature's authority and write a "beyond a reasonable doubt" standard into the sentencing statute.

### C. The Sentencing Statute Does not Violate the Equal Protection Clause or the Uniform Operation of Laws Clause

¶ 40  Mr. Houston next argues that the sentencing statute violates the uniform operation of laws clause of the Utah Constitution and the Equal Protection Clause of the United States Constitution because the statute "provides no guidance to jurors in determining which sentence to impose."  This, he contends, creates a substantial probability of arbitrary sentencing and disproportionate penalties.

¶ 41  Because we have held that Utah's uniform operation of laws clause "is at least as rigorous as the federal guarantee,"[67] we

---

[63] *Id.* at 59 (distinguishing *Wood*).

[64] *Id.*

[65] *Id.*

[66] *See* UTAH CODE § 76-3-207(5)(c) (2008).

[67] *State v. Drej*, 2010 UT 35, ¶ 33 n.5, 233 P.3d 476; *see also ABCO*

(con't.)

first analyze Mr. Houston's claims under the Utah Constitution. If we determine that the statute survives scrutiny under Utah's uniform operation of laws provision, then we must conclude that it is constitutional under the United States Constitution's Equal Protection Clause as well.[68]

¶ 42 Mr. Houston contends that two juvenile defendants could commit aggravated murder, and, due to the lack of guidance in the statute, a jury could arbitrarily sentence one of the juvenile offenders to life with parole and sentence the other to life without parole. Mr. Houston argues that by failing to narrow in a principled way those who may receive life without parole, the statute disparately treats similarly situated offenders without a rational basis for the disparate treatment. We disagree.

¶ 43 The uniform operation of laws provision of our Constitution requires us to address three questions: (1) "what, if any, classification is created under the statute," (2) "whether the classification imposes on similarly situated persons disparate treatment," and (3) whether "the legislature had any reasonable objective that warrants the disparity."[69]

¶ 44 Examining Utah's statute in light of these criteria, we conclude that it does not violate the uniform operation of laws clause because it creates no impermissible classifications and it treats all similarly situated defendants the same.

¶ 45 We begin by examining the plain language of the challenged sentencing statute "to determine what classification[, if any,] is created by [the] legislative enactment."[70] At the time of Mr. Houston's sentencing, the sentencing statute provided:

> If the jury is unable to reach a unanimous decision imposing the sentence of death, the jury

---

*Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 14, 211 P.3d 382 (concluding that uniform operation of laws and Equal Protection claims need only be analyzed under the more rigorous Utah provision).

[68] *Drej*, 2010 UT 35, ¶ 33 n.5.

[69] *Id.* ¶ 34 (internal quotation marks omitted).

[70] *Id.* ¶ 35.

shall then determine whether the penalty of life in prison without parole shall be imposed . . . . The penalty of life in prison without parole shall only be imposed if the jury determines that the sentence of life in prison without parole is appropriate.[71]

This statute classifies defendants into two categories—those eligible for a death sentence and those ineligible for a death sentence. And under the language of this statute, all defendants who are ineligible for a sentence of death are similarly situated and are treated equally—they are subject to a jury's determination that either a sentence of life with parole or a sentence of life without the possibility of parole is the more appropriate sentence based on the jury's evaluation of a particular case. Although it is true that two defendants who commit aggravated murder may receive different sentences from a jury, this is either because the defendants were not similarly situated (for example, one defendant committed a much more heinous crime) or the jury in the course of its deliberations finds it more "appropriate" to sentence one defendant to a more lenient or more severe penalty.

¶ 46 We conclude that the sentencing statute treats all similarly situated defendants the same and it does not contain any impermissible classifications. It subjects all defendants guilty of aggravated murder to a jury's determination of what sentence is most "appropriate" given the particular circumstances of each case. Mr. Houston's argument accordingly fails.

### D. The Statute Is not Unconstitutionally Vague Under the Due Process Clause of the Utah or the United States Constitutions

¶ 47 Mr. Houston also argues that the sentencing statute is unconstitutionally vague in violation of due process under the federal and state constitutions because it lacks clear standards to guide the jury in sentencing a defendant. Specifically, Mr. Houston claims that the sentencing statute only advises the jury to impose an LWOP sentence if "appropriate," but it does not provide a standard of proof for aggravating factors, nor does it contain a standard for determining when LWOP is an

---

[71] UTAH CODE § 76-3-207(5)(c) (2008).

"appropriate" sentence. He alleges that these deficiencies provided him with no notice as to whether pleading guilty would result in a life sentence with or without parole. Thus, he contends, the lack of standards created a "roll of the dice" as to which sentence he would receive.

¶ 48 We agree that, standing alone, the statutory directive that an LWOP sentence may be imposed if "appropriate" is troubling. The term "appropriate" contributes little or nothing to the solemn task in which it plays a central role. "Appropriate" is defined as "specially suitable" or "belonging peculiarly."[72] But everyday experience may not equip a juror with the ability to determine when it is "specially suitable" to imprison a juvenile for the remainder of his life. Nonetheless, "we do not interpret the 'plain meaning' of a statutory term in isolation."[73] Instead, we "determine the meaning of the text given the relevant context of the statute."[74] The sentencing statute supplies guidance to the decision-maker by illustrating examples of aggravating and mitigating factors that should be considered in making this weighty decision.[75] For example, the statute specifically lists "the youth of the defendant at the time of the crime" as a mitigating factor to consider.[76] Moreover, the sentencing authority is free to consider "any other fact in mitigation of the penalty."[77] We conclude that this guidance sufficiently contextualizes the "appropriate" standard such that the statute is not unconstitutionally vague.[78]

---

[72] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 106 (1961).

[73] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465.

[74] *Id.*

[75] *See* UTAH CODE § 76-3-207(3), (4) (2008).

[76] *Id.* § 76-3-207(4)(e).

[77] *Id.* § 76-3-207(4)(g).

[78] Moreover, the trial judge instructed the jurors that it was their "duty to consider all of the aggravating and mitigating evidence in determining the appropriate penalty." The judge listed several mitigating factors that may be considered in

(con't.)

### E. Mr. Houston's Sentence Does not Violate the
### Unnecessary Rigor Clause of the Utah Constitution

¶ 49 Mr. Houston also contends that his sentence violates Utah's unnecessary rigor clause because "it constitutes unnecessary rigor to sentence a juvenile to die in prison with no hope of parole." According to Mr. Houston, it is unconstitutional to impose the severe sentence of life without parole on a juvenile due to the immaturity, vulnerability, and undeveloped character associated with youth.[79] Mr. Houston argues that LWOP for juveniles is particularly rigorous because juveniles do not pose a great threat to public safety and are amenable to rehabilitation. Although some of these observations about the nature of youth are almost certainly true, they do not implicate the nature and purpose of the unnecessary rigor clause.

¶ 50 Article I, section 9 of the Utah Constitution provides that "[p]ersons arrested or imprisoned shall not be treated with unnecessary rigor." This clause protects arrested or imprisoned individuals from the infliction of treatment during their confinement that is incompatible with the values of a civilized society.[80] "The restriction on unnecessary rigor is focused on the circumstances and nature of the process and conditions of

---

sentencing, including Mr. Houston's youth and his capacity to appreciate the wrongfulness of his conduct. The judge also emphasized that the jury "should not merely add up the number of aggravating and mitigating circumstances or factors, or otherwise apply a mechanical rule" to their consideration of the evidence. And finally, the judge explained that the presumptive sentence was life with the possibility of parole and that the "burden rests upon the State to persuade [the jury] that a sentence of life in prison without parole [was] the appropriate sentence" to impose.

[79] The concurrence argues that this is an as-applied challenge. *Infra* ¶ 128. But Mr. Houston does not claim that LWOP constitutes unnecessary rigor given the specifics of his case; he argues that LWOP is unnecessarily rigorous when applied to any juvenile offender, regardless of the facts of the crime.

[80] *State v. Perea*, 2013 UT 68, ¶ 124, 322 P.3d 624.

confinement," not on "the sentence imposed."[81]  This provision is targeted at eliminating "unreasonably harsh, strict, or severe treatment" in prison such as "being unnecessarily exposed to an increased risk of serious harm."[82]

¶ 51 We hold that the unnecessary rigor clause does not apply to Mr. Houston's challenge.  Mr. Houston does not object to the conditions of his confinement, but rather the length of the sentence imposed by statute.   Although a defendant may challenge the length of his or her sentence as unconstitutional, this claim is more properly characterized as a cruel and unusual punishments claim and may not be brought under the unnecessary rigor clause.

*F.  Mr. Houston's Sentence Does not Violate the Cruel*
*and Unusual Punishments Clause of the Utah*
*or the United States Constitution*

1.  Cruel and Unusual Punishments Clause of the United States Constitution

¶ 52  Finally, Mr. Houston claims that sentencing a juvenile to LWOP violates the cruel and unusual punishments clauses of the Utah and United States Constitutions.  In support of his federal argument, Mr. Houston cites three recent United States Supreme Court cases:  *Graham v. Florida*, holding that it is unconstitutional to sentence a juvenile to LWOP for a nonhomicide crime;[83] *Roper v. Simmons*, holding that it is unconstitutional to sentence a juvenile to death;[84] and *Miller v. Alabama*, holding that it is unconstitutional to impose a mandatory LWOP sentence on a juvenile.[85]  Mr. Houston argues that the particular characteristics of youth undermine the penological basis for imposing an LWOP sentence, and that LWOP for a juvenile therefore constitutes cruel and unusual punishment.

---

[81] *Dexter v. Bosko*, 2008 UT 29, ¶ 17, 184 P.3d 592.

[82] *Id.* ¶ 19.

[83] 560 U.S. 48, 82 (2010).

[84] 543 U.S. 551, 578 (2005).

[85] 132 S. Ct. 2455, 2475 (2012).

¶ 53 We recognize that there are unique characteristics of juveniles that distinguish them from adult offenders, and we conclude that Utah's sentencing statute treats juveniles in a manner that accounts for these unique characteristics. For example, a juvenile cannot be sentenced to death, regardless of the offense committed. LWOP is neither a mandatory sentence nor the presumptive sentence under Utah's sentencing statute. And the statute directs the sentencing authority to consider any relevant mitigating circumstances. We therefore hold that Utah Code section 76-3-207 is facially constitutional. We begin by addressing Mr. Houston's claim under the United States Constitution and then turn to Mr. Houston's argument under the Utah Constitution.

¶ 54 The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[86] We have recognized that "[a] criminal punishment may be cruel and unusual when it is barbaric, excessive, or disproportional to the offense committed."[87] Moreover, despite an evolving analytical framework, the fundamental principle of the Eighth Amendment remains unchanged: "[C]riminal punishments are prohibited if they are excessive or contravene evolving standards of decency and human dignity."[88] We also note, however, that sentencing statutes derive from a variety of often imprecise policy considerations. For this reason, we must accord "substantial deference . . . to the prerogatives of legislative

---

[86] The Eighth Amendment's Cruel and Unusual Punishments Clause is incorporated against the states via the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 675 (1962); *State v. Herrera*, 1999 UT 64, ¶ 33 n.13, 993 P.2d 854.

[87] *State v. Mace*, 921 P.2d 1372, 1377 (Utah 1996) (footnote omitted) (citing *Solem v. Helm,* 463 U.S. 277, 284 (1983)).

[88] *State v. Lafferty*, 2001 UT 19, ¶ 76, 20 P.3d 342 (alteration in original) (internal quotation marks omitted); *see also Trop v. Dulles*, 356 U.S. 86, 101 (1958) ("The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.").

power 'in determining the types and limits of punishments for crimes.'"[89] For this reason, "absent a showing that a particular punishment is cruelly inhumane or disproportionate, we are not apt to substitute our judgment for that of the legislature regarding the wisdom of a particular punishment or of an entire sentencing scheme."[90]

¶ 55 The United States Supreme Court has not ruled on whether the Eighth Amendment prohibits the imposition of LWOP for a juvenile convicted of homicide.[91] But the Court considered related questions in *Graham*, *Roper*, and *Miller*. We find those cases instructive and determine that the Eighth Amendment does not prohibit the imposition of LWOP for a juvenile homicide offender.

¶ 56 We deferred our consideration of Mr. Houston's appeal while *Miller v. Alabama* was pending before the United States Supreme Court.[92] In *Miller*, two defendants who had committed unrelated murders at the age of fourteen challenged an Alabama statute that mandated an LWOP sentence.[93] The Supreme Court announced its decision in 2012, holding that a sentencing scheme that mandates an LWOP sentence for a juvenile constitutes cruel and unusual punishment under the United States Constitution.[94] The Court explained that the Eighth Amendment requires individualized sentencing procedures for juveniles so that the sentencing authority may consider the mitigating circumstances inherent in youth.[95] *Miller* did not, however, categorically

---

[89] *State v. Bishop*, 717 P.2d 261, 269 (Utah 1986) (quoting *Solem,* 463 U.S. at 290).

[90] *Mace*, 921 P.2d at 1377–78 (citation omitted) (internal quotation marks omitted).

[91] *See Miller*, 132 S. Ct. at 2469 (explicitly reserving ruling on this issue).

[92] The parties provided supplemental briefing addressing the effects of the *Miller* decision on the instant case.

[93] *Miller*, 132 S. Ct. at 2460.

[94] *Id.* at 2469.

[95] *Id.* at 2475 ("*Graham*, *Roper*, and our individualized
(con't.)

prohibit LWOP for juveniles.[96] The Court explained that it "[did] not foreclose a sentencer's ability" to sentence a juvenile convicted of homicide to LWOP.[97]

¶ 57 In *Miller*, the Supreme Court grounded its decision in an analysis of proportionality. The Court reiterated "the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense."[98] This proportionality analysis implicated two lines of cases. The first involves "categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty."[99] In that line of cases, the Court struck down the death penalty for nonhomicide offenders,[100] juveniles,[101] and individuals with severe mental disabilities.[102] Using similar reasoning, the Court prohibited LWOP for juveniles who commit nonhomicide crimes.[103] The second line of cases addresses the mandatory imposition of sentences—in other words, sentencing schemes that leave the sentencing authority without power to consider the individual circumstances of the offense or the offender.[104] For example, the Court invalidated statutes prescribing a mandatory death penalty sentence.[105] The

---

sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.").

[96] *Id.* at 2469.

[97] *Id.*

[98] *Id.* at 2463 (quoting *Roper*, 543 U.S. at 560) (internal quotation marks omitted).

[99] *Id.*

[100] *Kennedy v. Louisiana*, 554 U.S. 407, 469 (2008).

[101] *Roper*, 543 U.S. at 574–75.

[102] *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

[103] *Graham*, 560 U.S. at 75.

[104] *Miller*, 132 S. Ct. at 2463–64.

[105] *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (plurality opinion).

confluence of these two lines of precedent led the *Miller* Court to strike down Alabama's mandatory sentencing scheme imposing LWOP. The Court held that, as applied to juveniles, the punishment was severe and Alabama's statute did not allow for the consideration of possible mitigating factors.[106] Therefore, the Court concluded that mandatory LWOP sentences for juveniles could not be sustained under the Eighth Amendment.[107]

¶ 58 Drawing from evidence in *Graham* and *Roper*, the Court explained that juveniles "are constitutionally different from adults for purposes of sentencing."[108] This is because "juveniles have diminished culpability and greater prospects for reform," and thus "they are less deserving of the most severe punishments."[109] *Roper* and *Graham* identified three areas of "significant gaps" distinguishing juveniles from adults:

> First, children have a "lack of maturity and underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."[110]

These conclusions were informed by science and social science research, including longitudinal studies and brain mapping.[111] These decisions also recognized that "the distinctive attributes of

---

[106] *Miller*, 132 S. Ct. at 2468–69.

[107] *Id.* at 2475.

[108] *Id.* at 2464.

[109] *Id.* (internal quotation marks omitted).

[110] *Id.* (alterations in original) (citations omitted) (quoting *Roper*, 543 U.S. at 569–70) (internal quotation marks omitted).

[111] *Id.* at 2464–65, 2465 n.5.

youth diminish the penological justifications" for punishment, particularly regarding rehabilitation and retribution.[112]

¶ 59  But despite this evidence about the characteristics of youth, the Supreme Court has nonetheless narrowly limited its decisions.  In *Graham*, the Court applied its ban on LWOP for juveniles only where the underlying offense was a nonhomicide crime.[113]  The Court distinguished homicide crimes from nonhomicide crimes on the basis of "both moral culpability and consequential harm."[114]  Similarly, *Miller* declined to adopt a categorical bar to LWOP for juveniles; instead, the Court foreclosed only *mandatory* LWOP sentences because such sentences "prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender."[115]  And the Court recognized that there could be "appropriate occasions" for imposing LWOP on a juvenile offender, rare as those circumstances may be.[116]  Moreover, the Court explained that it did "not foreclose a sentencer's ability to [impose LWOP] in homicide cases," so long as the sentencer "take[s] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."[117]  Thus, though the penological justifications for LWOP may be diminished for a juvenile compared to an adult, such a sentence is not without justification in our criminal sentencing scheme.

¶ 60  We therefore agree with the Supreme Court and with the dissent[118] that juveniles represent a unique class warranting special considerations in sentencing.  We believe that the unique characteristics of youth are accounted for, both by Utah law and through federal constitutional protections.  We note again that

---

[112] *Id.* at 2465.

[113] 560 U.S. at 82.

[114] *Miller*, 132 S. Ct. at 2465 (citing *Graham*, 560 U.S. at 69–70).

[115] *Id.* at 2466.

[116] *Id.* at 2469.

[117] *Id.*

[118] *Infra* ¶ 258.

juveniles are not eligible for the death penalty, regardless of the offense committed, under both Utah law[119] and the Supreme Court's decision in *Roper*.[120] Similarly, state law[121] and federal precedent[122] prohibit LWOP for juveniles who commit a nonhomicide crime. And finally, as required by *Miller*, Utah's sentencing statute does not impose a mandatory LWOP sentence on juveniles.[123] Instead, the statute provides a presumptive sentence of twenty years; LWOP may be imposed only if ten or more jurors agree it is appropriate.[124]

¶ 61 Importantly, our statutory scheme enables the kind of individualized sentencing determination that the Supreme Court has deemed necessary for serious offenses. Utah Code section 76-3-207 permits the sentencer to consider any and all relevant factors which would affect the sentencing determination. The statute directs the sentencing authority to consider aggravating circumstances and mitigating factors, and it specifically provides a nonexhaustive list of each to aid the sentencer.[125] In fact, the statute specifically directs the sentencer to consider "the youth of the defendant at the time of the crime."[126] We thus conclude that the statute meets the "requirement of individualized sentencing for defendants facing the most serious penalties,"[127] and places particular emphasis on youth as a mitigating factor.

---

[119] UTAH CODE § 76-5-202(3)(e).

[120] 543 U.S. 551.

[121] *See, e.g.*, UTAH CODE § 76-5-302(6) (removing the possibility of LWOP for juveniles charged with aggravated kidnapping); *id.* § 76-5-402(3)(b)(ii) (same for rape); *id.* § 76-5-405(b) (same for aggravated sexual assault).

[122] *Graham*, 560 U.S. at 74.

[123] UTAH CODE § 76-3-207(5)(c) (2008).

[124] *Id.*

[125] *Id.* § 76-3-207(3), (4).

[126] *Id.* § 76-3-207(4)(e).

[127] *Miller*, 132 S. Ct. at 2460.

¶ 62 We are not alone in this conclusion. The Supreme Court has explained that "[i]n considering categorical bars to . . . life without parole, we ask as part of the analysis whether objective indicia of society's standards, as expressed in legislative enactments and state practice, show a national consensus against a sentence for a particular class of offenders."[128] As the dissent notes, a great majority of states as well as the federal system permit LWOP sentences for juveniles.[129] As of 2010, thirty-nine states allowed such sentences[130] while only six jurisdictions affirmatively prohibited them.[131] In looking to these as an indication of society's standards, we cannot conclude that the "national consensus" favors the prohibition of LWOP for juveniles convicted of homicide.

¶ 63 In sum, we conclude that imposing LWOP on a juvenile convicted of homicide does not violate the Eighth Amendment's prohibition on cruel and unusual punishments. We therefore deny Mr. Houston's challenge under the United States Constitution.

2. Cruel and Unusual Punishments Clause of the Utah Constitution

¶ 64 We next turn to article I, section 9 of the Utah Constitution, which provides that "cruel and unusual punishments [shall not] be inflicted." In *State v. Lafferty*, we held that "[a] criminal punishment is cruel and unusual under article I, section 9 if it is so disproportionate to the offense committed that it shock[s] the moral sense of all reasonable men as to what is right and proper under the circumstances."[132] The concurrence

---

[128] *Id.* at 2470 (quoting *Graham*, 560 U.S. at 61; *Roper*, 543 U.S. at 563) (internal quotation marks omitted).

[129] *Infra* ¶ 271.

[130] Brief for Petitioner, *Jackson v. Hobbs*, 132 S. Ct. 2455 (2012) (No. 10-9647), 2012 WL 92506, at *1a (combined case with *Miller v. Alabama*).

[131] *Graham*, 560 U.S. at 82 (Alaska, Colorado, Montana, Kansas, Kentucky, and Texas).

[132] *Lafferty*, 2001 UT 19, ¶ 73 (second alteration in original) (internal quotation marks omitted).

concludes that this determination merits no deference and should be repudiated because it is "an unworkable standard."[133] We do not agree. The basic concept of article I, section 9 flows from the precept of justice that punishment should be graduated and proportioned to both the offender and the offense. Like the Supreme Court, we recognize that "[w]hile the State has the power to punish," we must "assure that this power be exercised within the limits of civilized standards."[134] Fines, imprisonment, and even execution may be imposed depending upon the enormity of the crime.

¶ 65 Moreover, it would be inappropriate for us to deviate from our prior jurisprudence in the present case. Both the State and Mr. Houston have relied on the standard announced in *Lafferty*, and they have grounded their arguments in discussions of proportional punishment. The parties have not asked this court to consider the interpretation Justice Lee now advocates, and therefore the court does not have the benefit of adversarial briefing on the issue. As a general rule, we decline to rule or opine on issues that are not briefed by the parties.[135] We therefore

---

[133] *Infra* ¶ 138. The concurrence bases its argument "most fundamentally" on the fact that "no majority opinion of this court has ever employed a state standard of proportionality that is distinct from the federal standard." *Infra* ¶ 142; *see also infra* ¶ 145 (arguing that because we have treated the state and federal standards as indistinguishable, there is "no independent significance [for] the state standard" and "thus no basis for *stare decisis* reliance"). We fail to see how this supports the view that our prior pronouncements warrant no respect. While we are certainly not required to adopt a federal interpretation for our state provision, we likewise are not forbidden from doing so. Our jurisprudence does not garner precedential weight if, and only if, we adopt a standard that diverges from federal practice. Such a view contradicts our long-standing practice of looking to federal interpretation for guidance.

[134] *Trop*, 356 U.S. at 100.

[135] *See Utah Safe to Learn–Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 19, 94 P.3d 217 ("The courts are not a forum for hearing academic contentions or rendering advisory opinions." (internal (con't.)

find no reason to depart from the proportionality standard employed in *Lafferty*.[136]

¶ 66 Because we conclude that a punishment must be proportionate to the offense, we look to federal decisions as a guide in determining whether "a particular punishment is cruelly inhumane or disproportionate."[137] We therefore look to the characteristics of juveniles that set them apart from adult offenders. We again acknowledge the unique characteristics of youth—its impetuosity, vulnerability to outside influence, and potential for change.[138] We also consider the penological goals of the sentence, recognizing that they may be diminished in the case of juveniles.[139] But we do not conclude that these circumstances render LWOP cruel and unusual for juveniles as a class. Under Utah law, this severe sentence is only permitted for the gravest of offenses and requires at least ten members of the jury to

---

quotation marks omitted)); *State v. Ball*, 685 P.2d 1055, 1061 (Utah 1984) (declining to consider the scope of a state constitutional provision when the issues were not briefed by the parties because they "deserve thorough treatment by counsel and careful consideration by the Court"); *see also Winward v. State*, 2012 UT 85, ¶ 18 n.4, 293 P.3d 259 (recognizing that it would be "imprudent to now resolve [an] extremely important issue without the benefit of adversarial briefing"); *State v. Baker*, 2010 UT 18, ¶ 57, 229 P.3d 650 ("[W]here the law . . . is unsettled and we are without the benefit of adversarial briefing on the subject, we would be ill-advised to resolve this case on that basis.").

[136] We also note that our conclusion that Mr. Houston's sentence does not violate proportionality principles, *see infra* ¶¶ 66–67, ultimately renders a decision on which standard to apply unnecessary in this case. Mr. Houston's challenge fails regardless of whether we apply the *Lafferty* proportionality analysis or Justice Lee's more limited originalist approach, *infra* ¶ 210.

[137] *Lafferty*, 2001 UT 19, ¶ 74 (internal quotation marks omitted).

[138] *See Miller*, 132 S. Ct. at 2464.

[139] *Id.* at 2465.

determine that, given the circumstances of the crime and the offender's background, LWOP is appropriate. Moreover, we note that a majority of our sister states as well as the federal system permit LWOP for juveniles convicted of the most heinous crimes.[140] Applying a proportionality analysis, we conclude that the imposition of LWOP for juveniles convicted of homicide does not violate the Utah Constitution.

¶ 67 We reiterate the hope expressed by the Supreme Court that LWOP sentences for juveniles will be rare.[141] It is the most severe sentence a judge or jury can impose on a juvenile, and it should be carefully considered and reserved for only the most severe crimes and most incorrigible juvenile offenders. But where, as here, we find no constitutional violation, we may not "substitute our judgment for that of the legislature regarding the wisdom of a particular punishment."[142] We therefore hold that Mr. Houston has not demonstrated that his LWOP sentence violates the cruel and unusual punishments clauses of either the Utah or United States Constitution.

¶ 68 Because we reject each of Mr. Houston's constitutional challenges to his sentence of life without parole, we conclude that Mr. Houston has failed to demonstrate that his sentence was unconstitutional and therefore illegal under Utah Rule of Criminal Procedure 22(e).

### III. MR. HOUSTON HAS FAILED TO ESTABLISH THAT HIS COUNSEL RENDERED INEFFECTIVE ASSISTANCE

¶ 69 On appeal, Mr. Houston presents seven claims of ineffective assistance of counsel during his sentencing proceeding. First, Mr. Houston argues that his counsel was ineffective for not objecting to certain statements made by the prosecutor in closing argument, and alternatively that the trial court plainly erred in failing to intervene. Second, he contends that his counsel was ineffective in failing to find and call certain mitigation expert witnesses. Third, Mr. Houston claims that his counsel was

---

[140] *Supra* ¶ 62.

[141] *See Miller*, 132 S. Ct. at 2469.

[142] *Mace*, 921 P.2d at 1377–78.

deficient in conducting voir dire. Fourth, Mr. Houston argues that his counsel was ineffective for failing to seek a change of venue. Fifth, he claims his counsel was deficient for not objecting to certain testimony at the proceeding. Sixth, Mr. Houston contends that his counsel was deficient for not objecting to certain jury instructions. Finally, Mr. Houston argues that even if none of these errors alone is enough to constitute ineffective assistance of counsel, the cumulative effect of the errors should nonetheless undermine our confidence in the result of his sentencing proceeding. We determine that Mr. Houston has not established that his counsel provided ineffective assistance.

¶ 70 The right to counsel under the Sixth Amendment to the United States Constitution includes "the right to the effective assistance of counsel."[143] In *Strickland v. Washington*, the United States Supreme Court announced the two-part test for ineffective assistance of counsel claims.[144] First, the defendant must show that "his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment."[145] Second, the defendant must demonstrate "that counsel's performance prejudiced the defendant."[146] We have acknowledged "the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant."[147] As a result, "we must indulge in a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance, and that, under the

---

[143] *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *accord State v. Templin*, 805 P.2d 182, 186 (Utah 1990).

[144] 466 U.S. 668, 687 (1984).

[145] *Id.*; *accord Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232.

[146] *Archuleta*, 2011 UT 73, ¶ 38 (internal quotation marks omitted).

[147] *Templin*, 805 P.2d at 186 (alteration in original) (internal quotation marks omitted).

circumstances, the challenged action might be considered sound trial strategy."[148]

¶ 71   With this framework in mind, we now address each of Mr. Houston's ineffective assistance of counsel claims.

*A.  Mr. Houston Has Failed to Demonstrate that His Counsel*
*Was Ineffective when Counsel Did not Object to the*
*Prosecutor's Closing Argument or that the Trial*
*Court Plainly Erred by Failing to Intervene*

¶ 72   Mr. Houston argues that his counsel rendered ineffective assistance when counsel failed to object to statements made in the closing argument.  Alternatively, Mr. Houston contends that the trial court committed plain error for allowing the statements during closing argument.[149]   Mr. Houston fails to make either showing.

¶ 73   During the sentencing proceeding, Mr. Houston's expert neuropsychologist testified that another doctor had diagnosed Mr. Houston with a "conduct disorder" when he was an adolescent.  On cross-examination, the prosecution asked the neuropsychologist if she, too, had concluded that Mr. Houston had a conduct disorder.  The neuropsychologist explained that she did not conclude that Mr. Houston suffered from a conduct disorder because Mr. Houston was an adult when she evaluated him and "conduct disorder" is not an available diagnosis for an adult.  The prosecutor then asked the neuropsychologist if she believed that Mr. Houston was "antisocial."   The neuropsychologist testified that Mr. Houston may show signs of being antisocial, but ultimately she did not conclude that he met the test for an antisocial diagnosis.  The neuropsychologist also testified that she did not believe Mr. Houston suffered from psychopathy.  In supporting her opinion, the neuropsychologist contrasted Mr. Houston with the well-known serial killer and psychopath Ted Bundy.

---

[148] *State v. Lenkart*, 2011 UT 27, ¶ 25, 262 P.3d 1 (alteration in original) (internal quotation marks omitted).

[149] Mr. Houston raises this argument under the plain error doctrine because he acknowledges that it was not preserved.  *See State v. Weaver*, 2005 UT 49, ¶ 18, 122 P.3d 566.

¶ 74 In closing argument, the prosecution emphasized the conduct disorder that Mr. Houston was diagnosed with as a child. Mr. Houston argues the State erroneously claimed that Mr. Houston still has the conduct disorder:

> I think it is important that you look at [the conduct disorder] diagnosis, because what does it say? That diagnosis says, yeah, [Mr. Houston] *has* depression, but he *has* a conduct disorder. That means he's a violent character. He's a criminal. And they had to take that into consideration as they dealt with him.

Then the prosecution challenged the neuropsychologist's conclusion that Mr. Houston did not suffer from antisocial behavior as an adult:

> [The defense] expert didn't even look at [the conduct disorder] as antisocial behavior, . . . didn't even say that it was [antisocial] despite the fact that [Mr. Houston] had committed three violent acts.

¶ 75 Mr. Houston argues that his counsel was ineffective in failing to object to these statements. According to Mr. Houston, the State's closing argument was "incorrect and inflammatory" because the State "effectively argued—with no basis in the record whatsoever—that [Mr.] Houston is antisocial pathologic, incurably violent." By not objecting, moving to strike, or in any way addressing these statements, Mr. Houston contends that counsel left the jury "free to equate [Mr.] Houston with Ted Bundy." We disagree with Mr. Houston's characterization and conclusions.

¶ 76 First, Mr. Houston's counsel did not render ineffective assistance when he did not object to the prosecutor's statements. We have recognized that "[c]ounsel for both sides have considerable latitude in their closing arguments. They have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports."[150] Moreover, "[a] prosecutor has the duty and right to argue the case based on the total picture shown by the evidence."[151] When we review an

---

[150] *State v. Dibello*, 780 P.2d 1221, 1225 (Utah 1989).

[151] *State v. Hales*, 652 P.2d 1290, 1291 (Utah 1982) (internal
(con't.)

attorney's failure to object to a prosecutor's statements during closing argument, the question is "not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection."[152]  Here, we conclude that the prosecutor appropriately exercised his discretion to emphasize Mr. Houston's childhood diagnosis of conduct disorder, and to challenge the defense expert's conclusion that Mr. Houston did not suffer from an antisocial behavior disorder as an adult.  The record contained evidence that Mr. Houston was a violent offender and had extensive history with the criminal justice system.  The prosecutor was free to draw on this record evidence and question the conclusions of Mr. Houston's expert.  The jury was informed that what lawyers "say during their closing arguments is not evidence" and that the members of the jury should rely "on [their] memory of the evidence" in reaching a sentencing decision.  None of the prosecutor's statements were so inflammatory that "counsel's only defensible choice was to interrupt those comments with an objection."[153]

¶ 77  We also disagree that the court plainly erred when it did not address the prosecutor's statements.  We do not impose a duty on the courts "to constantly survey or second-guess the nonobjecting party's best interests or trial strategy."[154]  As stated above, the prosecutor was free to emphasize Mr. Houston's past diagnosis.  The prosecutor was also free to challenge the defense expert's conclusion that Mr. Houston was not antisocial.

¶ 78 Because we determine that neither Mr. Houston's counsel nor the trial judge had an obligation to object to the State's closing argument, we conclude that Mr. Houston has failed to meet his burden to show that the prosecutor's statements necessitate reversal.

---

quotation marks omitted).

[152] *Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994) (emphasis added).

[153] *Id.*

[154] *State v. Labrum*, 925 P.2d 937, 939 (Utah 1996).

### B. Mr. Houston Has Failed to Show that His Counsel Was Ineffective in Selecting and Presenting Expert Witnesses

¶ 79 Mr. Houston's second claim of ineffective assistance of counsel concerns his attorney's selection and presentation of expert witnesses relevant to Mr. Houston's mitigation defense. Specifically, Mr. Houston claims that his counsel was ineffective in "failing to retain experts qualified to (1) tell the jury *why* youth is a mitigating factor, (2) rebut self-serving testimony about the supervision provided at YHA, which fatally undermined counsel's primary theory, and (3) testify as to risk mitigation and rebut the state's future dangerousness theme."

¶ 80 "[C]ounsel's decision to call or not to call an expert witness is a matter of trial strategy, which will not be questioned and viewed as ineffectiveness unless there is no reasonable basis for that decision."[155] Thus, to demonstrate that his counsel was ineffective in retaining and presenting expert witnesses, Mr. Houston must "rebut the strong presumption that under the circumstances, [counsel's] action might be considered sound trial strategy."[156] This is because there are "countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."[157]

¶ 81 At the sentencing proceeding, Mr. Houston's counsel called a forensic neuropsychologist to testify about Mr. Houston's mental and emotional development. She explained to the jury that there were available treatments to help Mr. Houston confront his mental and emotional issues and to stop his violent reactions to his life circumstances. Our review of the record demonstrates that Mr. Houston's counsel did not act unreasonably in calling this qualified expert witness or in declining to call any additional expert witnesses on the same issue.

---

[155] *State v. Tyler*, 850 P.2d 1250, 1256 (Utah 1993).

[156] *Taylor v. State*, 2007 UT 12, ¶ 73, 156 P.3d 739 (internal quotation marks omitted).

[157] *Strickland*, 466 U.S. at 689.

1. Mr. Houston Has Failed to Demonstrate that His Counsel Was Ineffective for not Calling a Human Development Expert

¶ 82   Mr. Houston first argues that his counsel should have called a "human development" expert to testify about the effects of youth on the decision-making process.  While such testimony may have been helpful to Mr. Houston's defense, we conclude that this testimony was not required, and it certainly was not ineffective for Mr. Houston's counsel not to retain an expert on this topic.

¶ 83   We have stated before that expert testimony is most helpful to explain topics that are "beyond the common knowledge of ordinary jurors."[158]   Mr. Houston's counsel could have reasonably concluded that the jurors would understand from life experience that a seventeen-year-old's decision-making is not as reasoned as that of an adult. Moreover, throughout the sentencing procedure, Mr. Houston's counsel emphasized his youth in a manner that fell within the wide range of professionally competent assistance.  Therefore, it was not essential for counsel to retain an expert on this issue.

2. Mr. Houston Has Failed to Demonstrate that His Counsel Was Ineffective in Deciding not to Call an Expert to Testify About YHA's Failure to Treat and Supervise Mr. Houston

¶ 84   Mr. Houston next argues that his counsel was ineffective in failing to call an expert to testify that YHA's failure to properly treat and supervise Mr. Houston was the proximate cause of R.E.'s murder.   Mr. Houston argues that the result of his sentencing proceeding would have been different had his counsel called an expert to testify that had "YHA followed industry standards, or enforced its own policies, the crime would not have occurred."  Our review of the record indicates that this claim fails for two reasons.

¶ 85   First, like Mr. Houston's prior claim, no expert was needed to present to the jury facts related to YHA's deficient treatment and supervision of Mr. Houston because such facts were not beyond the common knowledge of the jurors.  During the proceeding, defense counsel successfully elicited this

---

[158] *State v. Clopten*, 2009 UT 84, ¶ 32, 223 P.3d 1103.

information through questioning of the YHA staff members as well as Mr. Houston's case worker.[159] For example, the jury heard evidence that YHA did not realize that Mr. Houston was skipping school; that Mr. Houston was engaged in sexual activity that may have resulted in his girlfriend's pregnancy; that Mr. Houston's therapist told YHA that she could not contact Mr. Houston for several months; and that Mr. Houston's mother was upset with the lack of communication from YHA. Thus, the jury was in a position to consider evidence of YHA's lack of supervision and treatment.

¶ 86 Second, given that testimony concerning YHA's treatment and supervision was already introduced at the proceeding, it is difficult for us to see how Mr. Houston's counsel's decision not to present expert testimony on this issue was unreasonable. Our review of the record demonstrates that counsel's decision not to seek an expert on this issue was the result of a strategic move consistent with the defense's theory that Mr. Houston deserved mercy in sentencing for having pleaded guilty and accepting responsibility for his own actions. Presenting an expert to blame Mr. Houston's crime on the YHA staff would have contradicted this theory.[160] We therefore conclude that Mr. Houston has failed to demonstrate ineffective assistance of counsel regarding this issue.

3. Mr. Houston Has Failed to Demonstrate that His Counsel Was Ineffective in Failing to Call a Different Risk Mitigation Expert

¶ 87 Mr. Houston also argues that his counsel should have called a different expert to address risk mitigation because the expert that Mr. Houston's counsel called was not sufficiently qualified to address these issues. Mr. Houston argues that had this testimony been presented to the jury, it would have made a

---

[159] *See State v. Walker*, 2010 UT App 157, ¶ 16, 235 P.3d 766 (noting expert testimony is not critical when same information can be elicited on cross-examination).

[160] *See Strickland*, 466 U.S. at 689 (noting that to succeed on an ineffective assistance of counsel claim, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (internal quotation marks omitted)).

difference in the outcome of his case because it would have rebutted the State's "powerful future dangerousness" argument. Again, we disagree.

¶ 88 Our review of the record indicates that the expert Mr. Houston's counsel called was a licensed neuropsychologist with extensive experience in evaluating criminal defendants. She has a bachelor's degree in psychology and biology, and master's and doctoral degrees and postdoctoral training in neurobiology. She has evaluated criminal defendants since 1987, and has treated individuals with obsessive disorders and sexual dysfunctions since 1979. This experience indicates that the neuropsychologist was fully qualified to testify as an expert in this case. Mr. Houston has failed to demonstrate that his counsel's decision to call and rely on her testimony was unreasonable.

¶ 89 Mr. Houston has also failed to demonstrate that the neuropsychologist's performance was anything but thorough and competent. The record indicates that the neuropsychologist testified extensively about Mr. Houston's troubled background and the impact it had on his mental health. Although she testified that Mr. Houston was troubled, she also testified that current medications could treat his disorders and could "really make a difference" in his mental and behavioral health. The neuropsychologist also described in detail how Mr. Houston could benefit from cognitive behavioral therapy and how this type of therapy could help him to develop skills to stop his violent thoughts and reactions. We thus conclude that the neuropsychologist adequately addressed the issue of risk mitigation and Mr. Houston's future dangerousness, and it was not unreasonable for Mr. Houston's counsel to rely on her testimony as sufficient.

¶ 90 At its core, we conclude that Mr. Houston's expert testimony claims are merely an assertion that appellate counsel would have called and retained different experts than those trial counsel decided to present to the jury. But we "will not review counsel's tactical decisions simply because another lawyer, e.g., appellate counsel, would have taken a different course."[161]

---

[161] *Parsons v. Barnes*, 871 P.2d 516, 524 (Utah 1994) (internal quotation marks omitted).

Mr. Houston's counsel relied on a common understanding of youth and an expert's opinion of Mr. Houston's mental condition instead of calling an expert to explain general development in youth. And his counsel properly questioned YHA staff members to introduce evidence of its inadequate supervision instead of calling an expert to criticize it. These strategic decisions were not deficient and did not deprive Mr. Houston of his constitutional right to counsel. We therefore conclude that Mr. Houston has failed to prevail on any of his claims that his counsel rendered ineffective assistance in seeking, retaining, and presenting expert testimony at the sentencing proceeding.

### C. Mr. Houston Has Failed to Show His Counsel Was Ineffective During Voir Dire Questioning

¶ 91 Mr. Houston's next ineffective assistance of counsel claim centers on his counsel's questioning during the initial juror interviews. Mr. Houston contends that his "[c]ounsel displayed a remarkable ignorance of the law, and rendered extraordinarily ineffective assistance when, during initial juror interviews, [counsel] surrendered the presumption favoring [a sentence of] life with parole." Specifically, Mr. Houston argues that by asking the jurors if they could "equally" consider imposing a sentence of life with parole and life without parole, Mr. Houston's counsel abandoned the directive that a juror should sentence a defendant to life with parole unless the State demonstrates that a sentence of life in prison without parole is more appropriate given the defendant's particular case. According to Mr. Houston, by failing to emphasize the favorable sentencing presumption, "the jurors were free to vote for life without parole based upon any inclination, no matter how slight," and "this certainly undermines confidence in the result." We disagree.

¶ 92 We recognize the importance of voir dire questioning as "essential to choosing an impartial jury, and an impartial jury is as essential to a fair trial as is an impartial judge."[162] Indeed, "[v]oir dire is intended to provide a tool for counsel . . . to carefully and skillfully determine, by inquiry, whether biases and prejudices, latent as well as acknowledged, will interfere with a fair trial if a

---

[162] *State v. Saunders*, 1999 UT 59, ¶ 33, 992 P.2d 951.

particular juror serves in it."[163]  While the jury selection process is of great importance, there are many ways to effectively question jurors, and there "are a multitude of inherently subjective factors typically constituting the sum and substance of an attorney's judgments about prospective jurors."[164]  Given that "jury selection is more art than science,"[165] "trial counsel should be given considerable latitude in asking voir dire questions, especially in view of the fact that only counsel will, at the beginning, have a clear overview of the entire case and the type of evidence to be adduced."[166]  Thus, when reviewing an attorney's questioning and decision to keep or remove a particular juror, we must presume that counsel's choices were objectively reasonable, "the product of a conscious choice or preference," and "constitute effective representation."[167]  Mr. Houston has failed to rebut this presumption.

¶ 93 First, Mr. Houston has failed to show that there was anything unreasonable about his counsel's questioning of the jurors.  During voir dire, Mr. Houston's counsel actively participated and asked the jurors a series of questions to probe their ability to serve as impartial jurors.  These questions included whether the individuals could consider the life with parole and life without parole sentences equally, and whether they thought one sentence was too severe or one was too lenient. Our review of the record demonstrates that all of the jurors selected expressed openness to imposing either sentence presented to them and that they were committed to hearing all the evidence before making a decision.[168]  And the excerpts cited by Mr. Houston in his brief

---

[163] *Id.* ¶ 34 (internal quotation marks omitted).

[164] *State v. Litherland*, 2000 UT 76, ¶ 21, 12 P.3d 92.

[165] *Id.*

[166] *Saunders*, 1999 UT 59, ¶ 34 (internal quotation marks omitted).

[167] *Litherland*, 2000 UT 76, ¶ 20.

[168] For example, when Mr. Houston's counsel asked one juror whether life without parole was too severe, or if she felt life with parole was too light, she responded, "Depends on what you guys present in front of us."  In response to a similar question, another

(con't.)

42

only bolster this conclusion. We determine that this openness does not mean the jurors were unable or unwilling to impose the presumptive sentence of life with parole, it simply indicates their ability and willingness to serve impartially.

¶ 94 Second, we conclude that any confusion that may have resulted from Mr. Houston's counsel's questions to the jurors was cured by the trial court's jury instruction to apply a presumption of life with parole, and by counsel's closing argument, which also emphasized this directive. Immediately before conducting individual jury voir dire, the trial court advised the prospective jurors that the law favored a sentence of life with parole over life without parole:

> The jury will be presented with evidence for and against a penalty of life in prison without parole. It is presumed that an indeterminate prison term of not less than 20 years and which may be for life will be imposed upon the defendant unless the State persuades you that a penalty of life in prison without parole is the appropriate sentence in this case.

¶ 95 During closing argument, Mr. Houston's counsel reminded the jury that the presumptive sentence was life with parole and that the State bore the burden of persuading the jury that life without parole was the appropriate sentence. Finally, at the conclusion of the sentencing proceeding, the court instructed the jury that "[t]he penalty of life without parole should only be imposed if the jury determines that such a sentence is appropriate" and that the "burden rests upon the State to persuade [the jury] that a sentence of life in prison without parole

---

juror responded, "I think you have to learn what the circumstances are. You know, you really can't judge the person unless you hear all the details." Other jurors explained that they would consider either sentence appropriate "depending on the circumstances," or "depending on what we hear" about the evidence. Similarly, other jurors noted that they were willing to consider "either [sentence] fairly" and that before the evidence was presented they "couldn't say one way or the other right now."

is the appropriate sentence in this case." We are convinced that these instructions and reminders from counsel and the court were sufficient to cure any misperceptions that may have been created during Mr. Houston's counsel's voir dire questioning.[169] Having concluded that Mr. Houston's counsel did not act unreasonably during voir dire questioning and that Mr. Houston has failed to show any prejudice from his performance, we reject this ineffective assistance of counsel claim.

### D. *Mr. Houston Has Failed to Show His Counsel Rendered Ineffective Assistance by Failing to Seek a Change of Venue*

¶ 96 Mr. Houston claims that his attorney rendered ineffective assistance of counsel by failing to seek a change of venue, or to "even conduct a venue analysis" in Mr. Houston's case. Specifically, Mr. Houston contends that the negative pretrial media attention surrounding his case—including reports of gruesome details about the crime, sympathetic stories about the victim and her family, and "community outcry" against violent sex offenders—made it impossible for Mr. Houston to have a fair proceeding in Davis County. We disagree.

¶ 97 Under Utah Rule of Criminal Procedure 29, a defendant who "believes that a fair and impartial trial cannot be had in the jurisdiction where the action is pending" may "ask to have the trial of the case transferred to another jurisdiction."[170] Whether counsel should seek a change of venue is a question that must be evaluated under the "totality of the circumstances."[171] Relevant considerations may include "(1) the standing of the victim and the accused in the community; (2) the size of the community; (3) the nature and gravity of the offense; and (4) the nature and extent of publicity."[172] However, recognizing the benefits of hindsight, in posttrial evaluation "the determinative question is whether [the]

---

[169] *See State v. Menzies*, 889 P.2d 393, 401 (Utah 1994) (noting that an appellate court will "generally presume that a jury will follow the instructions given [to] it").

[170] UTAH R. CRIM. P. 29(d)(1).

[171] *State v. James*, 767 P.2d 549, 552 (Utah 1989).

[172] *Id.*

defendant was ultimately tried by a fair and impartial jury."[173] This is because "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial."[174] And when a defendant challenges counsel's decision to seek a change of venue, the defendant must show that the pretrial media coverage was so prejudicial that it was objectively unreasonable for his counsel not to seek a change in venue.[175] Mr. Houston has not made this showing.

¶ 98 Counsel selected twelve jurors and two alternates. The record demonstrates that five of the jurors selected had no knowledge of Mr. Houston and were not exposed to any information about the crimes committed. Of the nine jurors who had heard of the crime, seven indicated that they had not formed an opinion about what Mr. Houston's punishment should be, and two indicated that they had formed opinions. However, subsequent explanations from those two jurors revealed that they had only formed an opinion about Mr. Houston's guilt—an issue that, because of Mr. Houston's plea, was not in dispute. Those jurors thus had not predetermined what Mr. Houston's punishment should be, only that some form of punishment was appropriate. Both jurors indicated that they could rely on the evidence to determine the appropriate sentence and would be fair and impartial in their decision-making.[176] Moreover,

---

[173] *Lafferty v. State*, 2007 UT 73, ¶ 42, 175 P.3d 530 (alteration in original) (internal quotation marks omitted).

[174] *Codianna v. Morris*, 660 P.2d 1101, 1111 (Utah 1983) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)) (internal quotation marks omitted).

[175] *See Archuleta*, 2011 UT 73, ¶ 38 (stating that a defendant must show both objectively deficient performance and prejudice to prevail on a claim of ineffective assistance of counsel).

[176] During voir dire, one of the two jurors explained that she did not really understand the question because she did not realize until later that Mr. Houston had pleaded guilty. She stated that she did not have any opinion about what his sentence should be because "you have to learn what the circumstances are. . . . [Y]ou can't judge the person unless you hear all the details." The other juror explained that she had not formed an opinion because "I

(con't.)

Mr. Houston's counsel asked detailed questions of all the jurors, and the jurors' voir dire answers demonstrated that they could be fair and impartial despite their exposure to any pretrial publicity.

¶ 99  Although Mr. Houston referenced several graphic and detailed newspaper articles about his case, he has failed to identify anything in the record that supports his claim that this pretrial coverage resulted in a biased juror or jury.  While it may have been prudent for Mr. Houston's attorney to seek a change of venue due to the small community and concentrated media attention surrounding Mr. Houston's case, Mr. Houston's claim that this pretrial publicity affected his sentence is speculative at best.  Because Mr. Houston has not shown that it was objectively unreasonable not to seek a change of venue or that counsel's decision resulted in an unfair sentencing proceeding, we conclude that this claim of ineffective assistance of counsel fails.

*E.  Mr. Houston Has Failed to Demonstrate that Counsel Was Ineffective for not Objecting to Testimony From a Department of Corrections Officer that Mr. Houston Could Be Paroled Before Serving at Least Twenty Years in Prison*

¶ 100 Mr. Houston next argues that his counsel was ineffective when he failed to object, move to strike, or seek a curative instruction to address the testimony from John Ford, an assistant director with the Utah Department of Corrections.  Mr. Ford testified that if Mr. Houston was sentenced to life with parole, there was a chance that Mr. Houston could be released before serving at least a twenty-year prison term.

¶ 101 During the sentencing proceeding, Mr. Houston's counsel called Mr. Ford to testify about Utah's sentencing system and to explain to the jury the different treatment afforded inmates sentenced to life with parole and life without parole.  Mr. Ford also explained that when an individual is sentenced to life with the possibility of parole, it is for an indeterminate term, meaning that after a period of time the Board of Pardons and Parole would hold a hearing to determine when an individual might be paroled. The Board of Pardons would also schedule a future hearing to revisit this determination.

---

haven't heard . . . enough to."  She also stated that she could fairly consider either sentencing option.

¶ 102 On cross-examination, the prosecutor asked Mr. Ford whether the Board of Pardons could release Mr. Houston before he served twenty years in prison if the jury chose to sentence him to life with parole. Mr. Ford responded, "I don't think [the Board of Pardons] would ever consider doing that. Unless there's a medical [emergency] or unless [the defendant] is no longer a threat." After this comment, the prosecutor and Mr. Ford had the following exchange:

PROSECUTOR: So generally speaking, you would anticipate the person serve at least 20 years?

MR. FORD: At least that and most likely it would be much more than that.

PROSECUTOR: But it's not a guarantee, clearly, because the Board of Pardons has great power?

MR. FORD: Yes.

¶ 103 To emphasize the unlikelihood of a release from prison before Mr. Houston served at least twenty years, Mr. Houston's counsel asked on redirect: "It was asked whether or not I guess in theory somebody could be released prior to 20 years. In theory that's possible, but not likely?" Mr. Ford responded, "Not likely." Mr. Houston's counsel then asked, "Especially where you need a three-person majority [of the Board of Pardons] and you indicated that it's most likely that the person will spend much more than the 20 years in prison?" Mr. Ford responded, "That's correct."

¶ 104 Mr. Houston argues that counsel was ineffective in responding to Mr. Ford's testimony. Specifically, Mr. Houston argues that counsel should have objected during the prosecutor's cross-examination of Mr. Ford, and that by bringing the issue back up on redirect, counsel only reinforced to the jury that Mr. Houston's early release was a viable possibility. We find nothing ineffective or prejudicial about Mr. Houston's counsel's response to Mr. Ford's testimony.

¶ 105 A formal objection and request for a curative instruction is not the only objectively reasonable response to unexpected or

47

unfavorable testimony.[177]  As stated before, there are a variety of ways to competently represent a criminal defendant, and no one method is required for effective representation.[178]  Instead of objecting to the prosecutor's line of questioning, Mr. Houston's counsel decided to clarify on redirect and emphasize to the jury that the likelihood that Mr. Houston would be released early was extremely limited.  When we consider this decision in light of the presumption of competence, we must conclude that Mr. Houston's counsel was not ineffective and that his decision to emphasize the limited chance of early release on redirect "was the result of conscious trial strategy."[179]

¶ 106 We further conclude that Mr. Houston has failed to demonstrate any prejudice resulting from his attorney's response to Mr. Ford's testimony.  Before sentencing, the judge instructed the jury to disregard any testimony about possible early release: "[Y]ou are not to take into account any actions the Board of Pardons and Parole might take in the future.  Future decisions of the Board are merely speculative and are irrelevant to a jury's determination of an appropriate sentence."  This instruction assures us that any improper weight that the jury may have assigned to this line of questioning was properly addressed and cured by the trial judge.[180]

*F.  Mr. Houston Has Failed to Demonstrate that His Counsel Was Ineffective for not Objecting to the Alleged Double Counting of an Aggravating Factor in the Jury Instructions*

¶ 107 Mr. Houston's next ineffective assistance of counsel argument stems from his counsel's failure to object to a series of

---

[177] *See State v. Bullock*, 791 P.2d 155, 160 (Utah 1989) (concluding trial counsel's decision not to object to unfavorable testimony did not constitute ineffective assistance of counsel).

[178] *See Templin*, 805 P.2d at 186.

[179] *Bullock*, 791 P.2d at 160.

[180] *See State v. Mead*, 2001 UT 58, ¶ 50, 27 P.3d 1115 (holding that a jury instruction cured any prejudice that may have resulted from the admission of improper testimony); *see also Menzies*, 889 P.2d at 401 (noting that an appellate court presumes that the jury follows its given instructions).

jury instructions. Mr. Houston claims that by not objecting to these instructions, counsel allowed the jury to engage in an improper double counting of aggravating factors during sentencing. We disagree.

¶ 108 Jury instruction number 13 states in relevant part:

> During the sentencing proceeding, aggravating and mitigating evidence was presented to you with respect to the penalty to be imposed. You are instructed that the terms "aggravating circumstances," "aggravating factors," and "aggravating evidence," used interchangeably, refer to evidence tending to show that the penalty of life without parole is appropriate.

Jury instruction number 14 states that "[t]he fact that [Mr. Houston] has pled guilty to the crime of Aggravated Murder is not an aggravating circumstance. . . . However, you may consider as aggravating circumstances the matters that were presented as aggravating circumstances in the charge against the defendant." And finally, jury instruction number 15 lists "rape" and "aggravated sexual assault" as two possible aggravating circumstances the jury could consider. "Aggravated sexual assault" is defined as when an individual "in the course of a rape . . . , causes bodily injury to the victim or uses or threatens the victim with the use of a dangerous weapon, such as a knife." Mr. Houston argues that these instructions created overlapping aggravating factors that skewed the weighing process in the minds of the jurors.

¶ 109 During the sentencing proceeding, the judge told the jury that it may find an aggravating circumstance if it concluded that "[Mr. Houston] intentionally or knowingly caused the death of [the victim] while . . . engaged in the submission of or an attempt to commit rape or aggravated sexual assault." The judge's instructions made clear that Mr. Houston was charged with and pleaded guilty to aggravated murder because he committed either rape or aggravated sexual assault, but not both. These aggravating factors were read to the jury in the alternative, and thus, the jury could find the presence of an aggravating circumstance if it concluded that *either* rape or sexual assault occurred. The instruction did not direct the jury to count these as

separate aggravating factors, and thus, Mr. Houston's counsel did not err by not objecting to these instructions.

¶ 110 We further conclude that even if there was some confusion surrounding aggravating circumstances in the jury instructions, any confusion did not prejudice Mr. Houston because the jury was instructed to weigh the aggravating and mitigating circumstances not in terms of numbers, but rather in terms of "how compelling or persuasive the evidence is when deciding an appropriate sentence." To emphasize the directive that the jury should not merely count up the aggravating and mitigating circumstances, the trial court stated that "any aggravating factor, standing alone, could be more persuasive than some or all of the mitigating factors in the case. On the other hand, one mitigating factor, standing alone, could be more persuasive than some or all of the aggravating factors." Therefore, even if Mr. Houston is correct in his assertion that the jurors counted the rape and sexual assault as two separate aggravating factors rather than finding the presence of one or the other, the jurors' ultimate decision was still based on what they found most compelling or persuasive considering the totality of the circumstances, not the mere number of aggravating factors present in the case. And in evaluating Mr. Houston's claim of prejudice, we must proceed "on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision."[181] We therefore conclude that Mr. Houston has failed to show that his counsel's performance was deficient or that any deficiency caused him prejudice.

*G. Mr. Houston Has not Demonstrated Cumulative Error that Undermines Our Confidence in His Sentence*

¶ 111 Finally, Mr. Houston argues that we should reverse his sentence under the cumulative error doctrine because the ineffectiveness of counsel alleged above should undermine our confidence in the sentence. To evaluate a cumulative error claim, "we consider all the identified errors, as well as any errors we assume may have occurred."[182] However, "[i]f the claims are

---

[181] *Parsons*, 871 P.2d at 530 (internal quotation marks omitted).

[182] *State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 (internal

(con't.)

50

found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied."[183]    Because we find that each of Mr. Houston's ineffective assistance of counsel claims fails, our confidence in the fairness of his sentence is not undermined.  Therefore, we find no cumulative error.

## CONCLUSION

¶ 112  It is beyond contention that Mr. Houston's case is tragic. This is an extremely uncommon case where the jury, considering the mitigating circumstances inherent to Mr. Houston's youth, nevertheless concluded that life without the possibility of parole was the appropriate sentence for the crime committed.  We hold that Mr. Houston properly brought constitutional challenges to his sentence under Utah Rule of Criminal Procedure 22(e); however, we conclude that each of his claims fails.  We also hold that Mr. Houston has failed to demonstrate that he received ineffective assistance of counsel.  We therefore affirm the jury's sentence of life in prison without the possibility of parole.

---

quotation marks omitted).

[183]  *Id.* (alteration in original) (internal quotation marks omitted).

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶ 113  I concur in the opinion of the court in part and concur in the judgment affirming the conviction entered against Mr. Houston. I write separately, however, to express my disagreement with the majority on two principal points: (1) I would not deem Houston's challenge to his sentence to be properly presented under rule 22(e) of our rules of criminal procedure (but instead subject only to review for plain error); and (2) I would reject Houston's state constitutional challenge to his sentence based on an original understanding of the Utah Constitution, which categorically forecloses the proportionality challenge advanced in this case.

## I. PRESERVATION AND UTAH RULE OF CRIMINAL PROCEDURE 22(e)

¶ 114  Houston failed to raise a constitutional challenge to his sentence in the proceedings below. Despite that failure, the majority deems the constitutional claims advanced on appeal to be properly presented under rule 22(e) of the Utah Rules of Criminal Procedure. *Supra* ¶ 26. That provision expressly authorizes a court to "correct an illegal sentence, or a sentence imposed in an illegal manner, at any time." UTAH R. CRIM. P. 22(e). In recent cases, however, we have adopted limiting constructions of this rule. Most recently, in *State v. Prion*, 2012 UT 15, 274 P.3d 919, we noted that "rule 22(e) is based on an antecedent in the federal rules," and we limited our state rule to the traditional application of its federal antecedent. *Id.* ¶ 22. Specifically, *Prion* held that a challenge to an "illegal sentence" under rule 22(e) is limited to "instances 'when the sentence imposed exceeds the statutorily-authorized limits, violates the Double Jeopardy Clause, or is ambiguous or internally contradictory.'" *Id.* (quoting *United States v. Pavlico*, 961 F.2d 440, 443 (4th Cir. 1992)).

¶ 115 As the *Prion* opinion explained, this traditional limitation (imported from federal law) is aimed at striking "a careful balance between the goal of correcting illegal sentences on one hand and . . . encouraging preservation and finality on the other." *Id.* Yet the *Prion* standard is not a subjective balancing test. Nor does it leave room for the standard embraced by the majority—of opening the door to unpreserved challenges to sentences that are "facial" and not "as-applied." *Supra* ¶ 26.

Instead, the standard we articulated in *Prion* is an objective one based on past practice under a parallel (but subsequently amended) federal rule. As stated plainly in *Prion*, rule 22(e) leaves room only for challenges to sentences that exceed statutory limits, that violate double jeopardy, or that are ambiguous or internally contradictory. *Prion*, 2012 UT 15, ¶ 22.

¶ 116 The majority overrules this standard, replacing it with a standard allowing a "facial challenge" to the constitutionality of a sentence but foreclosing "fact-intensive," "as-applied" challenges. *Supra* ¶¶ 18, 23, 26. The court purports to find support for this standard in *Prion* and its antecedents. *See supra* ¶¶ 24–27 (citing *Prion* and also *State v. Candedo*, 2010 UT 32, 232 P.3d 1008; *State v. Telford*, 2002 UT 51, 48 P.3d 228; and *State v. Brooks*, 908 P.2d 856 (Utah 1995)). But none of our prior opinions adopt the formulation established today.

¶ 117 Granted, the *Prion* opinion explained the rationale behind this limitation in terms that emphasized the downsides of opening the door to unlimited challenges to the constitutionality of a sentence. Our opinion warned, for example, of the abuse and anomaly that would ensue if our law "elevate[d] challenges to sentencing proceedings over parallel challenges to the guilt phase of a trial." *Prion*, 2012 UT 15, ¶ 20. And we cautioned specifically against "a fact-intensive challenge to the legality of a sentencing proceeding asserted long after the time for raising it in the initial trial or direct appeal." *Id*. But the quoted language was only an explanation of the policy basis for the standard we clarified in *Prion*; it was not the standard itself.

¶ 118 The *Prion* standard, rather, was the traditional formulation we imported from longstanding cases interpreting the federal rule incorporated into our rule 22(e)—encompassing only "instances 'when the sentence imposed exceeds the statutorily-authorized limits, violates the Double Jeopardy Clause, or is ambiguous or internally contradictory.'" *Id*. ¶ 22. The majority is mistaken in its assertion that *Prion* "nowhere stated that we were adopting the federal limitation" as the holding of the court. *Supra* ¶ 24 n.35. We did so expressly, and repeatedly. *See Prion*, 2012 UT 15, ¶ 21 (noting that "[b]oth grounds" asserted by Prion "to challenge his revised sentence are consistent with the traditional, established bases for a rule 22(e) motion," and indicating that "we *accordingly* reject the State's procedural argument notwithstanding our acknowledgement of the need for

a narrow construction of the rule" (emphasis added)); *see also id.* ¶ 23 ("[Prion's] 22(e) motion . . . is one that comes within the traditional bounds of the rule, and we *accordingly* uphold it against the State's procedural attack." (emphasis added)).

¶ 119 Our *Candedo* opinion cannot properly be read to support the majority's new standard. *Candedo* did not establish a standard dependent on the "facial" or "as-applied" nature of a constitutional challenge to a sentence. Instead, the opinion in *Candedo* simply reversed the court of appeals' determination that an "illegal" sentence under rule 22(e) was limited to cases "where either the sentencing court has no jurisdiction, or . . . the sentence is beyond the authorized statutory range." 2010 UT 32, ¶ 10 (alteration in original) (internal quotation marks omitted). And in so doing, *Candedo* stated generally that "if an offender's sentence is unconstitutional, the sentence is not authorized by the 'judgment of conviction,' and is therefore illegal." *Id.* ¶ 13. On that basis, *Candedo* held "that the court of appeals erred in failing to reach the merits of Candedo's" constitutional challenge "because the definition of illegal sentence under rule 22(e) is sufficiently broad to include constitutional violations that threaten the validity of the sentence." *Id.* ¶ 14. Our holding in *Candedo*, moreover, did not rest on a distinction between *facial* and *as-applied* challenges to a sentence.

¶ 120 Indeed, our constitutional analysis (upholding Candedo's sentence against a substantive due process attack) ultimately rejected *both* facial and as-applied challenges. *See id.* ¶ 21 (holding "that Utah's probation statute generally, as well as the term of probation to which Candedo was sentenced, are rationally related to the state's legitimate interest"); *id.* ¶ 23 (acknowledging that "a defendant could successfully challenge a probation sentence that is truly arbitrary or discriminatory under the due process clause or prove that the probation statute is cruel and unusual, but such a case is not before us now"). And as to the governing standard, the *Candedo* opinion effectively punted on the specific sorts of constitutional claims that could be cognizable under rule 22(e). While acknowledging the state's argument that rule 22(e) countenances only claims that a sentence is "'patently' or 'manifestly' illegal," the *Candedo* court concluded that it was unnecessary to "reach" that issue if the claims at issue failed on their merits. *Id.* ¶ 14 (concluding that there is no need to "reach

the issue of whether the sentence is 'patently' or 'manifestly' illegal" if the claim fails on its "merits").

¶ 121 Our earlier decision in *Telford* is to the same effect. There we acknowledged that Telford challenged his sentence "on both per se and as applied grounds," 2002 UT 51, ¶ 2; noted that rule 22(e) is a narrow exception to the rule of preservation, allowing only the "correction of manifestly illegal sentences," *id.* ¶ 5; and stopped short of defining the limiting standard (of what is "manifestly illegal") because the claims at issue clearly failed on their merits, *id.* ¶ 6 (rejecting claims under the Sixth Amendment and article I, section 12 of the Utah Constitution on the ground that these provisions provided "no articulable basis for attacking [Telford's] sentence").[184]

¶ 122 The majority also cites *State v. Brooks*, 908 P.2d 856 (Utah 1995), in support of its new standard, *supra* ¶ 27, but the *Brooks* opinion is in line with the approach in *Telford* and *Candedo*. As the majority indicates, the *Brooks* opinion states that "nothing is to be gained by remanding the case to the trial court" when "the pertinent facts are undisputed and a purely legal question with respect to which the trial court has no discretion remains to be decided." 980 P.2d at 860. But the *Brooks* opinion does not adopt the facial/as-applied distinction embraced by the majority. It simply holds that rule 22(e) may sometimes "permit[] the court of appeals to consider the legality of a sentence even if the issue is raised for the first time on appeal," while rejecting the applicability of the rule in the context of a claim that "[i]n substance" challenges the underlying conviction and not the sentence. *Id.* (explaining that Brooks's claim, while styled as a challenge to his sentence, was ultimately a challenge to his "conviction for a lesser included offense").

---

[184] The point is not to suggest that the court did not decide whether the claims in *Telford* and *Candedo* were properly brought under rule 22(e). I am simply clarifying that the operative standard articulated in these cases was relatively unimportant, as the sentencing challenges at issue failed on their merits in any event. And, given the patchwork formulations in our cases at the time we decided *Prion*, it was essential that our opinion in that case seek to provide some clarity.

¶ 123 I acknowledge the plausibility of the alternative readings of our prior cases advanced by the majority opinion. As that opinion suggests, the *Candedo* opinion may plausibly be read to have endorsed the viability of *any* "constitutional violations that threaten the validity of the sentence." *See supra* ¶ 24 n.35. As for *Telford* and *Brooks*, those opinions may also be understood to have interpreted rule 22(e) in a manner endorsing an operative legal standard—in *Telford*, the notion that the rule is limited to the correction of sentences that are "manifestly illegal," 2002 UT 51, ¶ 5; and in *Brooks*, the principle that the rule encompasses challenges to sentences that are "patently illegal," 908 P.2d at 860.

¶ 124 Yet these constructions of rule 22(e) are untenable. The broad formulation in *Candedo* would erase our rules of preservation for challenges to sentences and thereby treat sentencing proceedings as somehow more significant than trials. That makes no sense, as even the majority opinion today recognizes. And the standards in *Telford* and *Brooks* are unworkable. We can assess *illegality*; but "patent" or "manifest" illegality are concepts inviting arbitrary decision-making.

¶ 125 Our *Prion* opinion filled the gap left by the competing standards set forth in our caselaw. Facing the untenably broad formulation in *Candedo* and the unworkable premises of *Telford* and *Brooks*, *Prion* was faced with the task of determining conclusively the scope of the rule 22(e) exception. And because the claims in *Prion* could not easily be brushed aside as meritless, we could not easily sidestep the issue of the appropriate standard under rule 22(e). In addressing this question, moreover, *Prion* clearly and expressly defined an objective standard under rule 22(e)—a standard, as noted above, that tied our state rule to cases under its federal antecedent, and that limited the challenges countenanced by the rule to those attacking sentences that exceed statutory limits, that violate double jeopardy, or that are ambiguous or internally contradictory.[185] *Prion*, 2012 UT 15, ¶ 22.

---

[185] The majority's principal attempt to justify its rejection of the standard set forth in *Prion* is its recognition of the federal antecedent to our state rule 22(e), combined with the assertion that some federal courts recognized a "broader" principle under which a sentence "generally 'in violation of the Constitution'" or

(con't.)

¶ 126 This holding was significant. It established an objective, historically rooted limitation on the broad terms of rule 22(e) — a limitation that was essential to preserving the policies and domain of the doctrine of preservation, and of avoiding the absurdity of a regime that would preference constitutional challenges to *sentences* over constitutional challenges to underlying *convictions*. *See id.* ¶ 20 (warning of the prospect of "abuse" of a broad standard under rule 22(e), which would undermine the policies behind the law of preservation and would "elevate challenges to sentencing proceedings over parallel challenges to the guilt phase of a trial").

¶ 127 Our decision in *Prion* was simple, straightforward, and unanimous. I would reaffirm it and apply it here. And I would accordingly deem Houston's challenges to his sentence uncovered by rule 22(e), as none of them involve a claim that his sentence exceeded statutory limits, violated double jeopardy, or was

---

"based on 'misinformation of a constitutional magnitude'" could have been subject to challenge under the federal rule. *Supra* ¶ 23. It is unsurprising that the general federal rule we embraced in *Prion* may have been subject to an occasional aberration or exception in the federal caselaw. That is also beside the point. *Prion* embraced a straightforward, objective standard limiting rule 22(e) challenges to those attacking sentences that exceed statutory limits, that violate double jeopardy, or that are ambiguous or internally contradictory. *Prion*, 2012 UT 15, ¶ 22. We rooted that standard in the majority rule adopted in federal cases as we understood them. But the standard was clear and unmistakable; it was in no way a standard subject to expansion or extension if aberrational federal cases could be cited in the future (as in the majority opinion here).

The point in invoking the federal caselaw is not to suggest that we are bound to follow it. *Prion* was based on the need to adopt an objective, limiting standard under rule 22(e). And the federal standard was the one we chose to fulfill that need.

It is telling that even the majority does not adopt the standard set forth in the outlier federal cases that it cites. Instead, it adopts a new one of its own making, and in so doing it repudiates a square holding that is entitled to deference.

ambiguous or internally contradictory. Thus, I would analyze Houston's constitutional challenges to his sentence under a standard of plain error review, which is the standard that applies to an unpreserved challenge to a sentence that is not covered by rule 22(e).

¶ 128  I would also observe that the court's analysis is itself unfaithful to the standard it postulates. Some of Houston's challenges to his sentence seem to be "as-applied" challenges. *See supra* ¶¶ 30–32 (addressing Houston's *Apprendi* challenge); *supra* ¶¶ 49–51 (addressing Houston's Unnecessary Rigor Clause challenge). These claims clearly implicate a degree of fact-intensive analysis. Even "facial challenges," moreover, may require fact-intensive analysis, in that such challenges require a litigant to "establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).[186] If this is the sort of claim the majority means to preserve under criminal rule 22(e), the court has not succeeded in adopting a "limited" standard. It has instead opened the door to a broad range of claims that are quite often fact-intensive.

¶ 129  The back-and-forth between the majority and dissenting opinions is illustrative. The dissent cites extensive social science research in support of its conclusion that Houston's life-without-parole sentence is incompatible with the standard of proportionality that it advances. *Infra* ¶¶ 258–269 (cataloguing social science research on the nature of juvenile cognitive

---

[186] The majority opinion responds with the notion that "the court need not delve into the record or make findings of fact" on a "facial constitutional attack." *Supra* ¶ 27. That strikes me as overstated. To establish that "no set of circumstances exists" in which a sentencing provision could be valid, *Salerno*, 481 U.S. at 745, factual questions could easily be implicated. This case is a prime example. If we are to gauge social science research in assessing the question of proportionality in sentencing, surely we could benefit from the presentation of evidence on the matter. On this question the competing opinions find it sufficient to rest on their own evaluations of social science, but that does not make the inquiry any less fact-intensive.

functions and its impact on principles of retribution and rehabilitation). And the majority offers responses similarly invoking social science material. *Supra* ¶¶ 58–59 (addressing the special status of minors based on "science and social science research, including longitudinal studies and brain mapping"). With this background, it seems apparent that the cruel and unusual punishment challenge asserted by Houston is a fact-intensive one. For me, this underscores the untenable nature of the standard adopted by the court today. In time the court will be required to reject it, and replace it with a more workable one. I would avoid that problem by retaining the standard we articulated in *Prion*.

¶ 130 Finally, I would register a plea that we revisit this issue immediately through our rulemaking process. Our law as it stands under rule 22(e) as written is confusing, fuzzy, and perverse. The confusion is in the terms of the rule. The rule as it stands is a trap for an unwary litigant. We should not retain a rule that says one thing and means another. The fuzziness is in the court's standard as articulated today. There is no clear, established distinction between "facial" and "as-applied" challenges to a sentence.[187] So the standard we have adopted is sure to lead to uncertainty and arbitrary decisionmaking going forward. Lastly, the perversion is in a legal regime that suspends the law of preservation for "facial" constitutional challenges to a *sentence* while retaining the law of preservation for parallel challenges to a *conviction*. That is backwards. If anything, an unconstitutional conviction ought to be more troubling.

---

[187] *See Am. Fed'n of State, Cnty., & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 865 (11th Cir. 2013) ("[T]he line between facial and as-applied relief is a fluid one, and many constitutional challenges may occupy an intermediate position on the spectrum between purely as-applied relief and complete facial invalidation."); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1321 (2000) ("There is no single distinctive category of facial, as opposed to as-applied, litigation.").

¶ 131 The majority's standard under rule 22(e) should not stand. We should amend the rule to address the significant problems that are highlighted by today's opinion.

## II. HOUSTON'S CONSTITUTIONAL CLAIMS

¶ 132 For the above reasons, I would address Houston's constitutional claims under a plain error standard of review. And I would reject all of them under that standard, as Houston has not asserted—and cannot conceivably claim—that the sentence imposed runs afoul of established legal standards. *See, e.g.*, *State v. Nielsen*, 2014 UT 10, ¶ 58, 326 P.3d 645 (noting that for an error to be "plain" it must be legal in nature, and an "obvious" error "not reasonably in dispute" (internal quotation marks omitted)).

¶ 133 That is as far as we need to go to resolve this case. Because my colleagues see the matter differently, however, and proceed to address the merits of Houston's claims as if they were covered by rule 22(e), it seems appropriate for me to meet their analysis on its own terms. In so doing, I would first note that assuming rule 22(e) to apply to Houston's claims, I would concur in the majority's analysis of Houston's federal constitutional claims. *See supra* ¶¶ 29–63, 69–108.

¶ 134 To the extent Houston is asserting a federal constitutional challenge to his sentence, we are of course bound to follow the precedents of the United States Supreme Court under the Eighth Amendment's Cruel and Unusual Punishments Clause. And because those precedents appear to adopt a form of "proportionality" review,[188] we must apply that same standard

---

[188] The U.S. Supreme Court has invoked proportionality analysis in a number of its opinions. *See Miller v. Alabama*, 132 S. Ct. 2455, 2475 (2012) (striking down mandatory life without parole sentences for juveniles as violating the "principle of proportionality" embedded in the Eighth Amendment); *Graham v. Florida*, 560 U.S. 48, 59 (2010) (holding that Eighth Amendment proportionality principle prohibits imposition of life without parole sentence on juvenile who did not commit homicide); *Solem v. Helm*, 463 U.S. 277, 284 (1983) (striking down life without parole sentence for nonviolent felony under recidivism statute, holding that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed"). But the "precise contours" of the

(con't.)

here in assessing Houston's federal constitutional claim. I concur in the majority opinion's analysis as it applies to this federal claim. I would reject Houston's Eighth Amendment argument for the reasons set forth in the court's opinion. *See supra* ¶¶ 52–63.

¶ 135 Houston's state constitutional claim is another matter. To the extent Houston is challenging his sentence under article I, section 9 of the Utah Constitution, it is our prerogative and responsibility to articulate the applicable legal standard. And on that point my grounds for rejecting Houston's constitutional challenge to his sentence extend beyond those set forth in the majority opinion.

¶ 136 Unlike the majority, I would not assume that the Utah Cruel and Unusual Punishments Clause incorporates a standard of proportionality authorizing appellate courts to second-guess a lawfully imposed sentence on grounds of excessiveness. *Supra* ¶ 64.[189] And unlike the dissent, *infra* ¶¶ 213–251, I would not

---

proportionality standard are somewhat "unclear." *Harmelin v. Michigan*, 501 U.S. 957, 998 (1991) (Kennedy, J., concurring in part and concurring in the judgment). In *Harmelin*, the lead opinion (authored by Justice Scalia, and joined by Chief Justice Rehnquist) concluded that *Solem* was wrongly decided, and that the Eighth Amendment's Cruel and Unusual Punishments Clause did not incorporate a principle of proportionality or excessiveness. *See id.* at 961–94 (1991) (lead opinion of Scalia, J.). In a separate concurrence, Justice Kennedy (joined by two other members of the court) indicated an inclination to adopt a limited notion of "gross" proportionality. *See id.* at 1005 (Kennedy, J., concurring in part and concurring in the judgment). Thus, the federal caselaw appears to be "evolving," as we indicated in *State v. Mace*, 921 P.2d 1372, 1377 n.4 (Utah 1996) (asserting that "[o]ur use of the term 'disproportional' . . . is not meant to express any view on the status of this evolving jurisprudence, nor is the meaning of the term at issue in the present case"). Yet we are bound to follow the court's holdings—particularly, of relevance here, the decisions in *Graham* and *Miller*, which consider "objective indicia of society's standards" and a court's "independent judgment" in evaluating a "categorical" challenge to the constitutionality of a sentencing scheme as applied to juveniles. *Graham*, 560 U.S. at 61.

[189] I would also stop short of expressing any "hope . . . that LWOP sentences for juveniles will be rare." *Supra* ¶ 67. That

(con't.)

interpret article I, section 9 to authorize this court to consult our "humanitarian instincts," *infra* ¶ 255, or our sense of "evolving standards of decency that mark the progress of a maturing society." *Infra* ¶ 213.

¶ 137  Instead, based on the original meaning of the text of article I, section 9, I would conclude that the Utah Constitution forbids only those modes of punishment that were repudiated as "cruel" at the time of the adoption of this provision and that are "unusual" in the sense of being contrary to established practice. And I would accordingly reject Houston's state constitutional claim on grounds narrower than those embraced by the majority.

¶ 138  First, I would repudiate the dicta in this court's prior interpretations of article I, section 9, which articulate an unworkable standard and accordingly do not merit deference under the doctrine of *stare decisis*. Second, I would adopt an originalist conception of article I, section 9—a standard that leaves no room for proportionality analysis and prohibits only those methods of punishment that are so barbaric or cruel that they were barred by longstanding law or practice. Finally, applying this standard, I would reject Houston's state constitutional claim because he raises no challenge to the method of his punishment but only challenges his term of confinement on grounds of proportionality.

## A. Utah Supreme Court Precedent

¶ 139  In *State v. Herrera*, 1999 UT 64, ¶ 39, 993 P.2d 854, this court asserted that the Utah Constitution's prohibition of cruel and unusual punishments encompasses a principle of proportionality. In the *Herrera* court's words, "a criminal punishment is cruel and unusual" under article I, section 9 "if the punishment is so disproportionate to the offense committed that it shock[s] the moral sense of all reasonable men as to what is right and proper under the circumstances." *Id*. ¶ 33 (alteration in original) (internal quotation marks omitted).

---

sounds well and good as a matter of humanitarian empathy. But it strikes me as beyond our role as judges to express "hope" for any particular outcome—as to jury verdicts, damages awards, or criminal sentences—in the proceedings that we review on appeal.

¶ 140 A threshold question for me is whether to afford *stare decisis* deference to the standard set forth in *Herrera*. Such deference is a presumptive starting point. *See Austad v. Austad*, 269 P.2d 284, 290 (Utah 1954). And for good reason. "The doctrine of stare decisis is ingrained in our law and is entitled to serious consideration." *Id*. "The reason underlying [this doctrine] is that people should know what their legal rights are as defined by judicial precedent, and having conducted their affairs in reliance on such rights, ought not to have them swept away by judicial fiat." *Id.*

¶ 141 Yet the presumption of *stare decisis* is rebuttable. And it is rebutted where its reliance-based justification is not implicated, as where the precedent in question adopted a standard that is vague or unworkable. *State v. Menzies*, 889 P.2d 393, 399 (Utah 1994). I would decline to defer to the *Herrera* standard on two principal grounds.

¶ 142 First and most fundamentally, no majority opinion of this court has ever employed a state standard of proportionality that is distinct from the federal standard. *Herrera* articulated a state standard, but it did so in a manner that simply parroted the governing federal standard. Thus, in applying the above-quoted standard of proportionality, the *Herrera* court cited precedent applying the *federal* standard and concluded that the federal standard "appl[ied] with equal force to our consideration of Herrera's claims under the cruel and unusual punishment[s] clause of the Utah Constitution." 1999 UT 64, ¶ 38.

¶ 143 In support of the standard it employed, the *Herrera* court cited *State v. Mace*, 921 P.2d 1372, 1377–78 (Utah 1996). 1999 UT 64, ¶ 38. And the "cruel and unusual punishments" analysis in *Mace* is expressly and exclusively restricted to the Eighth Amendment. *Mace*, 921 P.2d at 1376 ("Mace has not separately briefed his state constitutional claim, and we do not reach it.").[190]

---

[190] In any event, our opinion in *Mace* is at best weak support for a general proportionality standard even as a matter of federal law. There we did expressly acknowledge a "proportionality" standard in the U.S. Supreme Court's opinion in *Solem v. Helm*, 463 U.S. 277 (1983). But we also acknowledged the feeble

(con't.)

That likewise holds for the other majority opinion cited in *Herrera*—*State v. Copeland*, 765 P.2d 1266, 1270 (Utah 1988). *Copeland*'s proportionality analysis was also federal in nature, as was the proportionality analysis in the other majority opinions from which *Copeland*'s standards emanate. *See id.* (citing *State v. Hanson*, 627 P.2d 53, 56 (Utah 1981) (federal Eighth Amendment claim; citing, in turn, *State v. Nance*, 438 P.2d 542, 544 (Utah 1968) (articulating Eighth Amendment proportionality standard under *Weems v. United States*, 217 U.S. 349 (1910))).

¶ 144  There is one other authority cited in *Herrera* for the state standard of proportionality that it adopted. *See Herrera*, 1999 UT 64 ¶ 33 (citing *State v. Gardner*, 947 P.2d 630, 633 (Utah 1997)). But the cited portion of *Gardner* is to an opinion that was *in the minority* on that point—an opinion of Justice Durham, joined only by Justice Stewart. *See Gardner*, 947 P.2d at 653. A majority of the court *declined* to embrace the *Gardner* court's state constitutional analysis. *See id.* (opinion of Zimmerman, A.C.J., expressing the view that the case could be dealt with on federal grounds, while declining to "reach the Utah constitutional issues dealt with by Justice Durham so sweepingly and at such length"); *id.* at 657 (opinion of Russon, J., joined by Howe, J.) (indicating the view that the sentence in question was constitutional, while asserting that the state constitutional question was not properly before the court given that the defendants "presented their oral arguments solely under the Eighth Amendment to the United States Constitution").

---

foundation of the *Solem* standard as a matter of federal constitutional law, noting as follows:

> [T]wo sitting justices of the United States Supreme Court have articulated the view that the Eighth Amendment does not embody a proportionality requirement for sentences in noncapital cases, and . . . three other justices would forbid only sentences that are "grossly disproportionate" to the crime committed. Our use of the term "disproportional" in the text is not meant to express any view on the status of this evolving jurisprudence, nor is the meaning of the term at issue in the present case.

*Mace*, 921 P.2d at 1377 n.4.

¶ 145 Thus, no majority of this court has ever adopted an independent standard of proportionality under article I, section 9 of the Utah Constitution. For the most part we have simply conflated the state and federal standards and treated them as indistinguishable—a determination that gives no independent significance to the state standard, and thus no basis for *stare decisis* reliance. And the sole exception to that rule is *Gardner*, in which a majority of the court refused to embrace any independent state standard. For that reason this is a case where the presumption in favor of *stare decisis* deference is rebutted, as no litigant could properly identify any independent standard under article I, section 9 that goes beyond a restatement of the binding federal standard.

¶ 146 The second reason for rejecting *Herrera* is that the standard it identifies is a hazy and unworkable one. This is another ground rebutting the presumption of *stare decisis*.[191] An unpredictable legal standard is simply not one that litigants can use as a guidepost in organizing their affairs. For that reason courts have long held that unworkable precedents do not qualify for *stare decisis* deference.[192] This court's precedents on proportionality in sentencing are an archetype of unworkability. That fact is reflected in the federal decisions on which our own cases are based[193] and in legal commentary.[194]

---

[191] *See, e.g., Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶¶ 36–42, 275 P.3d 208 (overruling *Ivers v. Utah Dep't of Transp.*, 2007 UT 19, 154 P.3d 802, both because it was "wrongly decided" and because its holding was "unworkable in practice").

[192] *Id.; see also Payne v. Tennessee*, 501 U.S. 808, 842–43 (1991) (Souter, J., concurring) ("In prior cases, when this Court has confronted a wrongly decided, unworkable precedent calling for some further action by the Court, we have chosen not to compound the original error, but to overrule the precedent."); *Swift & Co. v. Wickham*, 382 U.S. 111, 116 (1965) (overruling prior caselaw and noting that it "should not be kept on the books in the name of stare decisis once it is proved to be unworkable in practice").

[193] *See Graham*, 560 U.S. at 102 (Thomas, J. dissenting) ("The categorical proportionality review the Court employs . . . lacks a
(con't.)

¶ 147 This problem is highlighted by the formulation set forth in the dissenting opinion in this case. Quoting the Nevada Supreme Court, the dissent proposes a standard of proportionality that would turn "'largely, if not entirely, upon the humanitarian instincts of the judiciary'" — a standard that openly acknowledges that "'[w]e have nothing to guide us in defining what is cruel and unusual apart from our consciences,'" or in other words, the "'mosaic of our beliefs, our backgrounds and the degree of our faith in the dignity of the human personality.'" *Infra* ¶ 255 (quoting *Naovarath v. State*, 779 P.2d 944, 947 (Nev. 1989)). No part of that formulation could sustain any reasonable reliance interests. No criminal defendant or prosecutor could reliably divine what the "consciences" or "beliefs" of the judges assessing a particular sentencing practice might dictate in any anticipated trial or appeal. The proportionality standard as formulated by the dissent is the very definition of unworkability. It cannot possibly sustain any reasonable reliance interests, and thus has no claim to *stare decisis*.

### B. An Originalist View of Article I, Section 9

¶ 148 For the above reasons, I would not feel bound to follow our prior pronouncements on the meaning of article I, section 9. Instead, I would take a fresh look at the important question of the meaning of the Utah Cruel and Unusual Punishments Clause. In

---

principled foundation."); *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in the judgment) (noting that the court's precedents on proportionality "lack clear objective standards to distinguish between sentences for different terms of years"); *Roper v. Simmons*, 543 U.S. 551, 616 n.8 (2005) (Scalia, J., dissenting) ("The votes in today's case demonstrate that the offending of selected lawyers' moral sentiments is not a predictable basis for law — much less a democratic one.").

[194] *See* Bradford R. Clark, *Constitutional Structure, Judicial Discretion, and the Eighth Amendment*, 81 NOTRE DAME L. REV. 1149, 1159 (2006) (asserting that prevailing proportionality standard is highly discretionary and impossible to predict, given that it "rests on little more than the subjective opinion of five Justices" as to "the moral and penological propriety of the challenged punishment").

so doing, I would employ an originalist method of interpreting the Utah Constitution.

¶ 149 "Our state and federal constitutions are not just supreme; they are organic or constitutive, in that they establish the fundamental ground rules for lawmaking and fixed bulwarks against potential tyrannies of the majority." *State v. Walker*, 2011 UT 53, ¶ 35, 267 P.3d 210 (Lee, J., concurring). The founding purpose of the U.S. Constitution was to "form[ ] the fundamental and paramount law of the nation," by establishing "certain limits not to be transcended" and "designed to be permanent." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176–77, 178 (1803) ("[T]hat those limits may not be mistaken, or forgotten, the constitution is written."). And the Utah Constitution serves a similar function. It establishes the foundations of our state government, and the fundamental rights of our citizens.

¶ 150 This is the premise of originalism in constitutional interpretation. We implement the principles of the constitution as originally adopted because that is the very point of having a written constitution. When judges seize the discretion to amend and adapt the provisions of the constitution, those principles cease to be the "paramount law of the nation." *Id.* at 177. Or at least they can no longer be thought of as "permanent" rules that are "not to be transcended." *Id.* at 176. Thus, "originalism is not just a wise starting point; it is the beginning and end of the judge's function, and an essential limitation on judicial power." *Walker*, 2011 UT 53, ¶ 34 (Lee, J., concurring).

¶ 151 The originalist understands the value—and even the inevitability—of adaptation of the law over time. Thus, the case for originalism is not, as is sometimes assumed, an insistence that the founding generation had a monopoly on wisdom.[195] Instead, the originalist simply recognizes and respects the *means* by which our laws are supposed to adapt under the terms of the

---

[195] *See, e.g.*, Thurgood Marshall, *Reflections on the Bicentennial of the United States Constitution*, 101 HARV. L. REV. 1, 1–2 (1987) ("I do not believe that the meaning of the Constitution was forever 'fixed' at the Philadelphia Convention. Nor do I find the wisdom, foresight, and sense of justice exhibited by the framers particularly profound.").

constitution. Such means are twofold: (a) amendment of the constitution through the super-majoritarian procedures set forth in its provisions[196] and (b) the implementation of policies embraced by the people through their representatives in the political branches of government—by the adoption of statutes, regulations, and other laws within the limitations prescribed in the constitution.

¶ 152 These and other forms of legal adaptation refute a common critique of originalism—that it shackles society to rule by a "dead hand."[197] As these examples illustrate, the originalist does

---

[196] *See* U.S. CONST. art. V ("The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress . . . ."); UTAH CONST. art. XXIII, § 1 ("Any amendment or amendments to this Constitution may be proposed in either house of the Legislature, and if two-thirds of all the members elected to each of the two houses, shall vote in favor thereof, such proposed amendment or amendments shall be entered on their respective journals with the yeas and nays taken thereon; and the Legislature shall cause the same to be published in at least one newspaper in every county of the state, where a newspaper is published, for two months immediately preceding the next general election, at which time the said amendment or amendments shall be submitted to the electors of the state for their approval or rejection, and if a majority of the electors voting thereon shall approve the same, such amendment or amendments shall become part of this Constitution.").

[197] Justice William J. Brennan, Jr., Speech to the Text and Teaching Symposium, Georgetown University, Washington, D.C., Oct. 12, 1985, *in* ORIGINALISM: A QUARTER CENTURY OF DEBATE 55 (Steven G. Calabresi ed., 2005) ("[T]he genius of the Constitution rests not in any static meaning it might have had in a world that is dead and gone, but in the adaptability of its great principles to

(con't.)

not consign our society to a static regime stuck in the founding era. He simply demands that change be effected in the manner and by the means prescribed by the constitution.[198] And he is attuned to the perils of unelected judges overriding the terms of a document whose very purpose was to establish fixed limitations on our government, by means reserved to the people through the process of constitutional amendment.[199]

¶ 153 Thus, the words "cruel and unusual" "must be taken to mean what they meant to the minds of the voters of the state when the provision was adopted." *Tintic Standard Mining Co. v. Utah Cnty.*, 15 P.2d 633, 637 (Utah 1932). This is the approach to

cope with current problems and current needs."); Michael S. Moore, *A Natural Law Theory of Interpretation*, 58 S. CAL. L. REV. 277, 357 (1985) ("The dead hand of the past ought not to govern, for example, our treatment of the liberty of free speech, and any theory of interpretation that demands that it does is a bad theory.").

[198] *Am. Bush v. City of South Salt Lake*, 2006 UT 40, ¶ 66, 140 P.3d 1235 (Parrish, J., majority opinion) (noting that "[s]ocial values and public opinion . . . fluctuate over time," but that the appropriate response is for the people to address such problems "through legislative enactments or even to amend our constitution"); *id.* ¶¶ 79, 82 (Durrant, J., concurring) (noting that it is "enticing to adopt an interpretive technique whereby we, as judges, look to our own attitudes and views to discern the contours of the protective boundary erected by our state constitution," but explaining that this approach "is more akin to dictating than judging").

[199] *See Walker*, 2011 UT 53, ¶ 30 (Lee, J., concurring) (explaining that the "barriers to amendment of our laws are by design," and that "[m]embers of the public are entitled to rely on and organize their affairs around the law as positively enacted—unless and until the law is amended or repealed"); *Am. Bush*, 2006 UT 40, ¶ 66 (Parrish, J., majority opinion) (explaining that "[i]t is not our place" to "substitut[e] our own value judgment for that of the people of Utah when they drafted and ratified the constitution," while noting that this does not amount to "interpreting our constitution").

constitutional interpretation that this court has embraced—with a few notable exceptions[200]—for most of its history.[201]

---

[200] *Compare Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 921 n.6 (Utah 1993) ("We have encouraged parties briefing state constitutional issues to use . . . sister state law . . . and policy arguments in the form of economic and sociological materials to assist us in arriving at a proper interpretation of the provision in question."), *with Am. Bush*, 2006 UT 40, ¶ 12 n.3 ("We have intentionally excluded the consideration of policy arguments suggested by *Soc'y of Separationists v. Whitehead*, 870 P.2d 916, 921 n.6 (Utah 1993). . . . [O]ur duty is not to judge the wisdom of the people of Utah in granting or withholding constitutional protections but, rather, is confined to accurately discerning their intent."). *See also State v. Tiedemann*, 2007 UT 49, ¶¶ 32, 37, 162 P.3d 1106 (citing *Soc'y of Separationists*'s standard regarding "policy arguments in the form of economic and sociological materials" as a proper basis for state constitutional interpretation, while asserting that "[h]istorical arguments . . . do not represent a *sine qua non* in constitutional analysis"); *State v. Hoffmann*, 2013 UT App 290, ¶ 52 & n.8, 318 P.3d 225 (noting tension between *Tiedemann*'s comment about historical analysis and *American Bush*'s holding on the same point).

[201] *See* Jeremy M. Christiansen, *Some Thoughts on* Utah Originalism: *A Response*, 2014 UTAH L. REV. ONLAW 1, 5–6 & nn. 26–36, 9–10 & nn.59–64 (citing and discussing this court's approach to constitutional interpretation over time, and concluding that the prevailing approach has largely been originalist (citing *Richardson v. Treasure Hill Mining Co.*, 65 P. 74, 81 (Utah 1901) (interpreting article XII, section 18 by examining "[the framers'] discussions upon this subject[] [i]n the official report of the proceedings of the constitutional convention"); *Ritchie v. Richards*, 47 P. 670, 679 (Utah 1896) (per Batch, J.) (interpreting the secret ballot provision of article IV, section 8 and choosing the meaning of "secret" that was "in harmony with public thought and expression respecting the ballot systems at the time of and before the holding of the constitutional convention"); *State v. Elliott*, 44 P. 248, 251 (Utah 1896) (discerning the intent "of the framers of our fundamental law" in determining the scope of the "writ of quo warranto" in article VIII, section 4)).

¶ 154 We should reinforce the originalist method of interpretation in this case. We should construe the terms of article I, section 9 as originally understood when that provision was adopted in 1896. And we should expressly repudiate the methodology of the dissent to the extent it rests on a review of "policy arguments in the form of economic and sociological materials," *see* ¶ 219 (citing *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 921 n.6 (Utah 1991)), or an assertion of the heady prerogative of making constitutional law by the imposition of our "humanitarian instincts" "spring[ing] from the mosaic of our beliefs." *Infra* ¶ 255.[202] That is the antithesis of an originalist interpretation of the constitutional text.

¶ 155 A constitution rooted in "evolving standards" arising out of a judge's "humanitarian instincts" is no constitution at all. Or at least it is not a "written" constitution capable of "form[ing] the fundamental and paramount law of the nation," or of establishing "certain limits not to be transcended" and "designed to be permanent." *Marbury*, 5 U.S. (1 Cranch) at 176, 177.

¶ 156 As judges we take an oath to uphold and defend the constitution.[203] That oath must mean something. It should be understood to protect the fundamental rights of our citizens. It means nothing of the sort if its content is dependent on the "humanitarian instincts" or "beliefs" of the judge or panel of judges a litigant happens to draw in a judicial proceeding. No two judges are identical. Each of us possesses a different set of "instincts" and "beliefs." Surely the constitution was not meant to vary from case to case in accordance with the judge or panel assigned to a particular case. To make good on the promise of a written document securing fundamental, permanent rights, the constitution must mean what it originally meant.[204]

---

[202] To its credit, the dissent also considers historical materials in its analysis. *Infra* ¶¶ 214–17, 227–50. But the dissent's originalism falls short, for reasons discussed below.

[203] UTAH CONST. art. IV, § 10 (prescribing an oath, to be taken by all "officers made elective or appointive by this Constitution or by the laws made in pursuance thereof, to "support, obey and defend" the United States and Utah Constitutions).

[204] The "evolving standards" approach has one thing going for
(con't.)

¶ 157 I would accordingly reject the "evolving" anti-originalist approach endorsed by the dissent. Instead, I would adopt an interpretation of article I, section 9 rooted in the understanding of this provision that prevailed in the late nineteenth century. For reasons explored below, I would conclude that that understanding does not deputize the courts to second-guess punishments they deem excessive or lacking in proportionality, but only to proscribe *methods* of punishment historically rejected as barbaric or torturous. I would base that conclusion on the text and structure of article I, section 9; the history and understanding of this provision's federal and state counterparts at the time of its adoption in the late nineteenth century; and the drafting history and post-ratification history of this provision.

### 1. Text and Structure of Article I, Section 9

¶ 158 Article I, section 9 provides that "[e]xcessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted." UTAH CONST. art. I, § 9. The structure and language of this provision cut against an interpretation that would authorize the courts to assess the proportionality of a sentence, and suggest instead an inquiry into the nature or the method of punishment.

¶ 159 The first cue from the terms of this provision is structural. In its first two clauses, article I, section 9 expressly calls for proportionality review—by proscribing "[e]xcessive bail" and "excessive fines." The essence of *excessiveness*, after all, is

---

it; it is transparent. But a standard of constitutionality that expressly depends on the "humanitarian instincts" or "beliefs" of the judge(s) assigned to a particular case is incoherent. The oath that we take to uphold the constitution confirms that it is supposed to mean something concrete and objectively discernible. We thwart that premise—and replace it with an insistence that the constitution will mean different things in different courtrooms—when we repudiate originalism and insist on our right to see that the constitution evolves as a living document over time.

comparison.[205] So the prohibition of excessive bail or fines is an express invocation of a principle of proportionality.[206]

¶ 160 Significantly, however, section 9 limits review of a criminal punishment's *excessiveness* to bail and fines. For punishments, the Utah Constitution (like the Eighth Amendment) says nothing of excessiveness; it prohibits only those punishments that are "cruel and unusual." That is significant. Where three sets of parallel clauses use two distinct formulations, the clear implication is that a difference is intended. The qualifiers "cruel and unusual" would be "an exceedingly vague and oblique way" of communicating what article I, section 9 communicates directly in the two preceding clauses—proportionality. *See Harmelin v. Michigan*, 501 U.S. 957, 977 (1991) (lead opinion of Scalia, J.) (offering a parallel conclusion under the U.S. Constitution).[207]

---

[205] *See infra* ¶ 162.

[206] *See, e.g.*, *Bullock v. Goodall*, 7 Va. (3 Call) 44, 49–50 (1801) (noting that the "excessive fines" clause of the Virginia Constitution works to limit the discretion of courts to impose fines by ensuring that such discretion "is not . . . exercised arbitrarily, but justly; so as to impose a fine commensurate to the offence and injury"); *Earl of Devon's Case*, 11 State Trials 133, 136 (1689) (condemning a "fine of thirty thousand pounds" as "excessive and exorbitant").

[207] The *noscitur* canon of construction, *infra* ¶ 224, yields no support for the dissent's contrary view. This canon resolves ambiguities in a term in a statutory list by importing points of parallelism among other terms in the list. *See Thayer v. Wash. Cnty. Sch. Dist.*, 2012 UT 31, ¶ 15, 285 P.3d 1143; *Beecham v. United States*, 511 U.S. 368, 371 (1994). For that reason, however, the canon has no application where there is no ambiguity to resolve, or where the provision on its face is lacking in parallelism. Both problems are present here. The phrase "cruel and unusual" clause is decidedly distinct from—and unparallel with—the "excessive fines" and "excessive bail" clause. Thus, I see no basis for the dissent's approach—deeming this canon to extend to two adjectives (excessive), which are grammatically and structurally limited to the nouns they modify (bail and fines), to modify a

(con't.)

¶ 161 Clearly "cruel and unusual" is not the same as "excessive." The relevant (nineteenth century) sense of "cruel" is "[d]isposed to give pain," "barbarous." WEBSTER'S COMMON SCHOOL DICTIONARY 82 (1892).[208] Tellingly, the dissent does not point out any attested usage of the word "cruel" that reflects the notion of proportionality. The same goes for "unusual." In the relevant time period, that term was understood simply as "not usual; uncommon; rare." *Id.* at 393. Thus, a punishment is "cruel and unusual" if it is rare or uncommon in its barbarousness or tendency to cause pain. That has nothing to do with its proportionality in relation to the underlying offense.

¶ 162 "Excessive[ness]," on the other hand, is an unmistakable reference to the principle of proportionality. Historically, this term was understood to mean "[b]eyond any given degree, measure or limit, or beyond the common measure or *proportion*" and "[b]eyond the laws of morality and religion, or beyond the bounds of justice, fitness, propriety, expedience or utility." WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 314 (3d ed. 1830) (emphasis added); *see also* WEBSTER'S COMMON SCHOOL DICTIONARY 118 (defining "excess" as "intemperance; the amount by which one thing exceeds another"). This underscores the structural point highlighted above. Where article I, section 9 employs a term encompassing *proportionality* review in two of its clauses but not in the third, the message seems clear: Excessiveness or proportionality review is limited to judicial consideration of bail and fines, and does not extend more broadly to punishments.

¶ 163 The dissent deems this distinction "unnatural," "incongruous," and "'anomalous.'" *Infra* ¶ 224 (quoting *Solem*, 463 U.S. at 289). And, citing cases interpreting the Eighth Amendment of the U.S. Constitution, the dissent asserts that "[t]he Supreme

---

third noun (punishments) *already modified by its own adjectives* (cruel and unusual).

[208] *See also* WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 210 (3d ed. 1830) (defining "cruel" as "[d]isposed to give pain to others, in body or mind; willing or pleased to torment, vex, or afflict; inhuman; destitute of pity, compassion or kindness; fierce; ferocious; savage; barbarous; hard-hearted").

Court has long held . . . that . . . the Eighth Amendment prohibits disproportionate punishments." *Infra* ¶ 217 (citing *Weems v. United States*, 217 U.S. 349, 366 (1910); *Solem*, 463 U.S. at 290; *O'Neil v. Vermont*, 144 U.S. 323, 331–32, 339–40 (1892) (Field, J., dissenting)). I disagree on both points. As to precedent, the cases endorsed by the dissent have been called into question more recently. *See supra* ¶ 134 n.5 (describing the impact of the opinions in *Harmelin* on the analysis in *Solem*). The lead opinion in the court's more recent pronouncements under the Eighth Amendment, moreover, persuasively refutes the supposed "anomal[y]" of limiting the excessiveness inquiry to the terms with which it is connected (bail and fines):

> The logic of the matter is quite the opposite. If "cruel and unusual punishments" included disproportionate punishments, the separate prohibition of disproportionate fines (which are certainly punishments) would have been entirely superfluous. When two parts of a provision (the Eighth Amendment) use different language to address the same or similar subject matter, a difference in meaning is assumed.
>
> . . . .
>
> But, it might be argued, why would any rational person be careful to forbid the disproportionality of fines but provide no protection against the disproportionality of more severe punishments? Does not the one suggest the existence of the other? Not at all. There is good reason to be concerned that fines, uniquely of all punishments, will be imposed in a measure out of accord with the penal goals of retribution and deterrence. Imprisonment, corporal punishment, and even capital punishment cost a State money; fines are a source of revenue. As we have recognized in the context of other constitutional provisions, it makes sense to scrutinize governmental action more closely when the State stands to benefit.

*Harmelin*, 501 U.S. at 978 n.9 (lead opinion of Scalia, J.).

¶ 164 This is entirely in line with our Utah caselaw, which has long embraced the canon of independent meaning (or, in other

words, a presumption against superfluous language). *See, e.g., Hi-Country Prop. Rights Grp. v. Emmer*, 2013 UT 33, ¶ 24, 304 P.3d 851; *Vota v. Ohio Copper Co.*, 129 P. 349, 353 (Utah 1912). Under this canon, the Cruel and Unusual Punishments Clause should not be presumed to be superfluous. It should be assumed to have independent meaning. And in order to give it such meaning, we must presume that it does more than restate the bar on "excessive fines" in more general terms.

¶ 165 For these reasons, the language and structure of the Utah Constitution are incompatible with the proportionality standard embraced by the dissent. Instead, the terms of this provision appear to be directed at a standard focused on the question whether a punishment is one that is both "barbarous" or "disposed to give pain" and "uncommon" or "rare."

### B. Original Public Meaning of "Cruel and Unusual Punishments"

¶ 166 This view is confirmed by evidence of the original public meaning of the Utah Cruel and Unusual Punishments Clause and of its federal and English antecedents. Article I, section 9 traces its roots to a parallel provision in the U.S. Constitution's Eighth Amendment.[209] And the federal provision, in turn, was based on a parallel clause in the English Bill of Rights.

¶ 167 This background highlights three additional historical sources that inform my understanding of the meaning of article I, section 9: (1) the English origins of the principle of cruel and unusual punishments, (2) the original understanding of the federal Cruel and Unusual Punishments Clause, and (3) the understanding prevailing at the time of the adoption of the Utah Constitution. All three sources are incompatible with the principle of proportionality endorsed by the dissent, and point instead

---

[209] The two clauses are nearly identical. *Compare* U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."), *with* UTAH CONST. art. I, § 9 ("Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor.").

toward a prohibition of modes of punishment that are unprecedented in their barbarous nature.

### a. The English origins of protection against "cruel and unusual punishments"

¶ 168 I do not doubt that the "maxim that the punishment must fit the crime" is a matter "foundational" to any "reasoned system of criminal justice." *Infra* ¶ 214. But the question presented does not concern the wisdom or general applicability of this "venerable principle," *infra* ¶ 214, as a matter of aspirational public policy. Instead, the question is whether and to what extent this principle is incorporated in the terms of the Cruel and Unusual Punishments Clause. And that question must be answered by reference to the original meaning of the operative terms of the constitution.

¶ 169 The quest for original meaning is not simply a search for deeply embedded historical values. Again, the premise of originalism is not that a dusty tome is more worthy of respect than a modern one, but that a written constitution is aimed at cementing established principles in place unless and until they are repealed or amended. *See supra* ¶¶ 148–152. So the venerable historical sources cited in the dissent—*see infra* ¶¶ 214–15 (quoting the Code of Hammurabi, Leviticus, Plato, and Cicero)—are ultimately beside the point. The fact that sages of centuries past embraced proportionality in sentencing tells us little about the doctrine embedded in the U.S. Constitution in 1789, or the Utah Constitution in 1896. (And, in any event, the quoted provisions speak only to general aspirational policy of proportionality in criminal punishment; we undoubtedly have long embraced that general policy in the United States, but that doesn't mean that our constitutional law requires our judges to enforce such a principle as against legislatively endorsed punishments.)

¶ 170 To derive an original understanding of the constitution, we must consider its text and legal underpinnings. The Cruel and Unusual Punishments Clause borrows terms and concepts from the English Bill of Rights. *Compare* An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., 2d sess., ch. 2 (Dec. 16, 1689) ("That excessive bail ought not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."), *with* U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines

imposed, nor cruel and unusual punishments inflicted."). So the starting point for any historical study of the Eighth Amendment is an inquiry into the understanding of that provision that prevailed historically.

¶ 171 In its initial invocations of the principle of proportionality, the United States Supreme Court proceeded in open disdain for the original meaning of the Eighth Amendment. In *Weems v. United States*, for example, the Court openly acknowledged that it was embracing a "progressive" legal standard that was "not fastened to the obsolete." 217 U.S. at 378. Thus, far from attempting to connect up its view with original meaning, the *Weems* Court endorsed a principle that could "acquire meaning as public opinion becomes enlightened by a humane justice." *Id*. *Trop v. Dulles*, 356 U.S. 86 (1958), is to the same effect. There the Court formulated the principle endorsed by the dissent in this case—a proportionality inquiry rooted in "evolving standards of decency that mark the progress of a maturing society." *Infra* ¶ 213 (quoting *Trop*, 356 U.S. at 101).

¶ 172 More recent decisions give at least a nod to history. In *Solem v. Helm*, a majority of the Supreme Court purported to base its standard of proportionality on an original understanding of the Eighth Amendment. 463 U.S. at 284; *see infra* ¶ 218 (citing *Solem* for the proposition that "the Eighth Amendment's explicit prohibitions of '[e]xcessive bail' and 'excessive fines' must extend to bar excessive terms of imprisonment"). But the *Solem* court's textual and historical analysis was sparse. While invoking the English Bill of Rights, the *Solem* court gave no consideration to that provision's differential treatment of "bail" and "fines," on one hand, and "punishments inflicted," on the other. Nor did it examine historical practice in England under this provision in pursuit of any serious assessment of the question whether the standard of excessiveness (as applied to bail and fines) had been extended more broadly to "punishments." Instead, the *Solem* court simply cited historical precedent of the English courts in condemning "a '*fine* of thirty thousand pounds'" as "'excessive and exorbitant.'" 463 U.S. at 285 (emphasis added) (quoting *Earl of Devon's Case*, 11 State Trials 133, 136 (1689)). And, from there, the *Solem* court blithely asserted that the Eighth Amendment must have "adopted the English principle of proportionality," which it presumed would extend to punishments in the form of prison sentences. *Id*. at 285–86.

¶ 173 The *Solem* majority, like the dissent in this case, *infra* ¶ 215, also cited Blackstone in support of its conclusion that the Eighth Amendment incorporated a principle of proportionality. *Id*. at 285. Yet although it is true that Blackstone favored a principle under which the designated "'punishment ought always to be proportioned to the particular purpose it is meant to serve,'" *infra* ¶ 215 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *12 (facsimile ed. 1979) (1765–69)), the quoted provisions simply articulated *aspirational legislative policy*. *See* 4 BLACKSTONE, *supra* at *11 (indicating Blackstone's intent simply "to suggest a few hints for the consideration of such as are, or may hereafter become, legislators"). They do not purport to limit the discretion of the legislature or to indicate that the legislature might lack the power to impose a sentence that a court might later deem to be excessive or disproportionate. To the contrary, Blackstone went out of his way to emphasize the "right of the legislature in any country to [e]nforce it[]s own laws by the death of the transgressor." *Id*. And he even highlighted a key element of the case *against* judicial enforcement of a constitutional principle of proportionality—asserting that "the quantity of punishment can never be absolutely determined by any standing invariable rule; but it must be left to the arbitration of the legislature to inflict such penalties as are warranted by the laws of nature and society, and such as appear to be the best calculated to answer the end of precaution against future offences." *Id*. at *12.

¶ 174 These and other shortcomings of the originalist case for an Eighth Amendment principle of proportionality were highlighted in the lead opinion in *Harmelin v. Michigan*. In *Harmelin*, the lead opinion chides the *Solem* majority for "assum[ing], with no analysis" that the English Declaration of Rights' prohibition on "excessive" bail and fines extended also to "punishments." 501 U.S. at 967. And, citing the "historical context and contemporaneous understanding of the English guarantee," the *Harmelin* opinion concludes that the excessiveness limitation was historically understood to be limited to bail and fines, and that the restriction on "punishments" was defined by what was "cruel and unusual" in the sense of a form of punishment aimed at inflicting pain ("cruel") and also contrary to precedent ("unusual").

¶ 175 The *Harmelin* opinion's basis for this conclusion was the 1685 case of Titus Oates, which was decided the year after the

adoption of the English Bill of Rights. Oates was a "Protestant cleric whose false accusations had caused the execution of 15 prominent Catholics for allegedly organizing a 'Popish Plot' to overthrow King Charles II in 1679." *Id.* at 969. Oates was "tried and convicted before the King's Bench for perjury." *Id.* His crime, of "bearing false witness against another, with an express premeditated design to take away his life, so as the innocent person be condemned and executed,' had, at one time, been treated as a species of murder, and punished with death." *Id.* at 969–70. Yet

> [a]t sentencing, [Lord Chief Justice] Jeffreys complained that death was no longer available as a penalty and lamented that "a proportionable punishment of that crime can scarce by our law, as it now stands, be inflicted upon him." Second Trial of Titus Oates, 10 How. St. Tr. 1227, 1314 (K.B. 1685). The law would not stand in the way, however. The judges met, and, according to Jeffreys, were in unanimous agreement that "crimes of this nature are left to be punished according to the discretion of this court, so far as that the judgment extend not to life or member." *Ibid.* Another justice taunted Oates that "we have taken special care of you," *id.*, at 1316. The court then decreed that he should pay a fine of "1000 marks upon each Indictment," that he should be "stript of [his] Canonical Habits," that he should stand in the pillory annually at certain specified times and places, that on May 20 he should be whipped by "the common hangman" "from Aldgate to Newgate," that he should be similarly whipped on May 22 "from Newgate to Tyburn," and that he should be imprisoned for life. *Ibid.*

*Harmelin*, 501 U.S. at 970 (third alteration in original).

¶ 176 Oates challenged his sentence in the House of Lords, and the Lords' opinions form the basis of the *Harmelin* opinion's sense of the content of the English Bill of Rights' protection against "cruell and unusuall Punishments." *Id.* "'Not a single peer ventured to affirm that the judgment was legal: but much was said about the odious character of the appellant,' and the Lords affirmed the judgment." *Id.* "A minority of the Lords dissented, however, and their statement sheds light on the meaning of the

'cruell and unusual Punishments' clause." *Id*. Specifically, as the lead opinion in *Harmelin* indicated, the dissenting Lords asserted that the King's Bench, "'being a Temporal Court,'" had no authority to divest Oates "'of his canonical and priestly Habit'"; that there was "'no Precedent to warrant the Punishments of whipping and committing to Prison for Life, for the Crime of Perjury'"; and that "'said Judgments were contrary to Law and ancient Practice,'" and thus "contrary to the Declaration . . . that excessive Bail ought not to be required, nor excessive Fines imposed, nor cruel nor unusual Punishments afflicted.'" *Id*. at 971.

¶ 177 In further support of this understanding of the English Bill of Rights proscription on cruel and unusual punishments, the *Harmelin* opinion also quoted from the discussion in connection with a bill passed by the House of Commons, which would have annulled Oates's sentence. *Id*. That discussion again "confirm[ed] that the 'cruell and unusuall Punishments' clause was directed at the Oates case (among others) in particular, and at illegality, rather than disproportionality, of punishment in general." *Id*. "In all these contemporaneous discussions," the *Harmelin* opinion noted that "a punishment [was] not considered objectionable because it [was] disproportionate, but because it [was] 'out of the [Judges'] Power,' contrary to Law and ancient practice,' without 'Precedents' or 'express Law to warrant,' 'unusual,' 'illegal,' or imposed by 'Pretence to a discretionary Power.'" *Id*. "Moreover," the opinion noted that "the phrase 'cruell and unusuall' [was] treated as interchangeable with 'cruel and illegal,'" such that "the 'illegal and cruell Punishments' of the Declaration's prologue . . . are the same thing as the 'cruell and unusual Punishments' of its body." *Id*. at 973 (fourth alteration in original).

¶ 178 The dissent takes issue with this description of the history of Oates's trial, highlighting statements in the House of Lords that all thought "such an extravagant Judgment ought not to have been given, or a Punishment so exorbitant inflicted on an English Subject," or in the House of Commons that members described the sentence as "excessive" and "extravagant." *Infra* ¶ 234. It also cites the work of one legal scholar who has concluded, in part based upon his reading of the Oates materials, that the "English Cruell and Unusuall Punishments Clause was originally understood to prohibit new punishments that were excessive in light of prior practice." *Infra* ¶ 233 (quoting John F. Stinneford, *Rethinking Proportionality Under the Cruel and Unusual*

*Punishments Clause*, 97 VA. L. REV. 899, 937 (2011)). There are several problems with the dissent's take on the Oates case.

¶ 179 First, it is not true that Oates's punishment was "unprecedented in its severity," as the dissent puts it. *Infra* ¶ 234. It is simply not the case that parts of Oates's sentence (like the flogging that would probably have resulted in death) would have been seen as disproportionate to his crime—perjury with the intent (and the result) of having fifteen innocent people executed. *See Harmelin*, 501 U.S. at 973 n.4 (Scalia, J.); *see also* Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 CALIF. L. REV. 839, 859 n.97 (1969) (citing 4 THE DIARY OF JOHN EVELYN 445 (E. DeBeer ed. 1955) (noting contemporary opinion that Oates's "punishment was but what he well deserved")); 3 THOMAS BABINGTON MACAULAY, THE HISTORY OF ENGLAND FROM THE ACCESSION OF JAMES II 304 (1898) (noting that Oates's "sufferings, great as they might seem, had been trifling when compared with his crimes"). Indeed, the reason Lord Chief Justice Jeffreys complained that "a proportionable punishment of that crime can scarce by our law, as it now stands, be inflicted upon [Oates]," *Second Trial of Titus Oates*, 10 How. St. Tr. 1227, 1314 (K.B. 1685), is that the crime of which Oates was convicted *used to be punishable by death. See* 4 BLACKSTONE, *supra* at *196 (noting that under "the antient [sic] common law" it was "a species of killing held to be murder" to "bear[] false witness against another, with an express premeditated design to take away his life, so as the innocent person be condemned and executed"). But such punishment was discontinued and had no statutory authorization. Thus, the problem with Oates's sentence, in the view of the dissenting Lords and the House of Commons, was its unusualness or illegality.

¶ 180 Second, the Lords' and Commons' references to "excessive[ness]" may well have referred to the 2,000 marks Oates was fined, an amount that "may have been excessive" for the time period, Granucci, *supra* at 859, and which was undoubtedly subject to the Excessive Fines Clause of the English Bill of Rights. *See Earl of Devon's Case*, 11 State Trials 133, 136 (1689) (condemning a "fine of thirty thousand pounds" as "excessive and exorbitant.").

¶ 181 Finally, scholars and courts have overwhelmingly acknowledged that historical "English practice" was generally incompatible with a principle of proportionality.[210] After all, "in 1791, England punished over 200 crimes with death," and even in 1830 the "class of offenses punishable by death" encompassed "murder; attempts to murder by poisoning, stubbing, shooting

---

[210] *Harmelin*, 501 U.S. at 974 (citing Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 CALIF. L. REV. 839, 847 (1969)); *Weems*, 217 U.S. at 391–93 (White, J., dissenting, joined by Holmes, J.) ("That in England it was nowhere deemed that any theory of proportional punishment was suggested by the Bill of Rights, or that a protest was thereby intended against the severity of punishments, speaking generally, is demonstrated by the practice which prevailed in England as to punishing crime from the time of the Bill of Rights to the time of the American Revolution."); *In re Bayard*, 63 How. Pr. 73, 77 (N.Y. Gen. Term. 1881) (recognizing that the English Bill of Rights "clearly did not then refer to the degree of punishment, for the criminal law of England was at that time disgraced by the infliction of the very gravest punishment for the slight offenses, even petit larceny being then punishable with death").

A principal source for the dissent's view of originalism is the research of Professor Stinneford. *See infra* ¶ 233 (citing John F. Stinneford, *Rethinking Proportionality Under the Cruel and Unusual Punishments Clause*, 97 VA. L. REV. 899 (2011)). I find Stinneford's historical analysis helpful on some points, but deem his thesis unsupported by the history that he cites. In any event, it should be noted that Stinneford does not endorse the freewheeling approach to proportionality endorsed by the dissent. *See* Stinneford, *supra* at 917 (criticizing the U.S. Supreme Court's "proportionality jurisprudence" as arbitrary and noting "the lack of a workable method for measuring the excessiveness of punishment"); *id.* at 968 ("The evolving standards of decency test has proven itself an unreliable and ineffective measure of cruelty. [And] [s]ole reliance on the Court's 'independent judgment,' on the other hand, would be standardless and potentially antidemocratic." (footnote omitted)); *id.* at 969 (arguing for proportionality as determined by "the bounds" of the common law and prior practice).

etc.; administering poison to procure abortion; sodomy; rape; statutory rape, and certain classes of forgery."[211]

¶ 182   Thus, the more careful analysis of the English origins of the Eighth Amendment indicates an understanding in line with the terms and structure of article I, section 9—that it did not impose a principle of proportionality, but only a limitation on "cruel" forms of punishment that were "unusual" in the sense of being unauthorized by past precedent.

### b. Original understanding of the Eighth Amendment

¶ 183 This conclusion is also confirmed by the practice and debate that prevailed in the United States at or around the time of the federal framing. In state conventions leading to the ratification of the United States Constitution, for example, an objection was raised that the Constitution (then without a Bill of Rights) "nowhere restrained" Congress "from inventing the most cruel and unheard-of punishments, and annexing them to crimes." 2 JONATHAN ELLIOT, DEBATES OF THE FEDERAL CONSTITUTION 111 (2d ed. 1854). And, in context, the reference to such "cruel and unheard-of punishments" was not about proportionality, but about form—a concern that without such a "constitutional check," Congress might be inclined to turn to cruel punishments such as "racks and gibbets," which "may be amongst the most mild instruments" imaginable. *Id.*[212]

---

[211] *Harmelin*, 501 U.S. at 975 (citing 1 JAMES FITZJAMES STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 490 (1883), and noting that "during his discussion of English capital punishment reform, Stephen does not once mention the Cruell and Unusuall Punishments Clause, though he was certainly aware of it," and also that "in his discussion of the suitability of punishments, Blackstone [likewise] does not mention the Declaration").

[212] *See also* 3 ELLIOT, *supra* at 447 (Patrick Henry, in the Virginia Convention, speaking of the concern that without a prohibition against "cruel and unusual punishments," like that set forth in the Virginia Bill of Rights, Congress could "loose the restriction of not . . . inflicting cruel and unusual punishments," by allowing "tortures, or cruel and barbarous punishment"); *Harmelin*, 501 U.S. at 979–80 (citing and discussing these sources).

¶ 184 "The actions of the First Congress, which are of course persuasive evidence of what the Constitution means, belie any doctrine of proportionality." *Harmelin*, 501 U.S. at 980 (opinion of Scalia, J.) (citation omitted). After all, "[s]hortly after proposing the Bill of Rights, the First Congress" extended the punishment of "death by hanging" on a range of crimes, including "forgery of United States securities, 'run[ning] away with [a] ship or vessel, or any goods or merchandise to the value of fifty dollars,' treason, and murder on the high seas." *Id.* at 980–81 (second and third alterations in original) (quoting 1 Stat. 114). Significantly, "[t]he law books of the time are devoid of indication that anyone considered these newly enacted penalties unconstitutional by virtue of their disproportionality." *Id.* at 981.

¶ 185 Early American legal commentary is along the same lines. One commentator spoke of "[t]he prohibition of cruel and unusual punishments" as "mark[ing] the improved spirit of the age, which would not tolerate the use of the rack or stake, or any of those horrid modes of torture, devised by human ingenuity for the gratification of fiendish passion." JAMES BAYARD, A BRIEF EXPOSITION OF THE CONSTITUTION OF THE UNITED STATES 154 (2d ed. 1840). Another spoke of the Eighth Amendment's Cruel and Unusual Punishments Clause as prohibiting "[t]he various barbarous and cruel punishments inflicted under the laws of some other countries," such as "[b]reaking on the wheel, flaying alive, rendering asunder with horses, [and] various species of horrible tortures inflicted in the inquisition," such as "maiming, mutilating and scourging to death." BENJAMIN L. OLIVER, THE RIGHTS OF AN AMERICAN CITIZEN 186 (1832).[213]

---

[213] *See also* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1896 (1833) (asserting that the Eighth Amendment was "adopted as an admonition to all departments of the national government, to warn them against such *violent proceedings*, as had taken place in England in the arbitrary reigns of some of the Stuarts" (emphasis added)); *Harmelin*, 501 U.S. at 981–82 (discussing these and other commentaries, and concluding that they "contain[] no reference to disproportionate or excessive sentences" and indicate that the Cruel and Unusual Punishments Clause was understood as "designed to outlaw particular *modes* of punishment").

¶ 186 This commentary confirms what is indicated by the other historical sources cited above: The federal Cruel and Unusual Punishments Clause was widely understood not to prescribe an assessment of proportionality, but simply to prohibit modes of punishment that were "cruel" in the sense of being barbaric and "unusual" in the sense of being unprecedented.

c. The public understanding at the time of the Utah framing

¶ 187 This same understanding of "cruel and unusual punishments" prevailed at the time of the framing of the Utah Constitution. Thus, even if there were doubt about the original meaning of the federal Cruel and Unusual Punishments Clause, the question presented here would yield a straightforward answer: Article I, section 9, as originally adopted in 1896, is not a license for judicial assessment of the proportionality of criminal punishment; it is merely a prohibition of modes of punishment that are unprecedented in their barbarousness or tendency to inflict pain.

¶ 188 State and federal courts consistently conceived of the constitutional prohibition of cruel and unusual punishments in this way,[214] often expressly rejecting the type of proportionality

---

[214] *State v. Williams*, 77 Mo. 310, 312–13 (1883) (holding that cruel and unusual does not refer to prison sentences as a mode of punishment but only to "such punishments as amount to torture" such as "drawing and quartering" or "burning him at the stake"); *People ex rel. Kemmler v. Durston*, 7 N.Y.S. 813, 815 (Sup. Ct. Gen. Term 1889) (holding that the provision bans modes of punishment that "involve torture and a lingering death"); *In re Kemmler*, 7 N.Y.S. 145, 149–50 (Co. Ct. 1889) ("[I]t is clearly not against [death as a mode of punishment] that the constitution is directed" rather it extends to punishments such as "crucifixion, boiling in water, oil, or lead, blowing from cannon's mouth, burning, breaking on the wheel, dismemberment, [and] burying alive."); *James v. Commonwealth*, 12 Serg. & Rawle 220, 235 (Pa. 1825) (holding that "the ducking-stool" was an illegal punishment under "the humane provisions of the constitutions of the United Sates and of [Pennsylvania], as to cruel and unusual punishments"); *Ligan v. State*, 50 Tenn. 159, 164 (1871) (upholding KKK member's conviction and sentence "for feloniously prowling
(con't.)

analysis advocated by the dissent.[215] Throughout the nineteenth century, the courts generally understood the prohibition of "cruel

---

and travelling in disguise" and holding that "imprisonment in the penitentiary for a longer period, ten to twenty year . . . is neither cruel nor unusual, in the sense of the Constitution" (internal quotation marks omitted)).

[215] *See, e.g., Whitten v. State*, 47 Ga. 297, 300–01 (1872) (rejecting defendant's argument that sentence was "entirely disproportionate to the nature and character of the offense" and holding that "[s]o long as [legislators] do not provide cruel and unusual punishments, such as disgraced the civilization of former ages, and make one shudder with horror to read of them, as drawing, quartering, burning, etc., the Constitution does not put any limit upon legislative discretion"); *State v. White*, 25 P. 33, 35 (Kan. 1890) (concluding that despite the extreme severity of a statutory rape punishment, the court could not "say that the statute is void *for that reason*" and that "[i]mprisonment in the penitentiary at hard labor *is not of itself a cruel or unusual punishment*," but that the Kansas Cruel and Unusual Punishments Clause "*relates to the kind of punishment to be inflicted, and not to its duration*" (emphases added)); *Foote v. State*, 59 Md. 264, 266–68 (1883) (upholding defendant's sentence jail and lashing because "the people who made [the Maryland] Constitution, and who must be presumed to understand the meaning of the terms they use, have, from the time these words were first incorporated, in 1776 down to 1882," never considered "the punishment of whipping" to be "a 'cruel or unusual punishment'" and that the court was "not dealing with the expediency, justice, or efficacy of this punishment, but only with the true interpretation of the terms of the Constitution"); *Cummins v. People*, 3 N.W. 305, 305 (Mich. 1879) (rejecting the argument that a sentence was "unusually severe, and that, in the light of all the facts, it was in violation of [the Cruel and Unusual Punishments Clause,]" and holding "[t]he sentence was not in excess of that permitted by statute, and *when within the statute this court has no supervising control over the punishment that shall be inflicted.*" (emphasis added)); *State v. Borgstrom*, 72 N.W. 799, 803–04 (Minn. 1897) (rejecting claim that a prison sentence "was altogether disproportionate to the offense charged" and therefore "cruel [and] unusual" under the state

(con't.)

and unusual punishments" as a limitation on barbaric *methods* of punishment, while emphasizing that the length of a prison term was a matter for legislative discretion.[216] In the words of the

---

constitution and holding that the punishments "prohibited by our constitution" are the "cruel" and "inhuman" punishments such as "loading him with weights," "drown[ing], disembowel[ment]," or being "sewed up in a leather sack with a live dog, a cock, a viper, and an ape, and cast into the sea"); *Territory v. Ketchum*, 10 N.M. 718, 718 (1901) (expressing "great doubt," based on the then-state of constitutional law that "the courts, in any case, have the power to review legislative discretion in determining the severity of punishment for crime, so long as all forms of torture have been avoided"); *Garcia v. Territory*, 1 N.M. 415, 417–19 (1869) (upholding sentence of lashing for stealing a mule on the grounds that cruel and unusual punishment has reference only to "the process of torture" and that it was otherwise "never designed to abridge or limit the selection by the law-making power of such kind of punishment as was deemed most effective in the punishment and suppression of crime"); *People ex rel. Kemmler v. Durston*, 24 N.E. 6, 8 (N.Y. 1890) ("We entertain no doubt in regard to the power of the legislature to change the manner of inflicting the penalty of death. The general power of the legislature over crimes, and its power to define and punish the crime of murder, is not and cannot be disputed."); *State v. Hogan*, 63 Ohio St. 202, 218 (1900) ("Imprisonment at hard labor is neither cruel nor unusual. It may be severe, in the given instance, but that is a question for the lawmaking power."); *State v. Woodward*, 69 S.E. 385, 388–89 (W. Va. 1910) (holding that "cruel and unusual punishment" does "not affect legislation providing imprisonment for life or years" and that it only applies to "inhuman, barbarous inflictions" but nonetheless engaging in proportionality review under the state's Proportional Punishments Clause).

[216] *See Commonwealth v. Hitchings*, 71 Mass. 482, 486 (1855) (affirming sentence involving a fine and imprisonment for unlawful sale of intoxicating liquor and explaining that the length of imprisonment is a matter "for the legislature to determine"); *Barker v. People*, 20 Johns. 457, 459 (N.Y. 1823) (affirming punishment of disenfranchisement on conviction of dueling, rejecting challenge on cruel and unusual punishments grounds

(con't.)

Supreme Judicial Court of Massachusetts, "[t]he question whether the punishment is too severe, and disproportionate to the offense, is for the legislature to determine."[217]

¶ 189 This view prevailed throughout the nineteenth century, including in the decade in which our Utah Constitution was adopted. An exemplary decision was *Hobbs v. State*, 32 N.E. 1019 (Ind. 1893). In that case, the Indiana Supreme Court explained that "[t]he word 'cruel,' when considered in relation to the time when it found place in the bill of rights, meant, not a fine or imprisonment, or both, but such as that inflicted at the whipping post, in the pillory, burning at the stake, breaking on the wheel, etc." *Id.* at 1021. And, importantly, the *Hobbs* court went on to conclude that the prohibition of "cruel and unusual punishments" "does not affect legislation providing imprisonment for life or for years." *Id.*[218]

---

while explaining that "[t]he disfranchisement of a citizen is not an unusual punishment; it was the consequence of treason, and of infamous crimes, and it was altogether discretionary in the legislature to extend that punishment to other offences"); *Aldridge v. Commonwealth*, 4 Va. (2 Va. Cas.) 447, 449–50 (Va. Gen. Ct. 1824) (upholding sentence on conviction of larceny; rejecting challenge under the Cruel and Unusual Punishments Clause of Virginia Declaration of Rights, and explaining that the clause "was never designed to control the Legislative right to determine *ad libitum* upon the *adequacy* of punishment, but is merely applicable to the modes of punishment"); *see also Pervear v. Massachusetts*, 72 U.S. 475, 480 (1866) (upholding sentence involving fine of $50 and imprisonment at hard labor for three months on charge of maintaining a "tenement for the illegal sale and illegal keeping of intoxicating liquors"; holding that Eighth Amendment did not "apply to State but to National legislation," while also opining, in dicta, that there was "nothing excessive, or cruel, or unusual" in this punishment given that the matter was "wholly within the discretion of State legislatures").

[217] *Hitchings*, 71 Mass. at 486.

[218] *See also People v. Smith*, 54 N.W. 487, 487, 488 (Mich. 1893) (affirming sentence of five-year term of imprisonment for crime of receiving stolen property "of the value of one dollar"; rejecting

(con't.)

¶ 190 This same approach was reflected in legal commentary in the era. "Punishments" were understood as "cruel when they involve[d] torture or a lingering death." 3 BOUVIER'S LAW DICTIONARY 2771 (8th ed. 1914). On the question of "[w]hat punishment is suited to a specified offence," moreover, the prevailing view was that that matter "must in general be determined by the legislature." *Id*. Thus, a "[s]entence for a term not exceeding that prescribed by statute" was not "regarded as a cruel or unusual punishment." *Id*.

¶ 191 It may be a bit of an overstatement to say that the nineteenth-century view of the courts on this point was "universal." *See Harmelin*, 501 U.S. at 984 (opinion of Scalia, J.) (articulating this view); *Weems*, 217 U.S. at 402 (White, J., dissenting) (same). At or around the time the Utah Constitution was adopted, some courts had endorsed the view that the constitutional prohibition of cruel and unusual punishments encompassed a standard of review for proportionality of prison terms.[219] And at least a couple of legal treatises had begun to

---

challenge to sentence on the ground that it was "cruel and unusual" punishment, particularly in light of the fact that the thief himself could only have been sentenced to imprisonment for one year; explaining that "[u]pon the legislature alone is conferred the power to fix the minimum and maximum of the punishment for all crimes," and that a "law which provides a greater maximum penalty for receiving stolen property than for the larceny of it cannot be held to authorize cruel and unusual punishment"); *Jackson v. United States*, 102 F. 473, 487 (9th Cir. 1900) ("The general rule is well settled that the sentence and punishment imposed upon a defendant for any violation of the provisions of the statute, which is within the punishment provided for by the statute, cannot be regarded as excessive, cruel, or unusual.").

[219] *See O'Neil v. Vermont*, 144 U.S. 323, 339–40 (1892) (Field, J., dissenting) (asserting that the Eighth Amendment is "directed, not only against punishments" of a barbarous or unduly painful nature, but also "against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged"); *McDonald v. Commonwealth*, 53 N.E. 874, 875 (Mass. 1899) ("[I]t is possible that imprisonment in the state prison for a long term of years might be so disproportionate to the offense as

(con't.)

embrace this view.[220] But in light of the extensive authority cited above, this approach would surely have been seen by our Utah framers as aberrational.

¶ 192 The dissent disagrees, asserting that "the preponderance" of courts in the nineteenth century adopted the approach it takes today. *Infra* ¶ 244. But in so concluding, the dissent ignores—or at least fails to refute or distinguish—a significant segment of the body of cases cited above. *See supra* ¶¶ 188–89 & nn.31–35. And in any event the authority it cites does not support this conclusion. Before the dissenting opinion in *O'Neil* (1892) and then the majority in *Weems* (1910), the United States Supreme Court had never endorsed proportionality review under the Eighth Amendment. *Weems* and subsequent Supreme Court caselaw recognize as much. *Weems*, 217 U.S. at 378 (basing its holding on a "progressive" legal standard "not fastened to the obsolete" but "acquir[ing] meaning as public opinion becomes enlightened by a humane justice"); *Furman v. Georgia*, 408 U.S. 238, at 265–66 (1972) (Brennan, J., concurring) ("Had this historical interpretation of the Cruel and Unusual Punishments Clause prevailed, the Clause would have been effectively read out of the Bill of Rights. . . . But this Court in *Weems* decisively repudiated the historical interpretation of the Clause" (internal quotation marks omitted)); *id.* at 322–25 (Marshall, J., concurring) (concluding that "the history of the clause *clearly establishes* that it was intended to prohibit cruel punishments," and then noting the

---

to constitute a cruel and unusual punishment."); *State v. Becker*, 51 N.W. 1018, 1022 (S.D. 1892) ("[I]t is certain that it devolves upon the legislature to fix the punishment for crime, and that in the exercise of their judgment great latitude must be allowed; and the courts can reasonably interfere only when the punishment is so excessive or so cruel as to meet the disapproval and condemnation of the conscience and reason of men generally.").

[220] *See* 3 BOUVIER'S LAW DICTIONARY 2771 (8th ed. 1914) ("[T]he case must be very extraordinary in which [the legislature's] judgment could be brought in question."); OLIVER, *supra* ¶ 185, at 186 (asserting that "imprisonment for an unreasonable length of time[] is . . . contrary to the spirit of the constitution . . . [and] must be contrary to the intention of the framers of the constitution").

tide-change in Eighth Amendment law instigated by the *O'Neil* dissent and the *Weems* majority (emphasis added)). The dissent's reading of relevant caselaw prior to *Weems* is, in my view, in error.

¶ 193 The dissent derides my reading of *Pervear* as "unduly strained" and somehow meant to sustain the proposition that the Supreme Court "was proclaiming the punishments imposed by statute to be immune from constitutional review." *Supra* ¶ 239. First, I am not claiming that a legislative enactment can never be cruel and unusual. And no court ever held any such thing.[221] Instead, my point is simply that the prohibition on "cruel and unusual punishments" goes to the barbarousness or torturousness of the punishment, and not to the length of the term of confinement. Second, my reading of *Pervear* is hardly "strained"; the Court in that case did hold that "[t]he mode adopted" to punish a crime "is wholly within the discretion of State legislatures." *Pervear*, 72 U.S. at 480. Third, it is the dissent that stretches the scope of *Pervear* beyond what it bears by concluding that the Court "implicitly recognized its understanding that excessive punishments may be cruel and unusual punishments." *Infra* ¶ 238. There is little question why the Court indicated that it "perceive[d] nothing excessive, or cruel, or unusual" in Pervear's sentence. *Pervear*, 72 U.S. at 480. Pervear had argued that the "*fines and penalties imposed and inflicted by the State law*" were "*excessive*, cruel, and unusual." *Id.* at 479 (emphasis added). And

---

[221] For this reason, the dissent's critique of cases like *Jackson v. United States*, *infra* ¶ 246 n.2 also misses its mark. Neither my opinion nor any case upon which it relies ever claimed to "support the extreme proposition that a statute could never prescribe a cruel and unusual punishment." *Infra* ¶ 246 n.2. *See, e.g.*, *Whitten*, 47 Ga. at 301 ("So long as [legislators] do not provide cruel and unusual punishments, such as disgraced the civilization of former ages, and make one shudder with horror to read of them, as drawing, quartering, burning, etc., the Constitution does not put any limit upon legislative discretion."); *Ketchum*, 10 N.M. at 718 ("It would, indeed, seem to be a matter of great doubt, in view of the foregoing expressions of opinion on this subject, whether the courts, in any case, have the power to review legislative discretion in determining the severity of punishment for crime, so long as all forms of torture have been avoided.").

because the Eighth Amendment expressly prohibits "excessive fines," the quoted language in *Pervear* is simply a nod to the distinction between bail and fines on the one hand and punishments on the other.[222]

¶ 194 Of the various cases cited by the dissent purportedly establishing the authority of the judiciary to overturn a disproportionate sentence, only two of them actually overturned a prisoner's sentence. *See State ex rel. Garvey v. Whitaker*, 19 So. 457 (La. 1896); *State v. Driver*, 78 N.C. 423 (1878). Of the others, moreover, none are of any material aid to its thesis. At least one of the cited cases appears to be applying proportionality analysis to a *fine*,[223] which is expressly subject to the Excessive Fines Clause. And in other cases, the courts ultimately *upheld* the sentence under review and alluded to proportionality only as a matter of *arguendo* dicta. In *McDonald v. Commonwealth*, for example, the Supreme Judicial Court of Massachusetts merely allowed that "it is *possible* that imprisonment in the state prison for a long term of years *might* be so disproportionate to the offense as to constitute a cruel and unusual punishment," while ultimately upholding the sentence in question. 53 N.E. 874, 875 (Mass. 1899) (emphasis added).[224] The Vermont Supreme Court's approach in *State v. Four*

---

[222] *See State v. Sheppard*, 32 S.E. 146, 148 (S.C. 1899) ("[W]e certainly cannot say that such a fine was 'excessive,' or that the punishment inflicted was either 'cruel or unusual.'"); *Ex parte Keeler*, 23 S.E. 865, 868 (S.C. 1896) ("[T]he fine imposed on the defendant was not excessive, nor the punishment inflicted cruel and unusual.").

[223] *In re MacDonald*, 33 P. 18, 21 (Wyo. 1893) (explaining that the phrase cruel and unusual punishments was aimed "to prevent the imposition of obsolete, painful, and degrading punishments," and then holding that "[w]e do not think that *the fine imposed upon the petitioner by the trial court was excessive*, nor the punishment growing out of the failure to pay, or secured to be paid, that fine, is cruel or unusual" (emphasis added)).

[224] Even this dictum, moreover, represented a clear departure from prior practice. *See Sturtevant v. Commonwealth*, 33 N.E. 648, 649 (Mass. 1893) (holding that the "cruel or unusual" punishments clause applied to "courts, not to the legislature");
(con't.)

*Jugs of Intoxicating Liquor* is along similar lines. 2 A. 586 (Vt. 1886). There the court simply acknowledged that "[i]f the penalty were unreasonably severe for a *single* offense, the constitutional question *might* be urged," again while upholding the sentence in question. *Id.* at 593 (second emphasis added).

¶ 195  And finally, other cases cited by the dissent cut sharply against its position—notwithstanding the dissent's attempts to discredit them. *People v. Smith*, 54 N.W. 487 (Mich. 1893), unequivocally stated that "the legislature alone" had "the power to fix the minimum and maximum of the punishment for all crimes." *Id.* at 488. The dissent views this decision as undermined by a case handed down "just two years later"—*People v. Whitney*, 63 N.W. 765, 766 (Mich. 1895). *Infra* ¶ 246. But the *Whitney* court's reference to "cases" that "might arise when the punishment imposed by an act is so cruel and unusual that the courts would interfere and protect the rights of the party," *id.*, is entirely consistent with the original meaning of the principle of cruel and unusual punishments as I understand it. The referenced "cases," after all, could easily be aimed at encompassing the imposition of barbarous modes of punishment.

¶ 196  *Aldridge v. Commonwealth*, 4 Va. (2 Va. Cas.) 447, 449 (Va. Gen. Ct. 1824), also undermines the dissent's view. And the case cannot properly be dismissed on the "racial animus" grounds charged by the dissent. *Infra* ¶¶ 248–49. Granted, an element of the *Aldridge* court's analysis was based on the notion that the Bill of Rights did not apply to African Americans. *Aldridge*, 4 Va. at 449. But the court also articulated an alternative—and legitimate—ground: It expressly held that the Cruel and Unusual Punishments Clause "[had no] bearing on th[e] case" because the provision did not "control the right to determine . . . the *adequacy* of the punishment, but [wa]s merely applicable to the modes of punishment." *Id.* at 450. And, in the subsequent case of *Commonwealth v. Wyatt*, 27 Va. (6 Rand.) 694 (Gen. Ct. 1828), it is simply not true—as the dissent charges—that the court held that "sentencing judges were constitutionally restrained from

_____

*Hitchings*, 71 Mass. at 486 ("The question whether the punishment is too severe, and disproportionate to the offence, is for the legislature to determine.").

sentencing an individual to an excessive number of stripes." *Infra* ¶ 249. Instead, the court concluded that "[t]he punishment of offences by stripes is certainly odious, but cannot be said to be *unusual*." *Wyatt*, 27 Va. at 701. Thus, as far as the discretion of the lower court went, it was restrained by "the discretion always exercised by Common Law Courts to inflict fine and imprisonment." *Id.* Accordingly, in the same way that Titus Oates's sentence of flogging multiple times (such that he was effectively sentenced to death for a noncapital crime) was illegal (unauthorized by statute or common law), so too would a Virginia judge be constrained in sentencing someone who operated an illegal card game from being lashed so many times that he was effectively sentenced to "death produced by the most *cruel torture*." *Id.* at 700. This analysis is entirely consistent with the approach outlined in this opinion. The court confirmed that the constitutional restraint was on the mode and legality of the punishment and sentence, not a subjective assessment of proportionality.

¶ 197 Further support for this view can be found in the most prominent cruel and unusual punishment case out of Utah in the late nineteenth century, *People v. Wilkinson*, 2 Utah 158 (Utah Terr. 1877), *aff'd sub nom Wilkerson v. Utah*, 99 U.S. 130, 136 (1878). This case arose out of a conviction of first-degree murder and a sentence of death. The issue on appeal concerned the legality of the sentence of death—specifically, the proviso imposed by the trial judge that Wilkinson be executed by being "publicly shot." 2 Utah at 159. In challenging that sentence, Wilkinson asserted that the judge's determination of the "mode" of execution was a violation of Utah territorial statutes, the common law, and the Eighth Amendment of the U.S. Constitution. On that latter point, the Territorial Supreme Court affirmed, in terms in line with the approach set forth above:

> The question . . . presents itself: "Is the manner designated in the case before us, that of death by shooting, a cruel and unusual punishment?" We do not think the appellant so considers it, nor do we think he could. It is the mode adopted for the army in enforcing discipline; it is a mode recognized and practised in other civilized countries to enforce criminal laws; and, as we have seen, it was approved by express statute of this Territory for nearly a

> quarter of a century, and as history tells us, it is the manner of death of which criminals in this Territory made choice in preference to other modes, such as hanging and beheading. That manner cannot be cruel which criminals prefer, and that cannot be unusual which is often adopted.

*Id*. at 164.

¶ 198   The *Wilkinson* court's approach is entirely in line with the historically accepted view outlined above. Instead of assessing the proportionality or excessiveness of the punishment, the *Wilkinson* court's analysis deems the element of "cruel[ty]" to go to the "manner" of punishment, and that of "unusual[ness]" to be addressed to the extent to which a punishment is "adopted" by law and common practice.

¶ 199   The United States Supreme Court's decision affirming the Territorial Supreme Court is even clearer. Far from assessing proportionality or excessiveness, the Supreme Court directed its consideration of "cruelty" to methods of punishment involving "torture," or in other words "terror, pain, or disgrace." *Wilkerson*, 99 U.S. at 135. Thus, in affirming the sentence of death by firing squad, the Supreme Court made reference to modes of barbarous punishment such as "where the prisoner was drawn or dragged to the place of execution," or "where he was embowelled alive, beheaded, and quartered." *Id*. And in conceptualizing "the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted," the Supreme Court held "that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that emendment [sic] to the Constitution." *Id*. at 136. Because "[n]othing of the kind" was involved in this case, the Supreme Court affirmed, rejecting "the theory . . . that the court possessed no authority to prescribe the mode of execution" while holding that "death by shooting" was by no means cruel and unusual punishment. *Id*. at 136–37.

¶ 200   I suppose it's true that the *Wilkerson* decision did not "define with exactness the [full] extent" of the Eighth Amendment, but held only that "punishments of torture . . . are forbidden" by it. *Infra* ¶ 242 (quoting *Wilkerson*, 99 U.S. at 136). But the quoted statements are the sum and substance of the court's analysis of the Eighth Amendment, and they make no reference to proportionality. And in any event, any doubts about

*Wilkerson* were resolved in *In re Kemmler*, 136 U.S. 436 (1890), which unequivocally held that "[p]unishments are cruel *when they involve torture or a lingering death*; but *the punishment of death* is not cruel within the meaning of that word as used in the constitution. It implies something inhuman and barbarous,—something more than the mere extinguishment of life." *Id.* at 447 (emphasis added).

¶ 201  This was the prevailing public understanding of "cruel and unusual punishments" at the time of the framing of the Utah Constitution. As the author of the dissenting opinion today opined previously, "[l]egal scholars and jurists continued to accept this understanding of the phrase ['cruel and unusual'] throughout the nineteenth century despite occasional attempts to expand the cruel and unusual punishments clause to prohibit punishments deemed disproportionate to the crime." *State v. Gardner*, 947 P.2d 630, 636 (Utah 1997) (Durham, J., plurality opinion) (citing Granucci, *supra* at 842). At that time a few isolated judges and commentators had alluded to a theory of constitutional review for proportionality, but the overwhelming majority view was to the contrary—foreclosing only those barbarous methods of punishment rejected by law and common practice. And the majority approach had been endorsed by our Territorial Supreme Court in an opinion affirmed by the U.S. Supreme Court.

### 3. History of Article I, Section 9

¶ 202 The history of article I, section 9 supports this same construction. As the dissent indicates, *proposed* constitutions for the State of Deseret (a series of them, from 1849 to 1872) broadly provided that "[a]ll penalties and punishments shall be in proportion to the offence." DESERET CONST. art. VII, § 8; *infra* ¶ 216. But this general proviso never became law. By the time we became a state, the people of Utah had abandoned the broad principle of proportionality in the proposed Deseret constitutions. They adopted instead a provision that limits the excessiveness inquiry to the imposition of bail and fines. *See* UTAH CONST. art. I, § 9.

¶ 203  The dissent interprets this drafting history to preserve a broad principle of proportionality. *See infra* ¶¶ 216–17 & n.1. I see no basis for that conclusion. In light of the plain language of article I, section 9, I see no way to conclude that our constitution embraced a broad principle of proportionality for "all penalties

and punishments." Instead, I would interpret this provision as repudiating the general principle and replacing it with a more limited standard (restricting review for excessiveness to bail and fines).

¶ 204 Other state constitutions—including many in place at the time of the founding of this state—embrace the formulation in the proposed Deseret provision.[225] Many of those provisions expressly require proportionality in punishment *in addition to* prohibiting the "cruel and unusual." And courts interpreted them in accordance with their terms. In *State v. Woodward*, 69 S.E. 385 (W. Va. 1910), for example, the West Virginia Supreme Court concluded that its Cruel and Unusual Punishments Clause did "not affect legislation providing imprisonment for life or years," but applied only to "inhuman, barbarous inflictions." *Id.* at 388–89. Yet the court then went on to examine the propriety of a six month to one year prison sentence for violations of "Sunday" laws, noting the West Virginia Constitution commanded that "[p]enalties shall be proportioned to the character and degree of

---

[225] *See, e.g.*, GA. CONST. art. I, §§ 16, 21 (1868) ("[N]or shall cruel and unusual punishments be inflicted."; "All penalties shall be proportioned to the nature of the offence."); ILL. CONST. art. II, § 11 (1870) ("All penalties shall be proportioned to the nature of the offense. . . ."); IND. CONST. art. I, § 16 (1851) ("Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense."); ME. CONST. art. I, § 9 (1820) ("Sanguinary laws shall not be passed: all penalties and punishments shall be proportioned to the offence: excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted."); NEB. CONST. art. I, § 15 (1875) ("All penalties shall be proportioned to the nature of the offense . . . ."); OHIO CONST. art. VIII, §§ 13, 14 (1803) ("Excessive bail shall not be required; excessive fines shall not be imposed, nor cruel and unusual punishment inflicted. . . . All penalties shall be proportioned to the nature of the offense."); W. VA. CONST. art. III, § 5 (1872) ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. Penalties shall be proportioned to the character and degree of the offence.").

the offense." *Id.* at 389. Significantly, the court emphasized that this provision did not "refer to the mode of punishment, but to the degree, extent, and quality." *Id.*[226] With that background, the terms of article I, section 9 as adopted are telling.

¶ 205 The formulation in other state constitutions—*separately* requiring that "[a]ll penalties . . . be proportioned to the nature of the offense" *and* prohibiting "cruel and unusual punishments"— presupposes that the two provisions have independent meaning. *See, e.g., Hi-Country Prop. Rights Grp. v. Emmer*, 2013 UT 33, ¶ 24, 304 P.3d 851 (interpreting statute "under the presumption of independent meaning (and/or its converse, the presumption against surplusage)"); *Vota v. Ohio Copper Co.*, 129 P. 349, 353 (Utah 1912) ("It is our duty to give effect to every word or phrase contained in [a] statute. . . ."). That alone suggests that the prohibition of "cruel and unusual punishments" is something other than a requirement of proportionality. It also indicates, by implication, that the framers of the Utah Constitution rejected a principle of proportionality when they declined to include the proportionality provision in article I, section 9.

¶ 206 I suppose it is conceivable that the framers of the Utah Constitution were aware of the outlier cases identified above— cases embracing proportionality review as an element of the constitutional prohibition of cruel and unusual punishments. *See supra* ¶ 194 & n.40. But the text our framers adopted strikes me as a highly unlikely mode of embracing this aberrational theory. And if they had intended to buck the prevailing view in other jurisdictions operating under parallel clauses, it seems likely they would have addressed the matter openly in debate—as they did on other such points of dispute.[227] Yet the record of the

---

[226] The court acknowledged that the words "cruel and unusual" had been held to ban imprisonment that was "too long a time," but the only authority the court cited was *Weems*. *State v. Woodward*, 69 S.E. at 389.

[227] *See* 1 OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES OF THE CONVENTION 429–92 (1895) (debates over women's suffrage); *id.* at 326–38 (debates over the phrase "or damaged" into the Takings Clause); *id.* at 294–97 (debates over permitting a jury of less than twelve to have less-than-unanimous verdicts in civil

(con't.)

constitutional convention is silent on article I, section 9. That is significant. It suggests, all other things being equal, that our framers were endorsing the prevailing approach to "cruel and unusual punishments," and were not embracing a burgeoning theory of proportionality.

¶ 207 That conclusion is confirmed by the post-ratification history of this provision in the wake of the U.S. Supreme Court's decision in *Weems*. The *Weems* decision was the U.S. Supreme Court's first articulation of a principle of proportionality under the Eighth Amendment of the U.S. Constitution. 217 U.S. at 380–81. As the popular reaction to *Weems* indicates, however, that decision was hardly viewed as confirming an established view of "cruel and unusual punishments." Instead, *Weems* was seen as working an innovation in constitutional law. And the reaction in Utah and elsewhere thoroughly undermines the view that the concept of "cruel and unusual punishments" was historically understood to encompass a principle of proportionality.

¶ 208 Local newspaper reports of the *Weems* decision in Utah noted "agitat[ion] over the action of the supreme court of the United States in *inaugurating* what is designated as a *new era* in the punishment of criminals—*that of requiring punishment to be proportionate to the offense." New Era in Criminal Penology Commences*, SALT LAKE HERALD, at 1 (May 9, 1910) (emphasis added).[228] That account is impossible to square with the notion of

---

cases). Yet virtually nothing about article I, section 9 was said during the debates over our constitution. *See id.* at 257 (noting the reading of article I, section 9, one objection to the Unnecessary Rigor Clause, some response to that objection, and the striking of that clause).

[228] *See also New Era in Criminal Penology Commences*, SALT LAKE HERALD, at 1 (May 9, 1910) ("The court has determined that the eighth amendment is not applicable to the states, and hence the states will not be compelled to follow *the new principles*." (emphasis added)); *Supreme Court Arouses Lawyers*, OGDEN STANDARD, at 7 (May 9, 1910) ("It was admitted that the constitution makers have used this phrase only to prohibit the resort to inhuman methods for causing bodily torture. It had been used to prevent a return . . . to the English custom of

(con't.)

"cruel and unusual punishments" incorporating a longstanding principle of proportionality. If the generation that witnessed the framing of the Utah Constitution viewed the *Weems* decision as "inaugurating a new era . . . in the punishment of criminals," they certainly would not have viewed article I, section 9 as embracing that principle.[229]

¶ 209  At least one other data point cements this conclusion in the specific context of a claim like Houston's (challenging the imposition of a sentence of life without parole on a juvenile): At the time of the framing of the Utah Constitution and for many

_____

disemboweling traitors and burning alive women who committed treason. The court decided to regard these precedents as milestones in the advance of civilization and not as limitation on the phrase."); *Criminals and Their Punishment*, DESERET EVENING NEWS, at 7 (May 9, 1910) ("Much speculation exists as to the effect of the decision. . . . Most of the states . . . have provisions in their constitutions similar to the eighth amendment and it is believed the decision will have a powerful influence in the *future* interpretation of these." (emphasis added)); *Penalty Must Fit the Crime*, SALT LAKE TRIBUNE, at 1–2 (May 9, 1910); *Holds Punishment Cruel: Supreme Court Orders Release of Convicted Philippine Official*, N.Y. TIMES, at 4 (May 9, 1910) (noting that the Supreme Court had "[f]or the first time in its history" overturned a sentence on cruel and unusual punishment grounds and that "the musty precedents of the past" only used the words "cruel and unusual" to "prohibit a resort to inhuman methods for causing bodily torture").

[229] I have no doubt that the founding generation in Utah would have bristled at the notion of the death sentence "for a minor infraction such as public intoxication." *Infra* ¶ 226. And it would not be surprising to hear that some of them may have thought of such a sentence, colloquially, as "cruel." *Infra* ¶ 226. Presumably that's why they didn't adopt such a disproportionate sentence. But that ultimately tells us nothing about the original understanding of the constitutional construct of "cruel and unusual punishments." That question, instead, requires an examination of the founding generation's understanding of this legal term of art.

years thereafter, a juvenile convicted of murder[230] would have been subject to either the death penalty or to life in prison without the possibility of parole.[231] This well-established, widely applicable sentencing scheme renders Houston's claim of unconstitutionality highly questionable. Because our founding-era justice system clearly and expressly *required* a juvenile convicted of murder to be sentenced to a life-without-parole sentence or worse, I find it difficult to believe that such sentence would have been viewed as "cruel and unusual" at the time of our founding.[232]

---

[230] From the time of the founding of the Utah Constitution until 1907, Utah had no separate system for adjudicating crimes committed by minors. *See* 1907 Laws of Utah 207–14 (establishing the juvenile court system). And even after 1907, a minor who committed a felony was tried in the district courts, not the juvenile system. *See, e.g.*, 1907 Laws of Utah 208, § 2 ("[Juvenile] Court[s] shall have no jurisdiction in cases involving the commission of a felony."). Thus, a minor like Houston would have been "liable to be punished under the laws of this state." UTAH COMP. LAWS 1907, § 4072.

[231] *See* UTAH COMP. LAWS 1907, § 4071 ("All persons are capable of committing crimes except . . . . [c]hildren under the age of seven years; [c]hildren between the ages of seven years and fourteen years, in the absence of clear proof that at the time of committing the act charged against them they knew its wrongfulness."); *id.* § 4162 ("Every person guilty of murder in the first degree shall suffer death, or, upon the recommendation of the jury, may be imprisoned at hard labor in the state prison for life, in the discretion of the court."); *see also State v. Thorne*, 117 P. 58, 62 (Utah 1911) (same); *In re De Camp*, 49 P. 823, 823 (Utah 1897) (same); UTAH COMP. LAWS 1907, § 1686x13 ("The board of pardons is hereby authorized to extend to each convict *sentenced for any period less than life* . . . a reduction of the period of sentence, as hereinafter provided" (emphasis added)); *Connors v. Pratt*, 112 P. 399, 400 (Utah 1910) (noting that board of pardons was without power to reduce a life sentence).

[232] *Cf. Harmelin*, 501 U.S. at 980 (opinion of Scalia, J.) ("[T]he actions of the First Congress . . . are persuasive evidence of what

(con't.)

c. Houston's Article I, Section 9 Claim

¶ 210 For all of the above reasons, the Cruel and Unusual Punishments Clause of the Utah Constitution bars only those methods of punishment that are "cruel" in the sense of being barbaric or torturous and "unusual" in the sense of being contrary to law and longstanding practice. Houston's state constitutional claim fails under this standard.

¶ 211 Houston does not—and cannot—complain about any torturous or barbarous form of punishment. His claim, instead, goes to the alleged excessiveness of his prison term. He alleges, specifically, that his "immaturity, vulnerability, impetuosity, and underdeveloped character render him less culpable than an adult with fully developed brain and value systems," and as a result his sentence constitutes "disproportionate punishment."

¶ 212 This is not a cognizable constitutional claim under article I, section 9. Because Houston challenges only the excessiveness of his prison term, he has not asserted a claim under the Utah Constitution as originally understood. I would reject that claim on that basis.

––––––––––––

the Constitution means. . . ."); *M'Culloch v. Maryland*, 17 U.S. (4 Wheat) 316, 401–02 (1819) (relying on the fact that the power to establish a national bank "was exercised by the first congress" and that "[a]n exposition of the constitution, deliberately established by legislative acts . . . ought not to be lightly disregarded").

JUSTICE DURHAM, dissenting:

¶ 213 I disagree with the majority's conclusion that sentencing juveniles to life without the possibility of parole (LWOP) is not cruel and unusual under article I, section 9 of the Utah Constitution. In my view, the diminished culpability of juveniles, combined with the exceeding harshness and irreversible nature of LWOP, makes this sentence unconstitutionally disproportionate and inconsistent with the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

## I. UTAH'S CRUEL AND UNUSUAL PUNISHMENTS CLAUSE AND PROPORTIONAL SENTENCING

### *A. The Principle of Proportionality*

¶ 214 Perhaps no theory of punishment is more foundational to a reasoned system of criminal justice than the maxim that the punishment must fit the crime. This venerable principle can be traced back to the Code of Hammurabi and the Mosaic codes found in the Old Testament. CODE OF HAMMURABI § 196 (c. 1770 B.C.E.) ("If a man destroy the eye of another man, one shall destroy his eye."); *Leviticus* 24:20 ("Breach for breach, eye for eye, tooth for tooth: as he hath caused a blemish in a man, so shall it be done to him again."); *see* MORRIS RAPHAEL COHEN, REASON AND LAW 53 (1950) ("But if . . . an eye for an eye or a tooth for a tooth[] sounds too barbaric today, may we not . . . put it thus: Everyone is to be punished alike in proportion to the gravity of his offense . . . ?"). The ancient Greeks and Romans also acknowledged punishments in a just society must be proportional to the crime. PLATO, LAWS bk. XI, at 934, *in* 5 THE DIALOGUES OF PLATO 323 (B. Jowett trans., New York, MacMillan & Co. 3d ed. 1892) (c. 350 B.C.E.) ("[T]he law, like a good archer, should aim at the right measure of punishment, and in all cases at the deserved punishment."); CICERO, DE OFFICIIS bk. I, ch. XXV, at 91 (Walter Miller trans., Harvard Univ. Press 1997) (44 B.C.E.) ("We should take care also that the punishment shall not be out of proportion to the offense . . . .").

¶ 215 Consequently, "[t]he principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law jurisprudence." *Solem v. Helm*, 463 U.S. 277, 284 (1983). Indeed, the Magna Carta of 1215 guaranteed rights to proportional punishment: "A free man shall

not be [fined] for a trivial offence, except in accordance with the degree of the offence; and for a serious offence he shall be [fined] according to its gravity . . . ." J.C. HOLT, MAGNA CARTA 457 (2d ed. 1992). Blackstone later elaborated that "[t]he method . . . of inflicting punishment ought always to be proportioned to the particular purpose it is meant to serve, and by no means to exceed it." 4 WILLIAM BLACKSTONE, COMMENTARIES *12; *see also* Thomas A. Balmer, *Some Thoughts on Proportionality*, 87 OR. L. REV. 783, 787–88 (2008). Thus, Blackstone reasoned that the application of a disproportionately severe punishment is a form of malpractice performed by the state:

> It is a kind of quackery in government, and argues a want of solid skill, to apply the same universal remedy, the *ultimum supplicium* [the death penalty], to every case of difficulty. It is, it must be owned, much *easier* to extirpate than to amend mankind: yet that magistrate must be esteemed both a weak and a cruel surgeon, who cuts off every limb, which through ignorance or indolence he will not attempt to cure. It has been therefore ingeniously proposed, that in every state a scale of crimes should be formed, with a corresponding scale of punishments, descending from the greatest to the least . . . .

4 WILLIAM BLACKSTONE, COMMENTARIES *17–*18 (footnote omitted).

¶ 216 The early settlers of the Utah Territory intended that the "deeply rooted" common law principle of proportional punishment be constitutionally protected. In 1849, residents of what would become the Utah Territory prepared a proposed state constitution guaranteeing that "[a]ll penalties and punishments shall be in proportion to the offence." CONSTITUTION OF THE STATE OF DESERET 10 (Kanesville, Orson Hyde 1849). Constitutional conventions held in 1856 and 1862 produced proposed state constitutions containing identical guarantees of proportional punishment. *Constitution of the State of Deseret*, DESERET NEWS, April 2, 1856, at 30; SEN. MISC. DOC. No. 35–240, at 2, 4 (1858); H.R. MISC. DOC. NO. 37–78, at 5 (1862).

¶ 217 The fundamental principle of proportional punishment was carried forward into Utah's cruel and unusual punishments clause. The draft constitutions of 1872 and 1882 and the state

constitution adopted in 1895 replaced the more explicit guarantee of proportional punishment found in prior draft constitutions with language drawn from the Eighth Amendment of the U.S. Constitution:[1] "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted." UTAH CONST. art. I, § 9; *accord* H.R. MISC. DOC. NO. 42–165, at 5 (1872); CONSTITUTION OF THE STATE OF UTAH 20 (Salt Lake City, DESERET NEWS CO. 1882). The Supreme Court has long held that identical language found in the Eighth Amendment prohibits disproportionate punishments. *Solem*, 463 U.S. at 290 ("[A] criminal sentence must be proportionate to the crime for which the defendant has been convicted."); *Weems v. United States*, 217 U.S. 349, 367 (1910) ("[I]t is a precept of justice that punishment for crime should be graduated and proportioned to offense."); *O'Neil v. Vermont*, 144 U.S. 323, 331–32, 339–40 (1892) (Field, J., dissenting) (although the majority declined to address the issue of proportionality under the Eighth Amendment because it was not briefed and because the amendment had not yet been extended to the states, the dissent reasoned that the Eighth Amendment

---

[1] The 1872 draft constitution was modeled after the recently approved Nevada Constitution as part of the Utah Territory's ongoing efforts to obtain statehood despite national opposition to the practice of polygamy. *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 928 n.31 (Utah 1993) ("In 1872 the constitutional convention borrowed the constitution of Nevada as the basis for its proposed constitution." (internal quotation marks omitted)); *see* H.R. MISC. DOC. NO. 42–165, 42d at 4 (1872) ("The constitution of the proposed State, which is presented [to Congress] herewith, looks to the development of those improvements of political science which elsewhere excite public attention; for it will be observed that it provides for minority representation, impartial suffrage, and equal public educational facilities, without distinction of race, color, religion, or citizenship.") The cruel and unusual punishments clause contained in the 1872 draft is identical to the corresponding clause found in the Nevada Constitution. *Compare* H.R. MISC. DOC. NO. 42–165, at 5 (1872), *with* NEV. CONST. art. I, § 6. The language found in the Nevada Constitution was taken from the Eighth Amendment of the U.S. Constitution.

proscribes "all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged").

¶ 218 Courts have cited two principal reasons for interpreting the text of the Eighth Amendment to guarantee proportional punishment. Some courts have held that the Eighth Amendment's explicit prohibitions of "[e]xcessive bail" and "excessive fines" must extend to bar excessive terms of imprisonment as "cruel and unusual." *Solem*, 463 U.S. at 289. Other courts have held that disproportionately harsh sentences are both "cruel" and "unusual" within the meaning of those terms. *Weems*, 217 U.S. at 364, 377 (A sentence of twelve years of "hard and painful labor" for making false entries in an official document was "cruel in its excess of imprisonment and that which accompanies and follows imprisonment. It is unusual in its character. Its punishments come under the condemnation of the Bill of Rights, both on account of their degree and kind.").

¶ 219 Other states that have similar cruel and unusual punishments clauses in their constitutions have interpreted this clause to protect against disproportionate sentences. *See, e.g., McDonald v. Commonwealth*, 53 N.E. 874, 875 (Mass. 1899); *In re Lynch*, 503 P.2d 921, 930 (Cal. 1972). Although the interpretation given to similar or even identical language found in the federal Constitution or the constitutions of our sister states is not binding, we may look to these interpretations when construing Utah's Constitution. *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 921 n.6 (Utah 1993).

¶ 220 This court has also recognized that the cruel and unusual punishments clause of the Utah Constitution provides protections against disproportionate punishments similar to the safeguards provided by the Eighth Amendment. Thus, "[a] criminal punishment is cruel and unusual under article I, section 9 if it is so disproportionate to the offense committed that it shock[s] the moral sense of all reasonable men as to what is right and proper under the circumstances." *State v. Lafferty*, 2001 UT 19, ¶ 73, 20 P.3d 342 (second alteration in original) (internal quotation marks omitted). Given the deference we afford sentencing judges and the right of the legislature to mandate the maximum sentence for a given offense—so long as it does not stray beyond constitutional bounds—this type of individualized proportionality review is justifiably limited.

## B. *Utah's Cruel and Unusual Punishments Clause*
## *Prohibits Disproportionate Punishments*

¶ 221 In his concurring opinion, Justice Lee argues that we should abandon our caselaw affirming that the cruel and unusual punishments clause of the Utah Constitution forbids disproportionate sentences. The concurrence asserts that both the text of this clause and the historical understanding of the language adopted in the Utah Constitution point to a more limited understanding of "cruel and unusual punishments." Under this interpretation, the Utah Constitution bans methods of punishment that are barbaric, but does not prohibit an excessive application of an otherwise permissible mode of punishment.

¶ 222 I, along with a majority of this court, disagree. The text of the cruel and unusual punishments clause demonstrates that disproportionate punishments—not just barbaric methods of punishment—are prohibited. Moreover, the historical understanding of the term "cruel and unusual punishments" at the time Utah adopted its constitution affirms, rather than detracts from, this reading of the text.

1.  Text of Utah's Cruel and Unusual Punishments Clause

¶ 223 Article I, section 9 of the Utah Constitution provides: "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted." This section contains three parallel clauses. The first two clauses prohibit "[e]xcessive bail" and "excessive fines" and expressly incorporate the principle of proportionality. They require the amount of money a defendant may be required to deposit in security to remain free, as well as the amount in fines that a convicted individual may be required to pay, to be commensurate with the crime. The third prohibition against "cruel and unusual punishments" does not contain an explicit reference to proportionality.

¶ 224 Invoking the canon of independent meaning, the concurrence asserts that this structure indicates that the framers of the Utah Constitution intended to protect citizens from disproportionate fines, but not excessive prison sentences or the disproportionate application of the death penalty (both accepted methods of punishment in Utah). *Supra* ¶¶ 158–65. This structural reading of article I, section 9, however, produces an unnatural and incongruous result. A more appropriate canon of construction to

apply to a parallel list of items is that of *noscitur a sociis*, or "it is known from its associates," which "requires that the meaning of doubtful words or phrases be determined in the light of and take their character from associated words or phrases." *Heathman v. Giles*, 374 P.2d 839, 840 (Utah 1962) (internal quotation marks omitted). This concept of drawing meaning from the context of associated terms has been adopted by the United States Supreme Court in interpreting the nearly identical Eighth Amendment:

> We have recognized that the Eighth Amendment imposes "parallel limitations" on bail, fines, and other punishments, and the text is explicit that bail and fines may not be excessive. It would be anomalous indeed if the lesser punishment of a fine and the greater punishment of death were both subject to proportionality analysis, but the intermediate punishment of imprisonment were not.

*Solem*, 463 U.S. at 289 (citation omitted).

¶ 225 The *noscitur a sociis* canon is also more appropriate because of its long-standing application to this constitutional language. It was first used in Justice Field's influential 1892 dissent in *O'Neil v. Vermont*, where he reasoned: "The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted." 144 U.S. at 340 (quoted in *Weems*, 217 U.S. at 371). Because this canon was applied before Utah adopted article I, section 9, it is more appropriate to apply the *noscitur a sociis* canon to this constitutional provision.

¶ 226 The plain meaning of "cruel and unusual punishments" reinforces this structural interpretation. The concurrence looks to several nineteenth century definitions of the word "cruel" and argues that because none of these dictionary definitions do not expressly incorporate the concept of proportionality, Utah citizens would have understood "cruel" to exclude this notion. *Supra* ¶ 161. Under this logic, Utahns in 1895 would not have understood a death sentence imposed for a minor infraction such as public intoxication as a "cruel" punishment because the death penalty was not deemed to be an inherently barbarous penalty. This cannot be the case. The definition of "cruel" is broad enough to include grossly disproportionate punishments. Such punishments can be said to be "inhuman;" "destitute of pity,

compassion or kindness;" or "hard-hearted." WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 210 (3d ed. 1830) (defining "cruel"). As noted by the California Supreme Court:

> A contrary view leads to the astounding result that it is impossible to impose a cruel and unusual punishment so long as none of the old and discarded modes of punishment are used; and that there is no restriction upon the power of the legislative department, for example, to prescribe the death penalty by hanging for a misdemeanor, and that the courts would be compelled to impose the penalty. Yet such a punishment for such a crime would be considered extremely cruel and unusual by all right-mined people.

*Cox v. State*, 181 N.E. 469, 471 (Ind. 1932) (internal quotation marks omitted).

2. Historical Understanding of "Cruel and Unusual Punishments"

¶ 227 The concurrence also argues that the framers of the Utah Constitution would not have understood article I, section 9's prohibition of "cruel and unusual punishments" to forbid disproportionate punishments. *Supra* ¶¶ 166–67. Most of the historical evidence cited by the concurrence, however, merely supports the conclusion that this phrase was traditionally understood to *include* barbaric modes of punishment. This evidence does not advance the theory advocated by the concurrence: that the term "cruel and unusual punishments" traditionally *excluded* cruelly disproportionate applications of otherwise acceptable modes of punishment. A proper historical understanding of "cruel and unusual punishments" includes both the method and the severity of punishment imposed.

a. The English Bill of Rights

¶ 228 As noted by the concurrence, *supra* ¶ 170, the language for Utah's cruel and unusual punishments clause originated in the English Bill of Rights of 1689, which provides "[t]hat excessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusuall Punishments inflicted," An Act Declareing the Rights and Liberties of the Subject and Setleing the Succession of

the Crowne, in 6 STATUTES OF THE REALM 143 (1819). The concurrence also correctly notes that we may glean some understanding of the original meaning of "cruel and unusual punishments" from the Titus Oates case.

¶ 229 When King James II ascended to the throne, he had Oates tried for perjury for falsely accusing prominent English Catholics of organizing a "Popish Plot" to overthrow his brother, King Charles II. *Harmelin v. Michigan*, 501 U.S. 957, 969 (1991) (opinion of Scalia, J.). These accusations resulted in the execution of fifteen individuals. *Id.* Oates was found guilty, and the court sentenced him to life imprisonment and to annually stand in pillory and be whipped through the streets of London. *Id.* at 970. Shortly after James II was deposed in the Glorious Revolution of 1688 and the English Bill of Rights was passed, Oates petitioned the House of Lords to overturn his sentence. *Id.* Even though the Lords considered the judgment of sentence to be "erroneous" and "exorbitant," a majority of the House of Lords declined to overturn the sentence. 10 H.C. Jour. 249 (1689). Instead, the Lords deemed it sufficient to introduce a bill to "prevent . . . like Judgments for the future." *Id*. Members of the House of Commons took up Oates's cause, however, and passed a bill urging the House of Lords to reconsider. *Id*. at 251.

¶ 230 The record of the proceedings before the House of Lords and the House of Commons reveals that the debate over Oates's fate was largely driven by the sectarian politics and prejudices of the time. Members of the House of Commons argued that Oates's conviction should be set aside as corrupt because the trial was called for by the recently deposed "Papist" King James II after "partial, corrupt, and unqualified Persons were returned, and served on Juries." *Id*. at 248. House Members also asserted that the Jesuit novices who gave testimony against Oates could not be trusted to honor their oaths as witnesses because their superiors would have instructed them to lie in order "to discredit the Evidence of the Popish Plot; and disparage those Parliaments who had prosecuted it with so much Vigour." *Id*. The House of Commons further urged the House of Lords to consider whether denying Oates's petition would be "interpreted a great Step towards disavowing the Popish Plot," as it had already been understood by rival powers "beyond Sea," and to contemplate whether this tacit admission would "be so much for the Honour of our Nation, or our Religion." *Id*. at 247. Members of the House

of Lords, on the other hand, seemed to view Oates and his improbable conspiracy theories (including committing perjury "in other Matters" such as accusing the former Queen of conspiring to kill the King, "which nobody could believe of her") as something of an international embarrassment to be swept under the rug. *Id.* at 249. Although the Lords conceded that Oates's sentence was improper, they declined to reverse it, explaining that the Oates case "was a Matter of great Expectation: That the Eyes of all *Europe* were upon it: And that it would be the Occasion of great Censures, if he should be set up for a Witness again, without a full Examination of the whole Affair." *Id.*

¶ 231 As noted by the concurrence, both members of the House of Commons and the dissenting Lords also proffered a legal argument for overturning Oates's sentence based upon the recently passed English Bill of Rights. *Supra* ¶¶ 176–77. Given the extent to which national and religious politics pervaded this debate, however, it is somewhat difficult to discern the degree to which these political concerns colored the legal reasoning found in the record. But the comments preserved in the legislative record undoubtably provide some insight into the original meaning of the prohibition against "cruel and unusual punishments" contained in the English Bill of Rights.

¶ 232 The dissenting Lords argued that the sentence imposed upon Oates should be overturned under the cruel and unusual punishments clause of the English Bill of Rights because there were "no Precedents to warrant the Punishments of whipping and committing to Prison for Life, for the Crime of Perjury." 14 H.L. Jour. 228 (1689). Thus, they asserted that the judgment against Oates was "contrary to Law and ancient Practice, and therefore erroneous, and ought to be reversed." *Id.* Members of the House of Commons likewise decried the unprecedented nature of punishment, calling the sentence "illegal" and "against Law." 10 H.C. Jour. 247 (1689).

¶ 233 The lesson that the concurrence takes from these statements is that certain members of Parliament objected only to the illegal and unprecedented nature of Oates's sentence, and not the disproportionality of the punishment. *Supra* ¶ 177. But this is a false distinction. The punishments prescribed were unsupported by "Precedents" and were "contrary to Law and ancient Practice" because they exceeded the punishments previously meted out for similar crimes. As one legal commentator put it: "*Titus Oates' Case*

demonstrates that the English Cruell and Unusuall Punishments Clause was originally understood to prohibit new punishments that were excessive in light of prior practice." John F. Stinneford, *Rethinking Proportionality Under the Cruel and Unusual Punishments Clause*, 97 Va. L. Rev. 899, 937 (2011).

¶ 234 This concern that Oates's sentence was cruel and unusual because it was unprecedented in its severity is reflected in the Parliamentary record. The dissenting Lords, who argued that Oates's sentence should have been overturned, asserted that the sentence was "barbarous, inhuman, and unchristian" because "there is no Precedents to warrant the Punishments of whipping and committing to Prison for Life, for the Crime of Perjury." 14 H.L. Jour. 228 (1689). Even the Lords in the majority, who affirmed Oates's sentence in order to prevent "so ill a Man" from serving as witness in the future, conceded that "there was not one Lord, but thought the Judgments erroneous, and was fully satisfied, That such an *extravagant* Judgment ought not to have been given, or a Punishment so *exorbitant* inflicted upon an *English* Subject." 10 H.C. Jour. 249 (1689) (first and second emphases added). Members of the House of Commons likewise described the sentence as "cruel and ignominious," "excessive," "severe and extraordinary," and "an extravagant Judgment"—all descriptions of the disproportionate nature of the sentence. *Id.* at 247, 248.

¶ 235 Thus the Parliamentary debates over the sentence of Titus Oates, which were conducted in the context of the recently passed English Bill of Rights, demonstrate an original understanding of "cruel and unusual punishments" that includes the concept of proportionality.

   b. The understanding of the cruel and unusual punishments clause contemporaneous to the adoption of the Utah Constitution

¶ 236 Of course, the meaning assigned to "cruel and unusual punishments" in the English Bill of Rights does not control the question of what this phrase means in the context of the Utah Constitution. The relevant issue is what these words meant when our Constitution was drafted and ratified in 1895. The contemporaneous precedents of (1) the U.S. Supreme Court in examining the Eighth Amendment, which is nearly identical to the relevant language of article I, section 9 and (2) state supreme courts that examined similar constitutional clauses reveal that the

phrase "cruel and unusual punishments" was generally interpreted in line with its plain meaning: that disproportionately harsh punishments were cruel and unusual punishments.

(i)  Contemporaneous U.S. Supreme Court precedent

¶ 237 Although the majority of the U.S. Supreme Court did not squarely address the question of whether the Eighth Amendment prohibited disproportionately harsh punishments prior to the adoption of the Utah Constitution, Supreme Court precedent indicates that the Court had assumed that a disproportionately harsh sentence was a cruel and unusual sentence.

¶ 238 The Court first addressed a proportional punishments argument under the Eighth Amendment in *Pervear v. Massachusetts*, 72 U.S. (5 Wall.) 475 (1866). The defendant in that case argued that his sentence of a fifty dollar fine and three months imprisonment at hard labor for the illegal sale of intoxicating liquors was "excessive, cruel, and unusual" under the Eighth Amendment. *Id.* at 479–80. The Court declined to resolve this claim because it held that the Eighth Amendment did not apply to state legislation. *Id.* The Court went on to opine, however, that even if the defendant could invoke the Eighth Amendment, the defendant's argument would fail on its merits because the sentence was not excessive: "We perceive nothing excessive, or cruel, or unusual in [the defendant's sentence]." *Id.* at 480. Thus, the Court implicitly recognized that excessive punishments may be cruel and unusual punishments.

¶ 239 The concurrence, however, draws a different conclusion from this opinion. The concurrence focuses on the Court's subsequent observation that the objective of liquor licencing laws is "to protect the community against the manifold evils of intemperance" and that "[t]he mode adopted, of prohibiting under penalties the sale and keeping for sale of intoxicating liquors, without license, is the usual mode adopted in many, perhaps, all of the States. It is wholly within the discretion of State legislatures." *Id.* The concurrence interprets this language to mean that the "mode" of enforcing liquor licensing laws is completely within the discretion of the state legislature and could never be deemed cruel and unusual so long as the legislature does not employ inherently cruel methods of punishment. *Supra* ¶ 188 n.33. This reading is unduly strained. There is no indication that when

the Court stated that liquor licensing laws were "wholly within the discretion of State legislatures" that it was proclaiming the punishments imposed by a statute to be immune from constitutional review. Moreover, there is no textual justification for drawing a distinction between inherently cruel methods of punishment and disproportionately cruel sentences such that the former is constitutionally prohibited while the latter is not.

¶ 240 In 1892, just three years before the Utah Constitution was ratified, the Supreme Court again addressed a challenge to the proportionality of a sentence under the Eighth Amendment. The defendant in *O'Neil* challenged a sentence amounting to fifty-four years of imprisonment at hard labor for the unauthorized sale of intoxicating liquor as unconstitutionally excessive. 144 U.S. at 327, 339. Once again, the majority of the court declined to address a claim under the Eighth Amendment because it concluded that this amendment did not apply to punishments applied by the states. *Id.* at 331–32. Justice Field, however, authored a lengthy dissent in which he squarely addressed the issue, stating that the Cruel and Unusual Punishments Clause

> is directed, not only against punishments of the character mentioned [the rack, thumb-screws, iron boots, and stretching of limbs], but against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged. The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted.

*Id.* at 339–40. A separate dissenting opinion authored by Justice Harlan and joined by Justice Brewer expressed a similar view, declaring that a sentence of fifty-four years "inflicts punishment which, in view of the character of the offenses committed, must be deemed cruel and unusual." *Id.* at 371.

¶ 241 For the purpose of the inquiry at issue here—the prevailing understanding of the phrase "cruel and unusual punishments" when the Utah Constitution was drafted and ratified in 1895—it is of little importance that the opinions of Justices Field, Harlan, and Brewer are not binding precedent. The unchallenged opinion of three Supreme Court justices that a disproportionate sentence is also a cruel and unusual sentence just three years before Utah adopted its constitution is convincing

evidence of how contemporaries would have understood this phrase.

¶ 242  The U.S. Supreme Court case that the concurrence relies upon, *Wilkerson v. Utah*, 99 U.S. 130 (1878), does not contradict this understanding of "cruel and unusual punishments." *See supra* ¶¶ 197–99. The defendant in that case challenged the manner in which he was sentenced to be executed for first-degree murder in the Supreme Court of the Territory of Utah, arguing that the statutes in force at the time did not permit him to be executed by firing squad. *People v. Wilkinson*, 2 Utah 158, 160 (Utah Terr. 1877). The territorial supreme court considered sua sponte whether the manner of carrying out the execution, "death by shooting," was cruel and unusual. *Id.* at 164. The court concluded that death by firing squad was not cruel and unusual because it was not an unusual method and it was not any less humane than other accepted forms of execution. *Id.* The U.S. Supreme Court granted certiorari and considered the same constitutional question. *Wilkerson*, 99 U.S. at 130. The Court conceded that "[d]ifficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted." *Id.* at 135–36. It nonetheless concluded that, at minimum, "it is safe to affirm that punishments of torture . . . are forbidden by" the Eighth Amendment. *Id* at 136. The Court, therefore, determined that the method of execution—firing squad—was constitutional because it was not in the vein of barbarous methods of execution sometimes used in the past, such as disembowelment or being burned alive. *Id.* at 135–36.

¶ 243  While *Wilkerson* and the preceding territorial opinion certainly affirm the principle that inherently cruel methods of punishment are proscribed by the Eighth Amendment, these opinions do not provide that this is the outer limit of the protections afforded by this amendment. The Court did not consider whether execution was a disproportionately harsh punishment for first-degree murder for the simple reason that this claim was never raised. Indeed, such an argument certainly would have been deemed frivolous in 1878.

(ii)  Contemporaneous state supreme court precedent

¶ 244  The preponderance of state courts that addressed the proportional punishments question under identical state constitutional provisions agreed with the reading of "cruel and

unusual punishments" expressed by Justices Field, Harlan, and Brewer in *O'Neil v. Vermont*. State courts that rendered opinions on this subject either prior to or soon after the Utah Constitution was drafted and ratified in 1895 indicated that disproportionate punishments may be unconstitutionally cruel and unusual. *McDonald v. Commonwealth*, 53 N.E. 874, 875 (Mass. 1899) ("[I]t is possible that imprisonment in the state prison for a long term of years might be so disproportionate to the offense as to constitute a cruel and unusual punishment [under the Massachusetts Constitution]."); *State ex rel. Garvey v. Whitaker*, 19 So. 457, 457, 459 (La. 1896) (citing Justice Field's dissent in *O'Neil v. Vermont* and overturning a near six-year sentence for trespassing in a public park under Louisiana's cruel and unusual punishments clause because of the severity of the punishment); *People v. Whitney*, 63 N.W. 765, 766 (Mich. 1895) (noting that although "[u]pon the legislature alone is conferred the power to fix the minimum and maximum of the punishment for all crimes," nevertheless "[i]t is true that cases might arise when the punishment imposed by an act is so cruel and unusual that the courts would interfere and protect the rights of the party"); *In re MacDonald*, 33 P. 18, 20–21 (Wyo. 1893) (noting that a punishment is not "cruel or unusual" under the Wyoming constitution unless "the punishment provided by the law is so disproportionate to the offense as to shock the moral sense of the people" (internal quotation marks omitted)); *State v. Becker*, 51 N.W. 1018, 1022 (S.D. 1892) (noting that a punishment may be set aside as unconstitutional "in very extreme cases, where the punishment proposed is so severe and out of proportion to the offense as to shock public sentiment and violate the judgment of reasonable people"); *State v. Four Jugs of Intoxicating Liquor*, 2 A. 586, 593 (Vt. 1886) (rejecting a claim that the aggregate prison sentence for numerous separate offenses constituted a cruel and unusual punishment, but conceding that "[i]f the penalty were unreasonably severe for a *single* offense, the constitutional question might be urged"); *State v. Driver*, 78 N.C. 423, 426, 430 (1878) (overturning a sentence of imprisonment of five years and payment of a $500 security for assault and battery as unconstitutionally "'excessive, cruel and unusual'" because the sentence was "greater than [had] ever been prescribed or known or inflicted" for the same or similar offense).

¶ 245 The state cases cited by the concurrence do not significantly undermine these contemporaneous pronouncements

that a disproportionate sentence may be a cruel and unusual sentence. The concurring opinion cites several older state opinions that state the general proposition that the severity of a sentence is left to the legislature. *See Commonwealth v. Hitchings*, 71 Mass. (5 Gray) 482, 486 (1855) ("The question whether the punishment is too severe, and disproportionate to the offence, is for the legislature to determine."); *Barker v. People*, 20 Johns. 457, 459 (N.Y. Sup. Ct. 1823) ("[I]t was altogether discretionary in the legislature to extend [the punishment of disenfranchisement] to other offences."). These broad pronouncements that the legislature has the discretion to determine the severity of sentences do not directly lead to the conclusion that a sentence authorized by statute could never be unconstitutionally disproportionate. Indeed, courts in both Massachusetts and New York later announced that a disproportionately severe sentence could be set aside as cruel and unusual. *McDonald v. Commonwealth*, 53 N.E. at 875; *In re Bayard*, 63 How. Pr. 73, 77 (N.Y. Gen. Term 1881) (holding that "cruel and unusual punishments" may include "punishments so disproportioned to the offense as to shock the sense of the community").

¶ 246 In a terse opinion, the Michigan Supreme Court also rejected a claim that a sentence was cruel and unusual by stating that "[u]pon the legislature alone is conferred the power to fix the minimum and maximum of the punishment for all crimes." *People v. Smith*, 54 N.W. 487, 488 (Mich. 1893). But just two years later the court clarified that the state legislature's power was not absolute. While acknowledging the legislature's authority to "fix the minimum and maximum of the punishment for all crimes," the court concluded that the legislative prerogative of determining the appropriate amount of punishment for a particular crime was limited by the cruel and unusual punishments clause of the Michigan Constitution: "It is true that cases might arise when the punishment imposed by an act is so cruel and unusual that the courts would interfere and protect the rights of the party . . . ." *Whitney*, 63 N.W. at 766.[2]

---

[2] The concurrence also cites a federal Ninth Circuit case, which states that "[t]he general rule is well settled that the sentence and punishment imposed upon a defendant for any violation of the provisions of the statute, which is within the punishment

(con't.)

¶ 247 The concurrence cites several cases decided before Utah adopted its constitution that directly support the proposition that the phrase "cruel and unusual punishments" refers exclusively to the mode and not the degree of punishment. *Supra* ¶¶ 188–89. But these cases are of limited utility in determining the commonly understood meaning of this constitutional term, and they do not outweigh the Supreme Court and state precedent supporting proportionality review.

¶ 248 In *Aldridge v. Commonwealth*, 4 Va. (2 Va. Cas.) 447, 447–48 (Va. Gen. Ct. 1824), a defendant challenged the constitutionality of a Virginia statute authorizing his punishment as a "'free man of color'" convicted of larceny to be whipped with thirty-nine lashes, sold into slavery, and transported beyond the

---

provided for by the statute, cannot be regarded as excessive, cruel, or unusual." *Jackson v. United States*, 102 F. 473, 487 (9th Cir. 1900). But none of the cases cited by the *Jackson* court support the extreme proposition that a statute could never prescribe a cruel and unusual punishment. In *Ligan v. State*, 50 Tenn. (3 Heisk.) 159, 164 (1871), the court simply determined that the punishment was not cruel and unusual given the "character of acts" committed by the defendant and stated that it would "feel no hesitancy in enforcing sternly the penalties provided by the statute." Likewise, in *Jones v. Territory*, 43 P. 1072, 1074 (Okla. Terr. 1896), the court noted that because there was nothing in the record from which the court could determine the defendant's age, "previous character," or "the circumstances under which the crime was committed," it could not "say, as a matter of law, that a sentence of 50 years in the territorial prison for the crime of manslaughter in the first degree is per se cruel and inhuman." Finally, as noted above, the remaining cases cited by the *Jackson* court—*Pervear*, 72 U.S. (5 Wall.) at 480; *Becker*, 51 N.W. at 1022; and *Whitney*, 63 N.W. at 766—actually support the proposition that courts may reverse a disproportionately cruel and unusual sentence authorized by statute. *Supra* ¶¶ 238, 244. Moreover, the claim made in *Jackson* that a sentence imposed pursuant to a statute can never be cruel or unusual is plainly wrong. Even under the interpretation of the cruel and unusual punishments clause advocated by the concurrence, a statute providing for a barbaric mode of punishment would be unconstitutional.

borders of the United States. The court denied the defendant's constitutional challenge, arguing that the Eighth Amendment was never intended to extend to slaves or "free blacks and mulattoes." *Id.* at 449. The court went on to opine in dicta, however, that the constitutional prohibition against cruel and unusual punishments "was never designed to control the Legislative right to determine *ad libitum* upon the *adequacy* of punishment, but is merely applicable to the modes of punishment." *Id.* at 449–50.

¶ 249 The reasoning of *Aldridge*, however, does not reflect the common understanding of "cruel and unusual punishments" and may best be explained by racial animus. Indeed, just four years later a Virginia court contradicted *Aldridge*. In *Commonwealth v. Wyatt*, 27 Va. (6 Rand.) 694, 698 (Va. Gen. Ct. 1828), the court examined a statute permitting a judge to sentence a person guilty of operating an illegal card game to be whipped any number of times, so long as only thirty-nine stripes were inflicted at a time. Addressing an argument that the statute permitted cruel and unusual punishments, the court concluded that the statute was not unconstitutional on its face, but suggested that sentencing judges were constitutionally restrained from sentencing an individual to an excessive number of stripes. *Id.* at 700–701.

¶ 250 *Hobbs v. State*, 32 N.E. 1019 (Ind. 1893) is likewise of limited usefulness in determining the generally accepted meaning of "cruel and unusual punishments." In addressing a challenge to a prison sentence under the Indiana Constitution, that state's supreme court stated that it had not previously analyzed the cruel and unusual punishments clause in any depth. *Id.* at 1020. The court therefore cited Joseph Story's treatise for the proposition that the Cruel and Unusual Punishments Clause of the U.S. Constitution prohibits the violent methods of punishment that "had taken place in England in the arbitrary reigns of the Stuarts." *Id.* at 1021 (internal quotation marks omitted). The Indiana Supreme Court then took this thesis one step further and independently concluded that "cruel and unusual punishments" should be read to *exclusively* prohibit barbaric methods of punishment and that this language "does not affect legislation providing imprisonment for life or for years." *Id.* This holding, however, does not represent a common understanding of this constitutional language because the court did not cite any caselaw supporting this proposition. The Indiana Supreme Court came to this conclusion on its own. Indeed, the court seemed to be entirely

unaware of the numerous cases holding that a disproportionate prison sentence could be an unconstitutionally cruel sentence. *Supra* ¶ 244.

3. Conclusion

¶ 251 Under its plain meaning, "cruel and unusual punishments" includes disproportionately harsh punishments. And an examination of how this phase was understood in 1895 does not reveal an interpretation that diverges from this plain meaning. At minimum, however, this court should adhere to prior precedents where we have recognized that article I, section 9 of the Utah Constitution prohibits disproportionate sentences. *See Lafferty*, 2001 UT 19, ¶ 75; *State v. Herrera*, 1999 UT 64, ¶ 37, 993 P.2d 854. An identical interpretation has long been applied by federal courts to the Eighth Amendment. *Weems*, 217 U.S. at 377. In light of this long-standing interpretation given to identical language, we should not depart from our prior holdings because it is not "clearly convinc[ing] that the rule was originally erroneous or is no longer sound because of changing conditions." *State v. Menzies*, 889 P.2d 393, 399 (Utah 1994) (internal quotation marks omitted).

## II. PROPORTIONALITY OF JUVENILE LWOP

### *A. Proportionality in Relation to Juveniles as a Defined Class*

¶ 252 Because Utah has recognized that article I, section 9 of the Utah Constitution protects against disproportionately cruel and unusual punishments, I now examine whether sentencing a juvenile to LWOP violates this constitutional protection. As we have previously recognized in *State v. Lafferty* that "[a] criminal punishment is cruel and unusual under article I, section 9 if it is so disproportionate to the offense committed that it shock[s] the moral sense of all reasonable men as to what is right and proper under the circumstances." 2001 UT 19, ¶ 73, 20 P.3d 342 (second alteration in original) (internal quotation marks omitted). But an individualized proportionality review under the *Lafferty* standard is not the only kind of constitutional proportionality analysis. Article I, section 9 also requires courts to consider whether a particular punishment is unconstitutionally disproportionate when applied to a less culpable class of individuals—in this case, juveniles.

¶ 253 The Supreme Court has recognized that the Eighth Amendment embodies two distinct types of proportionality review. First, courts may determine that a sentence is unconstitutionally disproportionate, given all of the particular circumstances of an individual case. *Graham v. Florida,* 560 U.S. 48, 59–60 (2010). This kind of review is similar to Utah's "shocks the conscience" standard. Second, the Court has recognized that certain sentences are categorically disproportionate when applied to a particular class of individuals. *Id.* at 60–61; *see also Roper v. Simmons*, 543 U.S. 551, 575 (2005) (prohibiting the death penalty for juveniles); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (prohibiting the death penalty for persons with mental disabilities). This second type of proportionality review does not evaluate a particular sentencing decision, but assesses whether a specific sentence may be applied to a group of individuals with a defining characteristic that makes members of that group less culpable than the general population. *Graham*, 560 U.S. at 61–62.

¶ 254 A categorical proportionality analysis is likewise warranted under article I, section 9 of the Utah Constitution.[3] At least one other state has engaged in a similar class-based examination under its state constitution. *Workman v. Commonwealth*, 429 S.W.2d 374, 377–78 (Ky. 1968) (holding that an LWOP sentence for rape categorically violated the Kentucky Constitution's ban on "cruel punishment" when applied to juveniles). And, as already noted, because Utah's cruel and unusual punishments clause is rooted in the Eighth Amendment, it is highly persuasive that the federal language has been interpreted to include such a categorical analysis.

¶ 255 In conducting a categorical proportionality analysis, courts have addressed two questions: (1) whether "community consensus" favors or disfavors the application of a given penalty

---

[3] In *State v. Gardner*, a plurality of this court reasoned that Utah's cruel and unusual punishments clause categorically prohibited the death penalty for the crime of aggravated assault while in prison. 947 P.2d 630, 645 (Utah 1997) (plurality opinion). A majority of the court, however, based its holding that the sentence was unconstitutionally disproportionate on the Eighth Amendment. *Id.* at 653 (Zimmerman, A.C.J., concurring).

to a particular group and (2) whether that penalty is disproportionate based on a court's independent assessment. First, courts have asked whether statutory enactments or sentencing practices disfavor a particular punishment, indicating a consensus that the penalty is disproportionate when applied to a particular class. *Graham*, 560 U.S. at 66–67 (finding a consensus against juvenile LWOP for nonhomicide offenses); *Roper*, 543 U.S. at 567 (consensus against the death penalty for juveniles); *Atkins*, 536 U.S. at 316 (consensus against the execution of persons with mental disabilities). Indicia of society's disapproval of a punishment suggest the penalty is disproportionate and "unusual" under the Eighth Amendment. However, "[c]ommunity consensus, while entitled to great weight, is not itself determinative of whether a punishment is cruel and unusual." *Graham*, 560 U.S. at 67 (internal quotation marks omitted). The ultimate responsibility for determining whether a punishment violates constitutional protections remains the province of the courts, which must exercise "independent judgment." *Id*. As the Nevada Supreme Court has noted:

> More than any other provision in the Constitution the prohibition of cruel and unusual punishment depends largely, if not entirely, upon the humanitarian instincts of the judiciary. We have nothing to guide us in defining what is cruel and unusual apart from our consciences. . . . Our decision must necessarily spring from the mosaic of our beliefs, our backgrounds and the degree of our faith in the dignity of the human personality.

*Naovarath v. State*, 779 P.2d 944, 947 (Nev. 1989) (internal quotation marks omitted). "The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Graham*, 560 U.S. at 67.

### B. Independent Assessment of the Proportionality of Juvenile LWOP

¶ 256  "To be constitutionally proportionate, punishment must be tailored to a defendant's personal responsibility and moral guilt." *Harmelin v. Michigan*, 501 U.S. 957, 1023 (1991) (White, J., dissenting); *accord Williams v. New York*, 337 U.S. 241, 247 (1949) ("[T]he punishment should fit the offender and not merely the

crime."); *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985) ("In each case, a criminal sentence must reflect an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime."). The Supreme Court has recognized that certain categories of individuals, such as persons with mental disabilities and juveniles, must be treated differently when evaluating the constitutionality of a sentence because members of these classes are less culpable than other individuals.[4] *Atkins*, 536 U.S. at 311, 317, 321 (prohibiting the death penalty for persons with mental disabilities because of the reduced "relative culpability of mentally retarded offenders"); *Roper*, 543 U.S. at 571, 578 (prohibiting the death penalty for juveniles because of their "diminished culpability"). In the context of offenders under the age of eighteen, "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Miller v. Alabama*, __ U.S. __, 132 S. Ct. 2455, 2466 (2012).

¶ 257 In several recent cases, the Supreme Court has recognized that sentences appropriate for adult offenders may not be applied to juveniles. In *Roper v. Simmons*, the Court held that juveniles may not be subjected to the death penalty because it is "disproportionate punishment for offenders under 18." 543 U.S. at 575. The Court subsequently held in *Graham v. Florida* that a juvenile could not be sentenced to LWOP for a nonhomicide crime. 560 U.S. at 82. Finally, in *Miller v. Alabama,* the Court held that LWOP may not be imposed on a minor under a mandatory sentencing statute. __ U.S. at __, 132 S. Ct. at 2469. The *Miller*

---

[4] The law has also, for example, long recognized serious mental illness as a source of diminished capacity and tailored both concepts of culpability and sentencing accordingly. *See, e.g.*, UTAH CODE § 76-2-305(1)(b) ("Mental illness . . . may be evidence in mitigation of the penalty in a capital felony . . . and may be evidence of special mitigation reducing the level of a criminal homicide or attempted criminal homicide offense . . . ."); *Archuleta v. Galetka*, 2011 UT 73, ¶ 95, 267 P.3d 232 ("[E]vidence of physical and sexual abuse and diminished mental capacities compose the kind of troubled history that may diminish moral culpability." (internal quotation marks omitted)).

Court explicitly declined to consider, however, whether the Eighth Amendment categorically bars an LWOP sentence for juveniles, leaving that question open under the federal constitution. *Id.*

¶ 258 *Roper*, *Graham*, and *Miller* are founded upon the special circumstances of childhood that make juveniles less culpable and constitutionally different from adults. *Miller*, __ U.S. at __, 132 S. Ct. at 2464 ("[C]hildren are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform . . . they are less deserving of the most severe punishments." (internal quotation marks omitted)); *see also Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) (plurality opinion) ("[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult."). These cases rely upon three fundamental characteristics of juveniles that separate them from adults: (1) a lack of maturity, (2) a greater vulnerability to negative influences, and (3) the fact that a juvenile's character is less fixed than an adult. *Miller*, __ U.S. at __, 132 S. Ct. at 2464. The mitigating characteristics of youth must also inform a proportionality analysis under the Utah Constitution.

¶ 259 First, juveniles are less culpable because they exhibit "a lack of maturity and an underdeveloped sense of responsibility." *Id.* (internal quotation marks omitted). The underdeveloped nature of a juvenile's moral compass is not merely a matter of common-sense that "any parent knows"—it is rooted in the science of brain development. *Id.* (internal quotation marks omitted). Due to a lack of maturity, "'adolescents are overrepresented statistically in virtually every category of reckless behavior.'" *Roper*, 543 U.S. at 569 (quoting Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 DEVELOPMENTAL REV. 339, 339 (1992)).[5] An adolescent's propensity for reckless and criminal activity is attributable, at

---

[5] *See also* Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 DEVELOPMENTAL REV. 339, 343 ("Even when factors such as education, occupation, family size, and quality of home life are taken into account, the association of age with criminal behavior is preeminent . . . .").

least in part, to an underdeveloped brain: "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." *Graham*, 560 U.S. at 68. "Scientists have found clear evidence that the brain continues to mature through adolescence and into the early twenties, with large scale structural change taking place during this period in the frontal lobes, most importantly within the prefrontal cortex, . . . . [which] is central to . . . advanced thinking processes that are employed in planning ahead and controlling impulses, and in weighing the costs and benefits of decisions before acting." ELIZABETH S. SCOTT & LAURENCE STEINBERG, RETHINKING JUVENILE JUSTICE 44 (2008); *see also id.* at 45 ("Recent studies show substantial changes during [adolescence and early adulthood] in brain regions and systems associated with impulse control, the calibration of risk and reward, and the regulation of emotions.").

¶ 260 "In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent." *Roper*, 543 U.S. at 569; *accord Thompson*, 487 U.S. at 823 (plurality opinion) ("Examples of this distinction [between juveniles and adults] abound in our law: in contracts, in torts, in criminal law and procedure, in criminal sanctions and rehabilitation, and in the right to vote and to hold office." (internal quotation marks omitted)). The same markers of immaturity underlying the denial of certain rights to juveniles that are enjoyed by adults support the conclusion that juveniles are comparatively less blameworthy for crimes they may commit. *Thompson*, 487 U.S. at 835 (plurality opinion).

¶ 261 Second, juveniles are more vulnerable to negative influences and are generally unable to extricate themselves from crime-ridden environments. *Roper*, 543 U.S. at 569. "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). This susceptibility to negative influences is almost invariably coupled with a juvenile's inability to change his or her environment. Juveniles are dependent upon their parents or guardians for support and are unable to choose the neighborhood in which they live or, to great extent, the peers with whom they

associate. Elizabeth S. Scott & Laurence Steinberg, Rethinking Juvenile Justice 135 (2008). Nor do juveniles choose abusive, neglectful, or chaotic family lives that are all too often associated with criminal behavior in minors. Given their increased susceptibility to influences they cannot control, "juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." *Roper*, 543 U.S. at 570.

¶ 262 Third, a juvenile's character is less fixed than an adult and is less likely to be mired in irretrievable depravity and psychological damage. *Id.* Studies have shown that a majority of juvenile offenders "age out" of criminal behavior as they mature into adulthood. Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1014 (2003) ("For most teens, [antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood . . . ."); Terrie E. Moffitt, *Adolescence-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy*, 100 Psychol. Rev. 674, 675 (1993) ("The majority of criminal offenders are teenagers; by the early 20s, the number of active offenders decreases by over 50%, and by age 28, almost 85% of former delinquents desist from offending . . . ."). Given the often fleeting nature of juvenile criminal tendencies, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573. Because the adult who serves a life sentence will likely not be the same person who committed even a heinous crime while in their youth, juveniles are less deserving of the harsh sentence of LWOP.

¶ 263 The characteristics of youth that make juveniles less culpable than adults undermine the penological justifications for an LWOP sentence. "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." *Graham*, 560 U.S. at 71; *accord Atkins*, 536 U.S. at 318–20 (the death penalty for persons with mental disabilities is excessive because it does not further legitimate penological goals). Thus, a

penalty that does not adequately serve at least one of the legitimate social goals of punishment—rehabilitation, incapacitation, deterrence, and retribution—is nothing more than the "unnecessary and wanton infliction of pain" and violates Utah's cruel and unusual punishments clause. *State v. Gardner*, 947 P.2d 630, 634 (Utah 1997) (plurality opinion) (internal quotation marks omitted). Juvenile LWOP does not adequately further these traditional justifications for punishment.

¶ 264 LWOP serves no rehabilitative purpose, because the defendant will never be allowed to participate in society. *Miller*, __ U.S. at __, 132 S. Ct. at 2465 ("Life without parole forswears altogether the rehabilitative ideal." (internal quotation marks omitted)). Indeed, individuals serving LWOP are often denied access to rehabilitation programs in prison for the simple reason they will never be released. Ashley Nellis, *The Lives of Juvenile Lifers: Findings from a National Survey*, THE SENTENCING PROJECT 23–24 (Mar. 2012), http://sentencingproject.org/doc/publications /jj_The_Lives_of_Juvenile_Lifers.pdf.

¶ 265 On the other hand, an LWOP sentence does serve the penological goal of incapacitating the individual from committing future crimes—at least outside of prison. The incapacitation rationale, however, is only valid if the confined individual would commit additional crimes but for his or her incarceration. "To justify life without parole [under an incapacitation theory] on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible." *Graham*, 560 U.S. at 72. As noted above, however, making a determination that an individual will always be a danger to society based on crimes committed while a juvenile is very difficult given the often transient nature of juvenile criminal tendencies. *Supra* ¶ 262. Absent reliable indicators that a juvenile will forever be dangerous, the goal of incapacitation is severely undermined.

¶ 266 Juvenile LWOP likewise does not adequately serve the penological goal of deterrence. "Because juveniles' lack of maturity and underdeveloped sense of responsibility . . . often result in impetuous and ill-considered actions and decisions, they are less likely to take a possible punishment into consideration when making decisions." *Graham*, 560 U.S. at 72 (alteration in original) (citation omitted) (internal quotation marks omitted); *see also Atkins*, 536 U.S. at 319–20 (the death penalty for persons with

mental disabilities does not further the goal of deterrence because they often have a diminished ability to control their conduct based upon potential legal penalties). Thus, potential juvenile offenders are not likely to be deterred by the possibility of an LWOP sentence.

¶ 267 The goal of retribution also does not justify juvenile LWOP. "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison v. Arizona*, 481 U.S. 137, 149 (1987). Because juveniles are inherently less culpable than adults, "the case for retribution is not as strong with a minor as with an adult." *Miller*, __ U.S. at __, 132 S. Ct. at 2465 (internal quotation marks omitted). Juveniles are less blameworthy because of their immaturity, susceptibility to negative influences they cannot control, and increased capacity to reform. *Supra* ¶¶ 259–62. This greatly weakens society's claim to retribution—especially where the punishment involves permanent incarceration. Thus, retribution is a weak justification for juvenile LWOP. Absent sufficient justification within any of the traditional rationales for punishment, juvenile LWOP constitutes the "unnecessary and wanton infliction of pain." *See Gardner*, 947 P.2d at 634 (Durham, J., plurality) (internal quotation marks omitted).

¶ 268 Finally, when conducting a constitutional proportionality analysis, courts must weigh the culpability of a particular class of individuals against the severity of the penalty. In this case, juveniles are not only less culpable than adults; an LWOP sentence is disproportionate because it is a harsher penalty for juveniles than it is for adults. LWOP sentences "share some characteristics with death sentences that are shared by no other sentence[]" because "[i]mprisoning an offender until he dies alters the remainder of his life by a forfeiture that is irrevocable." *Miller*, __ U.S. at __, 132 S. Ct. at 2466 (internal quotation marks omitted). An LWOP sentence for juveniles "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." *Graham*, 560 U.S. at 70 (alteration in original) (internal quotation marks omitted). "Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." *Id*. An

adult and a juvenile sentenced to LWOP "receive the same punishment in name only." *Id.*

¶ 269 Thus, in weighing the reduced culpability of juveniles against the severity of juvenile LWOP, I conclude such a sentence is unconstitutionally disproportionate under Utah's cruel and unusual punishments clause.

### C. *Community Consensus*

¶ 270 Although community consensus regarding a punishment is not determinative, it is relevant to an analysis of the constitutionality of juvenile LWOP. In gauging community consensus, the Supreme Court has looked to whether "objective indicia of society's standards, as expressed in legislative enactments and state practice, show a national consensus against a sentence for a particular class of offenders." *Miller*, __ U.S. at __, 132 S. Ct. at 2470 (internal quotation marks omitted).

¶ 271 The first indication of society's standards—legislation regarding juvenile LWOP—is inconclusive. In a vast majority of states and in the federal criminal system, sentencing laws permit juvenile LWOP.[6] *Graham*, 560 U.S. at 62 ("Six jurisdictions do not allow life without parole sentences for any juvenile offenders [as of 2010]."); *State-By-State Legal Resource Guide*, UNIV. OF S.F. PROJECT TO END JUVENILE LIFE WITHOUT PAROLE (Nov. 28, 2012),

---

[6] Unlike interpretations of the United States Constitution, which affect laws promulgated by the state legislatures of all fifty states, when we address a Utah constitutional question, only Utah laws are implicated. When analyzing legislative enactments to gauge community consensus regarding a particular punishment, however, it is still appropriate to analyze laws from other states to gauge national consensus. *Gardner*, 947 P.2d at 640 (plurality opinion) (in evaluating the constitutionality of a punishment under a state constitutional provision, courts should compare "the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions*" (internal quotation marks omitted)). Indeed, if we confined our analysis to Utah legislative enactments, this measure of community consensus would be circular and always favor the State because in order for a convict to challenge the constitutionality of a sentence, the Utah Legislature must have first authorized the punishment.

https://www.usfca.edu/law/jlwop/resource_guide/ (juvenile LWOP prohibited in eight states and the District of Columbia as of November 2012). Simply tallying the jurisdictions that permit or prohibit this penalty, however, "present[s] a distorted view." *Miller*, __ U.S. at __, 132 S. Ct. at 2472. Most state legislation permitting juvenile LWOP does so only indirectly. Statutes typically authorize certain juveniles to be tried as adults and receive an adult sentence, but transfer statutes typically do not address whether a particular sentence is appropriate when applied to a juvenile.[7] *Id.* at __, 132 S. Ct. at 2472–73. Statutes that determine the conditions under which a juvenile may be transferred to the adult criminal system tells us that the states considered the juvenile "to be old enough to be tried in criminal court for serious crimes (or too old to be dealt with effectively in juvenile court), *but tells us nothing about the judgment these States have made regarding the appropriate punishment for such youthful offenders." Thompson*, 487 U.S. at 826 n.24 (plurality opinion). Thus, "the statutory eligibility of a juvenile offender for life without parole does not indicate that the penalty has been endorsed through deliberate, express, and full legislative consideration." *Graham*, 560 U.S. at 67.

¶ 272 In this case, the second consideration when measuring community consensus—actual sentencing practices—provides a more definite indication of consensus. "Actual sentencing practices are an important part of [an] inquiry into consensus." *Id.* at 62. Thus, even in jurisdictions where legislative enactments permit a particular penalty, infrequent imposition of the punishment may nonetheless indicate popular disapproval of the punishment. *Id.* (infrequent imposition of juvenile LWOP for nonhomicide crimes in jurisdictions where the penalty "is permitted by statute discloses a consensus against its use"); *Roper*, 543 U.S. at 567 (infrequent imposition of the death penalty on

---

[7] Until recently, Utah was among the states that only permitted juvenile LWOP through its transfer statutes. *See* UTAH CODE §§ 78A-6-602(3), 78A-6-702. In 2013, however, the legislature amended the aggravated murder statute to specify that juvenile defendants are not subject to the death penalty, but may be sentenced to either twenty-five years to life or LWOP. 2013 Utah Laws 317.

juvenile offenders contributed to the Court's conclusion that society disapproved of the practice); *Atkins*, 536 U.S. at 316 (infrequent imposition of the death penalty on persons with mental disabilities indicated community disapproval). A rarely imposed sentence may also indicate the punishment is "unusual" within the meaning of the constitutional ban on cruel and unusual punishments.[8] *Atkins*, 536 U.S. at 316.

¶ 273 Thus, the extreme infrequency of a juvenile LWOP sentence in Utah indicates societal disapproval of the punishment and that the sentence is "unusual" within the meaning of Utah's cruel and unusual punishments clause. Indeed, prior to Mr. Houston receiving an LWOP sentence for a crime he committed while he was a juvenile, the punishment was more hypothetical than real. Mr. Houston is the only person serving a juvenile LWOP sentence in Utah. *Juvenile Life Without Parole (JLWOP)*, NAT'L CONFERENCE OF STATE LEGISLATURES 14 (Feb. 2010), http://www.ncsl.org/documents/cj/jlwopchart.pdf; *State Distribution of Estimated 2,589 Juvenile Offenders Serving Juvenile Life Without Parol*, HUMAN RIGHTS WATCH (2004), http://www.hrw.org/sites/default/files/related_material/upda tedJLWOP10.09.pdf. And there is every indication that despite the fact that juvenile LWOP, as well as the death penalty before the Supreme Court declared it unconstitutional, has long been available through the juvenile transfer statute, Mr. Houston is the only juvenile offender to ever receive such a harsh sentence in Utah. Jesse Fruhwirth, *To Die in Prison*, STANDARD-EXAMINER, May 6, 2007, at 1A. A sentence so rarely imposed despite its availability through legislative enactment demonstrates this punishment has never garnered wide-spread approval in Utah.

¶ 274 Finally, the international consensus against juvenile LWOP confirms my conclusion that this sentence is cruel and

---

[8] The deterrent effect of an infrequently imposed sentence is also greatly reduced, undermining this justification for imposing the penalty in the first instance. *See Furman v. Georgia*, 408 U.S. 238, 311 (1972) (White, J., concurring) ("[T]he death penalty could so seldom be imposed that it would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system.").

unusual. International consensus regarding a particular penalty may be relevant in determining whether the punishment is cruel and unusual. *Roper*, 543 U.S. at 575 ("[A]t least from the time of the Court's decision in *Trop*, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'"); *Thompson*, 487 U.S. at 830 n.31 (plurality opinion) ("We have previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual.").

¶ 275 In the case of juvenile LWOP, the international consensus against the penalty is all but unanimous. The United States is the only country in the world that currently sentences juveniles to a life imprisonment with no chance of release. Connie de la Vega & Michelle Leighton, *Sentencing Our Children to Die in Prison: Global Law and Practice*, 42 U.S.F. L. Rev. 983, 989 (2008). Only ten other counties have laws allowing a juvenile LWOP sentence: Antigua and Barbuda, Argentina, Australia, Belize, Brunei, Cuba, Dominica, Saint Vincent and the Grenadines, the Solomon Islands, and Sri Lanka. *Id.* at 990. But researchers have been unable to identify any juveniles serving an LWOP sentence in these countries, indicating that, in practice, the United States is the only nation to actually impose irreversible life-long imprisonment on minors. *Id.* at 990, 1004–07.

¶ 276 International treaties confirm the international community's condemnation of juvenile LWOP. The U.N. Convention on Rights of the Child (CRC), adopted by almost every nation in the world, provides that "[n]either capital punishment nor life imprisonment without possibility of release shall be imposed for offences committed by persons below eighteen years of age." GA Res. 44/25, Annex, U.N. GAOR, 44th Sess., Supp. No. 49 at 167, U.N. Doc. A/44/49, at art. 37(a) (Nov. 20, 1989). The United States and Somalia are the only countries that have not ratified the CRC. Connie de la Vega & Michelle Leighton, *Sentencing Our Children to Die in Prison: Global Law and Practice*, 42 U.S.F. L. Rev. 983, 1009 (2008); Lisa S. Yun, *The United States Stands Alone: An International Consensus Against Juvenile Life Without Parole Sentences*, 20 S. Cal. Interdisc. L.J. 727, 732 (2011); Jelani Jefferson & John W. Head, *In Whose "Best Interests"? — An International and Comparative Assessment of US Rules on Sentencing of Juveniles*, 1 Hum. Rts. & Globalization L. Rev. 89, 103 (2008).

*D. Conclusion*

¶ 277 I agree with the majority's holding that Utah Rule of Criminal Procedure 22(e) requires this court to review Mr. Houston's unpreserved constitutional challenges to his sentence. I also agree with the majority that the cruel and unusual punishments clause of the Utah Constitution forbids disproportionate punishments—not just methods of punishment that are barbaric. Both this court's prior caselaw and an analysis of the text and history of this clause confirm that a disproportionate sentence may be both cruel and unusual.

¶ 278 I disagree, however, with the majority's conclusion that juvenile LWOP is not unconstitutionally disproportionate. Both the extreme infrequency of a juvenile LWOP sentence in Utah and global rejection of permanent incarceration for crimes committed before adulthood confirm my independent assessment that juvenile LWOP is cruel and unusual under the Utah Constitution. I would remand with instructions to administer the only other sentence available at the time of Mr. Houston's conviction: twenty years to life in prison. *See* UTAH CODE § 76-5-202(2) (2005); *id.* § 76-3-207(5)(a)–(c) (2005). Mr. Houston may well prove to be an irretrievably depraved individual, and a parole board may never deem him fit to rejoin society. Under this scenario, Mr. Houston would justifiably spend the rest of his days behind bars. I find it cruel and unusual, however, to make an irreversible determination that he should die in prison based upon even a heinous crime committed while he was a minor.[9] The special circumstances of youth, which make juveniles less blameworthy and more capable of reform than adults, require the justice system to treat children differently.

---

[9] I note that the record is replete with evidence that Mr. Houston suffers from mental illness and the psychological damage created by a history of abuse and neglect. With the option of eventual release, his access to treatment and services would be enhanced, and perhaps, therefore, his ability and motivation to transform his life.